UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JOSEPH D. DAVIS,

     Plaintiff,

v.                          Case No. _____

SYMETRA LIFE INSURANCE COMPANY,
f/k/a Safeco Life Insurance Company, and
LPL FINANCIAL, LLC,

     Defendants.

_____/

---

## COMPLAINT

---

NOW COMES Plaintiff JOSEPH D. DAVIS, by and through his attorneys Yarnell & Peterson, P.A. and for his complaint against Defendants SYMETRA LIFE INSURANCE COMPANY, f/k/a Safeco Life Insurance Company, an Iowa corporation, and LPL FINANCIAL, LLC, a California limited liability company, states as follows:

### THE PARTIES

1.     Plaintiff JOSEPH D. DAVIS ("Davis") is an adult resident of Collier County, Florida, is over the age of 18 years[1] and is otherwise *sui juris*. Plaintiff Davis is a citizen of the State of Florida.

---

[1] Plaintiff Davis' present age is 83 years.

2.	Defendant SYMETRA LIFE INSURANCE COMPANY f/k/a Safeco Life Insurance Company ("Symetra") is an Iowa corporation with its principal address and headquarters at 777 108th Ave NE, Suite 1200, Bellevue, Washington 98004-5134. Defendant Symetra is a citizen of the States of Iowa and Washington.

3.	Defendant LPL FINANCIAL, LLC ("LPL") is a California limited liability company with its principal address and headquarters at 4707 Executive Drive, San Diego, California 92121.  Defendant LPL is a citizen of the State of California.

## JURISDICTION AND VENUE

4.	This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy as to each defendant exceeds $75,000.00, exclusive of interest, costs and attorney fees.

5.	Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in Collier County and/or the funds due to be delivered to Plaintiff Davis by each Defendant was to be done in Collier County, Florida.

## GENERAL ALLEGATIONS

Symetra Life Insurance Company

6.      On November 7, 1996, Plaintiff Davis obtained an annuity contract from Defendant Symetra[2], contract number AA0751357.  See **Exhibit A**.  Plaintiff Davis is the annuitant/beneficiary under the annuity contract.

7.      Anticipating his retirement, Plaintiff Davis deferred payments owed to him pursuant to the annuity contract until 2012.  Under the contract, Defendant Symetra was obligated to make 120 guaranteed monthly payments in the amount of $17,938.71 commencing on June 25, 2012, and ending on June 25, 2022.  After Symetra completed making the guaranteed 120 monthly payments, Symetra continues to be obligated to make the monthly payments in the amount of $17,938.71 on the 25th day of each month so long as Plaintiff Davis is alive.

8.      Plaintiff Davis became a Florida resident in June 2020.  Once Plaintiff Davis became a Florida resident in June 2020, Defendant Symetra made monthly direct deposits to Plaintiff Davis' Florida bank account through September 2023.

9.      Pursuant to §222.14, Fla. Stat., annuity payments are exempt from attachment, garnishment or legal process in favor of any creditor of the beneficiary of the annuity contract.  *See In re Wilbur*, 206 B.R. 1002, 1009 (Bankr. M.D. Fla. 1997).

<u>LPL Financial, LLC</u>

10.     In late 2020, Plaintiff Davis' financial advisor Financial Design Resources Group of Boca Raton, Florida, which is an LPL Financial affiliate,

---

[2] At the time that the annuity contract was obtained by Plaintiff Davis, Symetra was operating under the name Safeco Life Insurance Company.  Safeco Life Insurance Company changed its name to Symetra Life Insurance Company on September 1, 2004.

recommended that Plaintiff Davis surrender a Northwestern Mutual Life Insurance Policy on his life[3] for its cash value and then transfer the proceeds from the life insurance policy to an individual retirement account (IRA).

11.     In February 2021, Plaintiff Davis followed through with the suggestion and transferred the cash value proceeds of the life insurance policy in the amount of $1,173,611.81 to Defendant LPL, as custodian and trustee, in Fort Mill, South Carolina wherein this sum was credited to Plaintiff Davis' IRA account ending in -3831.  See **Exhibit B**, LPL Financial IRA Account Application & Agreement.

12.     Pursuant to §222.21(2), Fla. Stat., individual retirement accounts are exempt from attachment, garnishment or legal process.

California Judgment & Attempted Levies

13.      On July 23, 2020, a default judgment in the amount of $5,000,000 was entered against Plaintiff Davis in Los Angeles County, California in favor of an individual named Douglas Bagby.  This judgment was domesticated in Florida on March 15, 2023.

14.     On January 5, 2023, Bagby obtained a writ of execution in Los Angeles County Superior Court and served a third-party levy on LPL Financial Holdings, Inc.

---

[3] Pursuant to §222.14, Fla. Stat., the cash surrender value of a life insurance policy issued on the life of a citizen or resident of Florida is exempt from attachment, garnishment or legal process in favor of any creditor of the person whose life is so insured.  Additionally, the Northwestern Mutual Life Insurance policy on the life of Plaintiff Davis was not issued for the benefit of any creditor, including Douglas Bagby.

("LPLFH").[4] On March 16, 2023, LPLFH responded to the third-party levy by stating under oath that no sums were due and payable to Plaintiff Davis at the time of the levy. Bagby did not object to LPLFH's sworn response or otherwise contend that any money was due and payable to Plaintiff Davis on March 16, 2023. The writ of execution expired on July 4, 2023, 180 days after the writ was originally issued on January 5, 2023 pursuant to §699.530(b), California Code of Civil Procedure. On July 17, 2023, the Sheriff's Return showed that nothing was levied from LPLFH.

15. On July 7, 2023 Bagby obtained a Los Angeles County Superior Court writ of execution and on October 10, 2023 served a third-party levy against Defendant Symetra for any then-pending annuity payments due Plaintiff Davis. The writ of execution expired on approximately January 4, 2024 and on February 8, 2024 the Sheriff's Return showed that nothing was levied from Defendant Symetra because nothing was "due and payable" to plaintiff on October 10, 2023. See *Smith v. Crocker Bank* (1957) 152 Cal.App. 2d 832, 834; *Thomas v. Thomas* (1961) 192 Cal.App.2d 771.[5] Bagby did not object to Defendant Symetra's response or otherwise contend that any money was "due and payable" to Plaintiff Davis on October 10, 2023.

16. At no time did Bagby seek to execute on assets within Defendant Symetra's control outside of California nor did he attempt to do the same with Defendant LPL regarding the funds held by it in South Carolina. There exists no order

---

[4] LPLFH is not the same entity as Defendant LPL.

[5] As an aside, no Symetra Life annuity payments were ever in California as Defendant Symetra has no offices, employees, or accounts in that state.

from a California Court, or any other court, that directs either Defendant Symetra or Defendant LPL to pay any of Plaintiff Davis' funds in their respective possession to Bagby nor is there any court order that directs or otherwise allows Defendant Symetra and Defendant LPL to not honor their respective contractual obligations to Plaintiff Davis.

**COUNT I**
**BREACH OF CONTRACT**
*(Against Defendant Symetra)*

17.    Plaintiff Davis repeats and realleges paragraphs 1,2, 4 through 9, 13, 15 and 16 as though fully stated herein and further alleges:

18.    Since October 25, 2023, Plaintiff Davis has made requests upon Defendant Symetra to issue to him his monthly annuity payments.

19.    Despite these requests, Defendant Symetra has refused to issue the monthly annuity payments to Plaintiff Davis and it has further refused to provide any explanation or legal justification for its failure to issue the monthly annuity payments to him.

20.    Defendant Symetra's failure and refusal to issue the monthly annuity payments to Plaintiff Davis is a material breach of the annuity contract attached as Exhibit A to this Complaint and this breach has caused Plaintiff Davis to suffer significant damages.

21.    Defendant Symetra has never contended that Plaintiff Davis breached any obligation he may have under the annuity contract that would justify its failure to issue the monthly annuity payments to him.

6

22.    Defendant Symetra currently owes Plaintiff Davis continuing monthly annuity payments of $17,938.71 from October 25, 2023 to the present date and continuing on the 25th day of every month in the future as long as Plaintiff Davis is alive.  The amount due and owing to Plaintiff Davis from Defendant Symetra will be determined at the time of trial but at the time of filing is no less than $556,100.01 plus interest at the prevailing legal rate.

WHEREFORE Plaintiff JOSEPH D. DAVIS demands judgment against Defendant SYMETRA LIFE INSURANCE COMPANY for his damages, costs and interest as allowed by law, attorney fees as allowed by law and any further relief this Honorable Court deems just and proper.

**COUNT II**
**DECLARATORY JUDGMENT**
*(Against Defendant Symetra)*

23.    Plaintiff Davis repeats and realleges paragraphs 1,2, 4 through 9, 13, 15 and 16 as though fully stated herein and further alleges:

24.    While never taking a formal position, representatives from Defendant Symetra have intimated that it did not make the monthly annuity payments for fear of being required to make payment of the same funds twice because of the levy attempted by Bagby.

25.    Despite being informed that Florida law exempts annuity payments from collection by a creditor, Defendant Symetra has failed and refused to issue the monthly annuity payments to Plaintiff Davis.

26.     There is a bona fide dispute between the parties as to whether the annuity payments due to Plaintiff Davis from Defendant Symetra are exempt from collection by any creditors pursuant to §222.14, Fla. Stat.

27.     Plaintiff Davis has a justiciable question as to the existence of his right to assert that as a Florida resident he is entitled to the protections of §222.14, Fla. Stat. with respect to the annuity payments to which he is entitled to receive from Defendant Symetra.

28.     Plaintiff Davis is in doubt as to his rights to the exemption protections of §222.14, Fla. Stat., as those rights pertain to the annuity payments that he is contractually entitled to receive from Defendant Symetra and there is a bona fide, actual, present need for a declaration from this Honorable Court that (a) Plaintiff Davis is entitled as a Florida resident to claim the exemption protections of §222.14, Fla. Stat., and (b) that the annuity payments from Defendant Symetra to Plaintiff Davis are exempt from collection by creditors pursuant to §222.14, Fla. Stat.

29.     As Defendant Symetra has improperly withheld the annuity payments from Plaintiff Davis, there is a bona fide, actual present need for the declaration that that (a) Plaintiff Davis is entitled as a Florida resident to claim the exemption protections of §222.14, Fla. Stat., and (b) that the annuity payments from Defendant Symetra to Plaintiff Davis are exempt from collection by creditors pursuant to §222.14, Fla. Stat.

30.     There exists an actual controversy between Plaintiff Davis and Defendant Symetra because (a) it has improperly withheld the monthly annuity

payments from Plaintiff Davis and (b) Defendant Symetra has stated in conversations to Plaintiff Davis that it has not made the monthly annuity payments because it is afraid that without an order of the court determining that the monthly annuity payments payable to Plaintiff Davis are exempt from collection by a creditor pursuant to §222.14, Fla. Stat., that it will be required to also make payment to a judgment creditor in the amount of any monthly annuity payment made to Plaintiff Davis.

31.    Plaintiff Davis has suffered actual injury in not receiving the monthly annuity payments since October 2023 as these payments were arranged to provide for his health, maintenance and support during retirement and he depends on these payments.   Plaintiff Davis will continue to suffer further injury in the future if Defendant Symetra continues to improperly withhold the monthly annuity payments as he will struggle to support his ever-increasing cost of living.

32.    Plaintiff Davis' injury caused by Defendant Symetra's failure to issue the monthly annuity payments can be directly attributed to Defendant Symetra's failure to recognize that the monthly annuity payments to Plaintiff Davis are exempt from collection by a judgment creditor pursuant to §222.14, Fla. Stat. and that, because of this exemption, its fear of having to pay the monthly annuity amounts to a judgment crecitor (in addition to Plaintiff Davis) are wholly unfounded.

33.    Plaintiff Davis' injury will be redressed in full with a favorable determination from this Honorable Court that Plaintiff Davis is entitled to the exemption protections of §222.14, Fla. Stat., that the monthly annuity payments to be paid to Plaintiff Davis are exempt from collection by a judgment creditor and that such

payments may be made freely by Defendant Symetra to Plaintiff Davis without fear that any judgment creditor will have the ability to claim that said payments must be sent to him.

WHEREFORE Plaintiff JOSEPH D. DAVIS requests judgment in his favor and against Defendant Symetra Life Insurance Company holding that (a) Plaintiff Davis, as a Florida resident, is entitled to claim the exemption protections of §222.14, Fla. Stat., (b) that the monthly annuity payments from Defendant Symetra to Plaintiff Davis in the amount of $17,938.71 are exempt from collection by any creditor of Plaintiff Davis pursuant to §222.14, Fla. Stat., that (c) Defendant Symetra is to make the monthly annuity payments to Plaintiff Davis by the 25th day of each month consistent with the terms of the annuity contract attached hereto as Exhibit A, and that (d) Plaintiff Davis is entitled to any further relief this Honorable Court deems just and proper.

**COUNT III**
**BREACH OF CONTRACT**
*(Against Defendant LPL)*

34.    Plaintiff Davis repeats and realleges paragraphs 1, 3 through 5, 10 through 14 and 16 as though fully stated herein and further alleges:

35.    Since July 2023, Plaintiff Davis has made requests upon Defendant LPL to return access to his IRA account and to release to him his required minimum distributions, which at present are approximately $83,000.00.

36.    Despite these requests, Defendant LPL has refused to return access to the IRA account to Plaintiff Davis, has refused to issue to him required minimum

10

distributions, and it has refused to provide any explanation or legal justification for its failure to positively respond to Plaintiff Davis' requests.

37.     Defendant LPL's failure and refusal to return access to the IRA account and to issue required minimum distributions to Plaintiff Davis is a material breach of the IRA's contract attached as Exhibit B to this Complaint and this breach has caused Plaintiff Davis to suffer significant damages.

38.     Defendant LPL has never contended that Plaintiff Davis breached any obligation he may have under the IRA contract that would justify its failure to allow Plaintiff Davis access to the account and failure to issue the required minimum distributions.

39.     Defendant LPL currently owes Plaintiff Davis access to the entirety of the IRA and required minimum distributions of at least $83,000.00 plus penalties Plaintiff Davis has incurred for the required minimum distributions not being issued. The amount due and owing to Plaintiff Davis from Defendant LPL will be determined at the time of trial but at the time of filing is no less than $83,000.00 plus penalties and interest at the prevailing legal rate.

WHEREFORE Plaintiff JOSEPH D. DAVIS demands judgment against Defendant LPL FINANCIAL, LLC for his damages, costs, interest and attorney fees as allowed by law and any further relief this Honorable Court deems just and proper.

**COUNT IV**
**DECLARATORY JUDGMENT**
*(Against Defendant LPL)*

11

40. Plaintiff Davis repeats and realleges paragraphs 1, 3 through 5, 10 through 14 and 16 as though fully stated herein and further alleges:

41. While never taking a formal position, representatives from Defendant LPL have intimated that it did not issue the required minimum distributions from his IRA since 2023 for fear of being required to make payment of the same funds twice because of the levy attempted by Bagby.

42. Despite being informed that Florida law exempts proceeds from individual retirement accounts from collection by a judgment creditor, Defendant LPL has failed and refused to issue the required minimum distributions or turn over account access to Plaintiff Davis.

43. There is a bona fide dispute between the parties as to whether the control of the IRA and required minimum distributions due to Plaintiff Davis from Defendant LPL are exempt from collection by any judgment creditor pursuant to §222.21(2), Fla. Stat.

44. Plaintiff Davis has a justiciable question as to the existence of his right to assert that as a Florida resident he is entitled to the protections of §222.21(2), Fla. Stat. with respect to the required minimum distributions (and access to the IRA) to which he is entitled to receive from Defendant LPL.

45. Plaintiff Davis is in doubt as to his rights to the exemption protections of §222.21(2), Fla. Stat., as those rights pertain to the required minimum distributions that he is contractually entitled to receive from Defendant LPL and there is a bona fide, actual, present need for a declaration from this Honorable Court that (a) Plaintiff

Davis is entitled as a Florida resident to claim the exemption protections of §222.21(2), Fla. Stat., and (b) that the required minimum distributions from Defendant LPL to Plaintiff Davis are exempt from collection by judgment creditors pursuant to §222.21(2), Fla. Stat.

46. As Defendant Symetra has improperly withheld the required minimum distributions from Plaintiff Davis and otherwise denied access to his IRA, there is a bona fide, actual present need for the declaration that that (a) Plaintiff Davis is entitled as a Florida resident to claim the exemption protections of §222.21(2), Fla. Stat., and (b) that the required minimum distributions from Defendant LPL to Plaintiff Davis are exempt from collection by creditors pursuant to §222.21(2), Fla. Stat.

47. There exists an actual controversy between Plaintiff Davis and Defendant LPL because (a) it has improperly withheld the required minimum distributions from Plaintiff Davis and denied him access to the IRA and (b) Defendant LPL has stated in conversations to Plaintiff Davis that it has not made the required minimum distributions because it is afraid that without an order of the court determining that the required minimum distributions payable to Plaintiff Davis are exempt from collection by a creditor pursuant to §222.21(2), Fla. Stat., that it will be required to also make payment to a creditor in the amount of any distribution payment made to Plaintiff Davis.

48. Plaintiff Davis has suffered actual injury in not receiving the required minimum distributions nor has he been able to access the remaining funds in the IRA since March 2023 as these distributions are meant to provide for his health,

maintenance and support during retirement and he depends on these funds. Plaintiff Davis will continue to suffer further injury in the future if Defendant LPL continues to improperly withhold the required minimum distributions and otherwise prevent him from accessing the remaining funds in his IRA as he will struggle to support his ever-increasing cost of living.

49.    Plaintiff Davis' injury caused by Defendant LPL's failure to issue the required minimum distributions (and otherwise allow access to the remaining funds in his IRA) can be directly attributed to Defendant LPL's failure to recognize that the proceeds of an individual retirement account issued to Plaintiff Davis are exempt from collection by a creditor pursuant to §222.21(2), Fla. Stat. and that, because of this exemption, its fear of having to pay distributions to a creditor (in addition to Plaintiff Davis) are wholly unfounded.

50.    Plaintiff Davis' injury will be redressed in full with a favorable determination from this Honorable Court that Plaintiff Davis is entitled to the exemption protections of §222.21(2), Fla. Stat., that the required minimum distributions to be paid to Plaintiff Davis are exempt from collection by a creditor and that such payments may be made freely by Defendant LPL to Plaintiff Davis without fear that any creditor will have the ability to claim that said payments must be sent to him.

WHEREFORE Plaintiff JOSEPH D. DAVIS requests judgment in his favor and against Defendant LPL Financial, LLC holding that (a) Plaintiff Davis, as a Florida resident, is entitled to claim the exemption protections of §222.21(2), Fla. Stat.,

14

(b) that the required minimum distributions (and all other distributions from the IRA) from Defendant LPL to Plaintiff Davis are exempt from collection by any creditor of Plaintiff Davis pursuant to §222.21(2), Fla. Stat., that (c) Defendant LPL is to make at least the required minimum distributions to Plaintiff Davis consistent with the terms of the individual retirement account attached hereto as Exhibit B, and that (d) Plaintiff Davis is entitled to any further relief this Honorable Court deems just and proper.

Dated:    May 8, 2026

/s/ Donald G. Peterson
Donald G. Peterson, Esq.
Florida Bar No. 711616
Yasser Lakhlifi, Esq.
Florida Bar No. 116566
Yarnell & Peterson, P.A.
3431 Pine Ridge Road, Suite 101
Naples, Florida 34109
Ph. 239/566-2013; Fax 239/566-9561
DonPeterson@NaplesLaw.us
YasserLakhlifi@NaplesLaw.us
RachelDanzig@NaplesLaw.us
Service@NaplesLaw.us
**Attorneys for Plaintiff**

15

EXHIBIT A

Annuitant

**JOSEPH D DAVIS**

Contract Number

**AA0751357**

Contract Date

**NOVEMBER 7, 1996**



## SAFECO

# Annuity Contract

- SAFECO Life Insurance Company will pay an annuity in the amount and on the due dates specified in the Schedule of Benefits.

- This contract has been issued in consideration of the application and payment of the first premium.

- Signed for SAFECO Life Insurance Company, a stock company, at its Home Office on the contract date.

R.E. Zunker
President

R.A. Pierson
Sr. Vice President and Secretary

## IMMEDIATE ANNUITY

Non-Participating. No Dividends.

Single Premium.

Benefits payable periodically - see schedules.

10 DAY RIGHT TO EXAMINE CONTRACT. Within 10 days after this contract is first received, it may be canceled by delivering or mailing it to the insurance agent from whom it was purchased or to our Home Office. Upon cancellation, all premiums paid will be refunded. THIS IS A LEGAL CONTRACT. PLEASE READ IT THOROUGHLY.

SAFECO Life Insurance Company     Home Office: Redmond, Washington 98052

COPY

IMPORTANT NOTICE
This contract belongs to the owner shown on the application. It will pay all benefits when due exactly as shown on the schedule of benefits. Benefits may not be delayed or paid before they are due. The right to receive benefits may not be sold to anyone

Annuitant              **JOSEPH D DAVIS**

Contract Number        **AA0751357**

Contract Date          **NOVEMBER 7, 1996**


Premium                **$1.00 and other**
                       **valuable consideration**


Date Of Birth          **JULY 25, 1942**

Sex                    **MALE**

Schedule of Benefits

Amount                                         Due Dates

$17,938.11                          **JOSEPH D DAVIS**

                                    **On JUNE 25, 2012 and on the**
                                    **25th day of each following month**
                                    **as long as the annuitant is alive.**
                                    **In no event shall there be fewer**
                                    **than 120 payments.**

L-6416 7/84

## ENDORSEMENT

The provisions of this annuity contract, captioned **Assignment**, are replaced by the following:

An absolute assignment of this annuity contract will make the assignee the new owner of this annuity contract. We will not be bound by an assignment until written notice from the owner of this annuity contract is recorded at our home office.

No payment under this annuity contract may be accelerated, deferred, increased, or decreased, or anticipated, sold, assigned, or encumbered in any manner by the annuitant (or either joint annuitant) or any other recipient of the payment.

Effective on the Contract Date, unless a different date is shown here: _____

SAFECO Life Insurance Company

*R. A. Pierson*

R. A. Pierson
Sr. Vice President and Secretary

LNC 26 5/94


**SAFECO**

**APPLICATION**
SINGLE PREMIUM
IMMEDIATE ANNUITY

SAFECO LIFE INSURANCE COMPANY
P O Box 34690
SEATTLE, WASHINGTON 98124-1690

**1. Proposed Annuitant**

(a)  Joseph D. Davis
       First          Middle          Last

(b)  1999 Avenue of the Stars
       No.                    Street

(c)  Los Angeles          CA    90067
       City and State              Zip Code

(d)  Date of Birth 07/25 1942  ☒ Male    ☐ Female

(e)  Social Security No.    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

**2. Joint Annuitant (if any)**

(a)
       First          Middle          Last

(b)
       No                     Street

(c)
       City and State              Zip Code

(d)  Date of Birth          ☐ Male    ☐ Female

(e)  Social Security No:

(f)  Relationship to Proposed Annuitant

**3. Owner, If Other Than Proposed Annuitant, is:**

(a)  SABSCO
       First          Middle          Last

(b)  15411 NE 51st Street
       No.                    Street

(c)  Redmond          WA    98052
       City and State              Zip Code

(d)  Owner is  ☐Individual ☒Corporation ☐Partnership
       ☐ Trustee

For Home Office Use Only

**4. Plan Applied for**
(describe benefits to be paid and dates to commence,
attach an additional sheet if more space is required.)

**5.** ☒ Check if additional sheet is attached.

**6. Beneficiary**

| First | Middle | Last |
|---|---|---|
| Date of Birth | Relationship | Social Security No |

**7. Contingent Beneficiary**

| First | Middle | Last |
|---|---|---|
| Date of Birth | Relationship | Social Security No |

**8.** Do you intend the replacement or change of any of your existing life insurance or annuity policies in connection with this application for an annuity?

       ☐ Yes          ☒ No

*Note:* *If one or more of the benefits applied for cease upon death of the annuitant, then it is essential that an authentic record of annuitant's birth be submitted prior to the first annuity payment. This record should be a birth certificate, if available; otherwise a certified copy of church or baptismal record, or certified copy of family record, such as reference to annuitant in family Bible, will be acceptable.*

I (We) represent that the statements and answers recorded on this application are full, complete and true, to the best of my (our) knowledge and belief, and shall form a part of the annuity contract issued hereon, and my (our) acceptance of such annuity shall constitute my (our) ratification of any additions, corrections or changes made in the space provided "For Home Office Use Only." The owner of this annuity will be the applicant. Application is made with the knowledge and consent of the proposed annuitant. I (We) agree that any annuity contract issued upon this application shall be considered a contract of the State in which the owner resides at the time of application.

**Agent:** To the best of your knowledge, does the annuity applied for replace any other annuity or life insurance presently in force?   ☐ Yes   ☒ No

X _____
Signature of Agent
       JOHN J McCULLOCH          - - 10-96-2557-01

**Agency**
       REDMOND, WA          Stat #  11/7/96  Trac
Dated At (City, State)          On (Month, Day)
LU-350 R1 5/90

Redmond, WA          11/7  19 96

Dated At (City, State)          On (Month, Day)

X _____
Signature of Applicant*

X          Vice President
Title
* If applicant is corporation or partnership, a corporate officer other than proposed annuitant must **sign** and state title.



**SAFECO**

## Application Attachment
### Single Premium Immediate Annuity

**Annuitant:** Joseph D. Davis                  **Joint Annuitant:**

### Lifetime Benefits

| Initial Lifetime Benefit | Date of First Payment | Number of Guaranteed Payments | Months Between Payments | Increase Amount | Months Between Increases |
|---|---|---|---|---|---|
| $17,938.11 | 06.25 2012 | 120 | 1 | $0 | N/A |

### Temporary Benefits

| Type of Benefit | Initial Benefit Amount | Date of First Payment | Number of Payments | Months Between Payments | Increase Amount | Months Between Increases |
|---|---|---|---|---|---|---|
| | | | | | | |

### Beneficiaries

| Name | Birthdate | Relationship | SSN |
|---|---|---|---|
| The THEN ACTING TRUSTEE OF THE JOSEPH & HILLARY DAVIS LIVING TRUST, DATED 10/31/94. | | | |

### Contingent Beneficiaries

| Name | Birthdate | Relationship | SSN |
|---|---|---|---|
| THE ESTATE OF JOSEPH D. DAVIS. | | | |

# SAFECO

## IMMEDIATE ANNUITY

Non-Participating (No Dividends).

Single Premium.

Benefits payable periodically (see schedule).

SAFECO Life Insurance Company, 15411 NE 51st Street, Redmond, WA 98052, (800) 426-7335

## PROVISIONS

**Definitions**

In this contract SAFECO Life Insurance Company is referred to as "we," "us," or "our."

**Entire Contract**

This contract and the application are the entire contract. A copy of the application is attached. All statements in the application are treated as representations and not warranties. No statement will void this contract or be used in defense of a claim unless the statement is in the application.

**Effective Date**

The effective date of this contract is the same as the contract date.

**Conformity to State Law**

This contract shall be construed in accordance with and is amended to conform to the laws of the state in which the owner resides at the time of application.

**Owner**

This contract's owner is named in the application. The owner may name a new owner or may name a successor to become owner if the owner dies. Such a change will become effective when written notice is received and recorded at our home office.

**Assignment**

An absolute assignment will make the assignee the owner of this contract. We will not be responsible for the validity of any assignment. We will not be bound by an assignment until written notice from the owner of the contract is recorded at our home office. This contract may not be assigned as collateral for any loan or indebtedness.

**Misstatement of Age or Sex**

If the birthdate or sex of the annuitant has been misstated, any amounts payable will be adjusted. The adjustment will be to an amount the premium would have purchased using the correct birthdate and sex, using the rates in effect on the contract date. We may recoup any overpayment, with compound interest at the rate of 6% per year, by charging against payments made after the adjustment. We will refund any underpayment with compound interest at the rate of 6% per year.

**Benefits**

The annuity benefits payable under this contract are those shown in the schedule of benefits. This contract has no cash surrender value. Benefit payments may not be advanced, accelerated, commuted, or encumbered by the annuitant or any beneficiary.

**Beneficiary**

The beneficiary is as named in the application unless changed by the owner. There may be more than one beneficiary.

**Annuity Payments**

Benefit payments will be made to the annuitant unless otherwise designated in the application. We will make all benefit payments under this contract at our home office by check. We may require evidence that the annuitant is alive on the due date of each payment. If the annuitant dies, any remaining payments will be made to the beneficiary. If there is more than one beneficiary, payments will be made jointly to all surviving beneficiaries. If no beneficiaries live to receive all payments, any remaining payments will be made to the estate of the last surviving beneficiary. If no beneficiaries are alive when the annuitant dies, benefit payments will be made to the estate of the annuitant.

**Expiration**

This contract will expire when the last payment set forth on the schedule of benefits has been made.

L-6417 R1 3/90

**EXHIBIT B**

# Account Application
## Advisory - Retirement

A2

Account Number [REDACTED]

Rep ID | M | 0 | N | N

**Financial advisor instructions:** To be used for all LPL advisory retirement accounts held at the individual account level. For more detailed information on the appropriate paperwork requirements for all registration types, please consult the appropriate account opening checklist located in the resource center. For existing accounts, this form should only be used for adding or removing account holders or to change the registration.

Please email the completed form to imaging.email@lpl.com or fax to (858) 202-8325.

ATTENTION: Any alterations must be initialed by all account holders.

## Section I: Account Information

**1. Account Type** (choose only one)

Account updates required by LPL Operations ☐

Each account holder must receive, read and understand the contents of the applicable Account Packet referenced below based on the account type selected. This separate packet contains the Account Agreement and Program Brochure and details the relationship between you, your financial advisor, LPL Financial ("LPL") and other parties and related conflicts of interest.

- ⦿ Strategic Asset Management* (Account Packet - SAM Programs)
- ○ Strategic Asset Management II** (Account Packet - SAM Programs)
- ○ Manager Select (Account Packet - Manager Select)
- ○ Optimum Market Portfolios Advisory (Account Packet - OMP)
- ○ Model Wealth Portfolios (Account Packet - MWP)
- ○ Personal Wealth Portfolios (Account Packet - PWP)

\* I understand that I bear transaction charges for purchases and sales in the Account.
\*\* I understand that transaction costs for the Account are borne by my financial advisor.

**2. Registration Type** (choose only one)

- ○ Traditional IRA
- ⦿ Rollover IRA
- ○ Roth IRA
- ○ SEP IRA
- ○ SAR-SEP IRA
- ○ SIMPLE IRA

- ○ Beneficiary IRA
- ○ Beneficiary Roth IRA
- ○ Beneficiary SIMPLE IRA
- ○ Beneficiary 403(b)(7)

Name of Decedent (required for Beneficiary accounts)

- ○ 403(b)(7) Non-ERISA*
- ○ 403(b)(7) ERISA*
- ○ 457 Plan
- ○ Money Purchase Pension Plan

- ○ 401(k) Plan
- ○ Profit Sharing Plan
- ○ Defined Benefit Plan
- ○ Trusteed IRA
- ○ Trusteed Roth IRA
- ○ Other Retirement Type:

\*403(b)(7) plans may or may not be subject to ERISA depending on how the plan operates. Please consult the employer to determine if the plan is subject to ERISA.

| | | |
|---|---|---|
| Is this account or plan subject to ERISA? | ○ Yes | ⦿ No |
| Is this account for a Government Entity? | ○ Yes | ⦿ No |
| Is your account holder considered an "institutional account" based on one or more of the following definitions per FINRA Rule 4512(c): | ○ Yes | ⦿ No |

1. A bank, savings and loan association, insurance company or registered investment company;
2. An investment adviser registered either with the SEC under Section 203 of the Investment Advisers Act or with a state securities commission (or any agency or office performing like functions); or
3. Any other person (whether a natural person, corporation, partnership, trust or otherwise) with total assets of at least $50 million

**3. Registration Information**

Individual or Participant Social Security Number
[REDACTED]

Account Registration
PTC CUST ROLLOVER IRA FBO

JOSEPH DAVIS

Mailing Address
603 N Peninsula Ave

New Smyrna Beach, FL 32169-2423

Fill in your current residency status: (choose only one)
⦿ U.S. Citizen    ○ Resident Alien    ○ Non-Resident Alien

Country Of Citizenship or Legal Establishment
UNITED STATES

Group Plan Name or Employer (if applicable)

Group Plan, Trust or Estate Tax ID (if applicable)

Date Plan Established (if applicable)

| Home Phone | Mobile Phone | Business Phone | Fax Number |
|---|---|---|---|
| | | (310)433-7475 | |

 LPL Financial

Member FINRA/SIPC

**F1AR**
Revised 0620



## Section II: Investment Objective and Risk Tolerance

1. **Select the investment objective that most accurately reflects the goals for this account** (choose only one)

The investment objectives are overall objectives for the entire account and may be inconsistent with a particular holding at any time. Please note that achievement of the stated investment objectives is a long-term goal for the account. These choices are listed in order from what is considered to be conservative to highest risk. There is no guarantee that the investment objective will be achieved.

○ A. Income with Capital Preservation. Designed as a longer term accumulation account, this is considered generally the most conservative investment objective.  Emphasis is placed on generation of current income with minimal risk of capital loss. Lowering the risk generally means lowering the potential income and overall return.

○ B. Income with Moderate Growth. Emphasis is placed on generation of current income with a secondary focus on moderate capital growth.

◉ C. Growth with Income. Emphasis is placed on modest capital growth with some focus on generation of current income.

○ D. Growth. Emphasis is placed on achieving high long-term growth and capital appreciation. There is little focus on generation of current income.

○ E. Aggressive Growth. Emphasis is placed on aggressive growth and maximum capital appreciation. No focus on generation of current income. This objective has a very high level of risk and is for investors with a longer time horizon.

ATTENTION: If you select an objective and cross it out to choose another, the change must be initialed by all account holders.

## Section III: Account Holder Information

If you are an institutional trustee or a financial organization serving as trustee of a ERISA Group Plan, the identification sections are optional. If the plan is non ERISA then all fields are required for additional account holders, complete the Supplemental Account Application (F1C).

1. **Primary Information**

| Primary Account Holder/Trustee/Minor/Auth. Officer | Occupation (former if retired or unemployed) | ID Type (Ex: Driver's License, Passport, etc.) |
|---|---|---|
| Joseph Davis | Lawyer | |

| Social Security Number | Date of Birth | Industry (former if retired) | ID Place of Issuance |
|---|---|---|---|
| ████ | ████ | Legal Services | |

Residence Address (no P. O. Boxes) ☑ Same as mailing address — Employer Name ☐ Mark here if retired or unemployed: Joseph Davis PA — ID Number

603 N Peninsula Ave

New Smyrna Beach, FL 32169-2423

Country of Citizenship: UNITED STATES

Employment Address: 603 N Peninsula Ave

New Smyrna Beach, FL 32169-2423

ID Issuance Date | ID Expiration Date

ID verified?   ○ Yes   ◉ No

| Home Phone | Mobile Phone | Business Phone | Fax Number |
|---|---|---|---|
| | | (310)433-7475 | |

Is this account for the benefit of a Politically Exposed Person (PEP)*?   ○ Yes   ◉ No

If yes, define PEP position:

*A Politically Exposed Person (PEP) is defined as: 1. A current or former senior foreign (non-U.S.) political figure; 2. His/her immediate family members (e.g., parents, spouse, sibling, children, in-laws); 3. Close associates - People who are widely and publicly known to maintain a close relationship with the PEP, including people who are in a position to conduct substantial financial transactions on behalf of the PEP; 4. Any corporation, business or other entity that has been formed by, or for the benefit of, the PEP.

The trusted contact person is intended to be a resource for LPL in administering your accounts, protecting your assets, and responding to possible financial exploitation (refer to account packet/agreement for more details). Note: Your trusted contact person must be age 18 or older, and would not be able to conduct transactions in your account.

☑ **I decline to provide a trusted contact person at this time.**

Trusted Contact Name | Trusted Contact Email

Trusted Contact Address

Trusted Contact Primary Phone | Relationship to Account Holder (Spouse, Relative, Friend, Professional Relationship, Other)

F1AR
Revised 0620

**A2**

## Section III: Account Holder Information (continued)

**1. Primary Information** (continued)

☐ Mark here and complete the below information if a FINRA employee or person associated with a broker/dealer or municipal securities dealer has a financial interest in, controls trading in, or has discretionary authority over this account (e.g., accounts for minor children). This includes situations where you are employed by FINRA or associated with a broker/dealer or municipal securities dealer. This also includes situations where your spouse, domestic partner, or other immediate family member is employed by FINRA or associated with a broker/dealer or municipal securities dealer.

LPL will notify FINRA, the broker/dealer, or the municipal securities dealer regarding this account and may transmit duplicate statements, confirmations and other information concerning the account. By completing and signing this new account application, you authorize LPL to provide transactional data as listed above to FINRA, the broker/dealer, or municipal securities dealer as applicable.

Full Name of Person Associated with Firm or FINRA

Relationship to Account Holder of Person Associated with Firm or FINRA

Name of Associated Firm (if FINRA, list FINRA)

Address of Person Associated with Firm or FINRA

Corporate Compliance Mailing Address of Firm

☐ Mark here if you or any member of your immediate family has been a corporate officer, director, or owner of 10% or more of any public corporation within the past three months.

Name of Corporation(s)

**2. Secondary Information**

Parent/Guardian/Fiduciary/Trustee/Co-Trustee

Occupation (former if retired or unemployed)

ID Type (Ex: Driver's License, Passport, etc.)

Social Security Number

Date of Birth

Industry (former if retired)

ID Place of Issuance

Residence Address (no P. O. Boxes) ☐ Same as mailing address

Employer Name ☐ Mark here if retired or unemployed

ID Number

Employment Address

ID Issuance Date    ID Expiration Date

Country of Citizenship

ID verified?    ○ Yes    ○ No

Home Phone

Mobile Phone

Business Phone

Fax Number

Is this account for the benefit of a Politically Exposed Person (PEP)*?    ○ Yes    ○ No

If yes, define PEP position:

*A Politically Exposed Person (PEP) is defined as: 1. A current or former senior foreign (non-U.S.) political figure; 2. His/her immediate family members (e.g., parents, spouse, sibling, children, in-laws); 3. Close associates - People who are widely and publicly known to maintain a close relationship with the PEP, including people who are in a position to conduct substantial financial transactions on behalf of the PEP; 4. Any corporation, business or other entity that has been formed by, or for the benefit of, the PEP.

The trusted contact person is intended to be a resource for LPL in administering your accounts, protecting your assets, and responding to possible financial exploitation (refer to account packet/agreement for more details). Note: Your trusted contact person must be age 18 or older, and would not be able to conduct transactions in your account.

☐ I decline to provide a trusted contact person at this time.

Trusted Contact Name

Trusted Contact Email

Trusted Contact Address

Trusted Contact Primary Phone

Relationship to Account Holder (Spouse, Relative, Friend, Professional Relationship, Other)

Account Number

**F1AR**
Revised 0620

## Section III: Account Holder Information (continued)

**2. Secondary Information** (continued)

☐ Mark here and complete the below information if a FINRA employee or person associated with a broker/dealer or municipal securities dealer has a financial interest in, controls trading in, or has discretionary authority over this account (e.g., accounts for minor children). This includes situations where you are employed by FINRA or associated with a broker/dealer or municipal securities dealer. This also includes situations where your spouse, domestic partner, or other immediate family member is employed by FINRA or associated with a broker/dealer or municipal securities dealer.

LPL will notify FINRA, the broker/dealer, or the municipal securities dealer regarding this account and may transmit duplicate statements, confirmations and other information concerning the account. By completing and signing this new account application, you authorize LPL to provide transactional data as listed above to FINRA, the broker/dealer, or municipal securities dealer as applicable.

Full Name of Person Associated with Firm or FINRA

Relationship to Account Holder of Person Associated with Firm or FINRA

Name of Associated Firm (if FINRA, list FINRA)

Address of Person Associated with Firm or FINRA

Corporate Compliance Mailing Address of Firm

☐ Mark here if you or any member of your immediate family has been a corporate officer, director, or owner of 10% or more of any public corporation within the past three months.

Name of Corporation(s)

## Section IV: Financial Information and Experience

**1. Investment Information**

Enter the letter that corresponds to the correct range:

Annual income? **F**    Net worth? (exclusive of primary residence) **H**    Liquid net worth?* **H**    Approximate account value?** **H**

| | | | |
|---|---|---|---|
| A. $1 - $24,999 | B. $25,000 - $49,999 | C. $50,000 - $99,999 | D. $100,000 - $249,999 |
| E. $250,000 - $499,999 | F. $500,000 - $749,999 | G. $750,000 - $999,999 | H. $1,000,000 and over |

Specify the exact Source of Account Holder Wealth and Income (e.g. Inheritance, employment salary, sale of real estate, etc.)

Employment Income

Federal income tax bracket? (%) **37**

Investment Experience (total number of years): **20+ years**

Indicate the number of years of experience for each investment type:

Annuities **40**    Mutual Funds **40**    Partnerships **40**    Margin **40**    Stocks **40**    Bonds **40**    Options

Other (please specify):

What are your assets/investments (includes positions held outside and by LPL in this and other accounts)? Please indicate <u>approximate</u> percentage of assets in whole numbers exclusive of primary home (must equal 100%). Do not provide percentages in fractions or decimals.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Real Estate | 25 % | Mutual Funds | ___ % | Checking / Savings | 75 % | Annuities | ___ % |
| Insurance | ___ % | Stocks | ___ % | Alternative Investments | ___ % | Bonds | ___ % |
| Other | ___ % | If Other, please explain | | | | | |

*Liquid net worth is exclusive of real estate; only include assets that can be liquidated within 30 days.
**Account minimums apply; see the applicable Account Packet for details or ask your financial advisor.

**2. Investment Time Horizon and Liquidity Needs**

What is your investment time horizon for this account?    ○ 1-3 years    ○ 3-5 years    ○ 5-10 years    ◉ More than 10 years

Do you have liquidity needs from the funds in this account?    ◉ Yes    ○ No

If yes, when do you need these funds?    ◉ Within 3 years    ○ More than 3 years

## Section V: Advisory Program Account Information

**1. Primary Advisor Information**

Primary Financial Advisor Name
JASON SOLODKIN

Business Address
6501 CONGRESS AVE STE 108

Business Phone
(954)961-5333

BOCA RATON, FL 33487

Account Number
█████████████

**F1AR**
Revised 0620



## Section V: Advisory Program Account Information (continued)

**2.  Annual Account Fee Information**

One of the following fee instruction areas is required to be completed. If left blank, or the Tiered Account Fee Authorization Form is not received, then the application will be rejected.

**For SAM, SAM II, Manager Select, PWP, and OMP only:**
*Note: Tiered Account Fees are not available for PWP*

Total Account Fee

| 0.95 | (%)  OR  ☐  Check here if account will be set up for Tiered Account Fee Billing* |

*\* For Tiered Account Fee Billing, Form F521 (Tiered Account Fee Authorization Form) is required to be submitted with this application.*
*\* TAF set up for eligible accounts must be completed prior to Form F521 submission. To learn more about this requirement, please refer to the Quick Start Guide (TAFS) posted in the Resource Center.*

**For MWP only:**
*Note: Tiered Account Fees are not available for MWP*

Account Fee  =  Advisor Fee: [            ] (%)  +  Strategist Fee* (if applicable)  +  LPL Program Fee*

*\* Please refer to the Account Agreement for a description of the Strategist Fee and the LPL Program Fee.*

**3.  Commissions on Trades from Accounts Outside of LPL** (Optional)

Financial Advisor(s): Mark below if you wish to apply a fee credit to the assets (cash or securities) being deposited into this account that originated from a firm other than LPL Financial and a commission was earned by you within the past two years. Please provide trade details below to apply a fee credit:

| Purchase Date | Purchase Amount | Investment Name | Fund Class | CUSIP/Symbol | Commission |
|---|---|---|---|---|---|
| | $ | | | | $ |
| | $ | | | | $ |
| | $ | | | | $ |
| | $ | | | | $ |

**4.  Specific Securities Restrictions**

Mark below if you wish to restrict specific securities, categories, groups or sectors from your account (for SAM/SAM II, PWP and Manager Select accounts only). In order to facilitate these restrictions, please provide restriction details below.*

Restrict common stock securities: (enter symbol)
Restrictions do not apply to mutual funds.
(attach additional pages if necessary)

Other Restrictions (for SAM/SAM II and PWP accounts only): Please explain any other restrictions below. This includes any industry group, sector or social category restrictions that apply to a PWP account.  Financial advisor should refer to the Resource Center for detailed information on the restriction options available for PWP accounts. (attach additional pages if necessary)

*\*Certain restrictions may require further review with LPL and your financial advisor.*

Account Number

**F1AR**
Revised 0620

A2

## Section VI: Manager Select Account Information

1. **Complete This Section for Manager Select Accounts Only**

Account Type (choose either SMA Platform or Model Delivery Platform):

◯ SMA Platform (SMA Portfolio Manager indicated below has discretionary authority)
SMA Portfolio Manager Name

| Asset Class* | Investment Style* |
|---|---|
| | |

Did the SMA Portfolio Manager indicated above previously manage the assets in this account?    ◯ Yes    ◯ No

_____    _____    _____
Accepted by SMA Portfolio Manager / Authorized Person Signature    Accepted by SMA Portfolio Manager / Authorized Person Name (print)    Date (required)

◯ Model Delivery Platform (LPL has discretionary authority)
Model Advisor Name

| Asset Class* | Investment Style* |
|---|---|
| | |

*Financial advisor should refer to the Manager Select Participation List on the Resource Center for detailed information on each SMA Portfolio Manager and Model Advisor, their available asset classes and investment styles.

## Section VII: Retirement Plan Accounts

1. **Required for Sponsor-Directed Qualified Retirement Accounts**

What is the total value of the plan?    $ _____

Classify the corporation's employees:

◯ Young employees, few years of service, many years until retirement    ◯ Older work force of lengthy service, nearing retirement

◯ Even distribution over all age groups and years of service

Identify the relationship between plan contributions and distributions:

◯ Contributions will exceed distributions for at least the next two years    ◯ Distributions will exceed contributions for at least the next two years

◯ Contributions currently exceed distributions but this could change within the next two years    ◯ Distributions currently exceed contributions but this could change within the next two years

Please specify the estimated distributions of the any known retiring participants:

| | Approximate Distribution | Date of Distribution | | Approximate Distribution | Date of Distribution |
|---|---|---|---|---|---|
| Participant 1: | $ | | Participant 3: $ | | |
| Participant 2: | $ | | Participant 4: $ | | |

## Section VIII: Custodian and Trustee Information

1. **For all IRA, Roth IRA, all Trusteed IRA, SIMPLE IRA, and 403(b)(7) Participant Accounts Only**

Retirement Account Custodian or Trustee:
Unless an Outside Custodian is designated and marked below, all IRA, Roth IRA, all Trusteed IRA, SIMPLE IRA and 403(b)(7) participant accounts (Section I) will default to The Private Trust Company, N.A. ("PTC") as custodian. Each account holder must receive, read and understand the contents of the applicable Custodial Agreement or Trust Agreement referenced below based on the registration type selected in Section I.2.

Custodial Agreement PTC - IRA:  For Traditional IRA, Traditional Rollover IRA, Beneficiary IRA, SEP IRA, and SAR-SEP IRA accounts
Custodial Agreement PTC - Roth IRA:  For Roth IRA and Beneficiary Roth IRA accounts
Custodial Agreement PTC - SIMPLE IRA:  For SIMPLE IRA and Beneficiary SIMPLE IRA accounts
Custodial Agreement PTC - 403(b)(7):  For 403(b)(7) ERISA, 403(b)(7) Non-ERISA, and Beneficiary 403(b)(7) accounts
Trusteed IRA Agreement - Trusteed IRA, Trusteed Beneficiary IRA, Trusteed Roth IRA, and Trusteed Beneficiary Roth IRA accounts

☐ Mark here for Outside Custodian (account holder to complete and submit custodian's adoption agreement) Skip Section VIII.2

Account Number
███████████████

**F1AR**
Revised 0620



**A2**

## Section VIII: Custodian and Trustee Information (continued)

2. **Beneficiary Designation** (This section only applies to accounts with PTC as custodian; also excludes Trusteed IRA account. For all Trusteed IRA accounts, complete the Trusteed IRA Beneficiary Designation form (F780))**:**

Marital Status:    ◯ Single    ⦿ Married

I hereby designate the following individual(s) or entity(ies) as my primary and/or contingent beneficiary(ies) unless otherwise directed in writing by the account holder and properly filed with the custodian. If neither primary nor contingent is indicated, the individual or entity will be deemed to be a primary beneficiary. If more than one primary beneficiary is designated and no distribution percentages are indicated, or the percentages do not total 100%, the beneficiaries will be deemed to own equal share of the unspecified percentages in the account. If more than one contingent beneficiary is designated and no distribution percentages are indicated, or the percentages do not total 100%, the beneficiaries will be deemed to own equal share of the unspecified percentages in the account. If this is a Guardian account, the account will automatically pass to the minor's estate. Once the minor has reached the age of majority for the state of residence, he or she may then designate a beneficiary(ies).

LPL generally will divide all securities and cash in my account proportionately among the designated beneficiaries based on the allocations indicated herein; provided that LPL will seek to maintain fixed income minimum denomination in lot sizes sufficient to meet any minimum trading requirements (per issuers' requirements).  In the event that any securities remain after such proportionate division of assets and the market value of each such remaining security is less than or equal to $50.00, LPL will distribute such remaining shares/bonds to the first primary beneficiary listed herein.  In the event that any securities remain after such proportionate division of assets and the market value of each such security is greater than $50.00, LPL will use reasonable efforts to liquidate such remaining shares/bonds and divide the proceeds proportionately among the beneficiaries based on the allocations indicated herein. Notwithstanding the foregoing, LPL will use reasonable efforts to liquidate all remaining fixed income securities and divide the proceeds proportionately among the beneficiaries based on the allocations indicated herein.

*In the event that a designated beneficiary dies, you may select whether distributions will be made to other remaining beneficiaries or to your beneficiary's heirs.*

- *Pro Rata (Default Rule) -- Unless Per Stirpes is indicated below, the following Pro Rata rule will be in place at my death. If any primary beneficiary(ies) dies before me, his or her interest shall terminate completely, and the percentage share of any remaining primary beneficiary (ies) shall be increased equally. If no primary beneficiary survives me, the contingent beneficiary(ies) shall acquire the designated share of my account. If no primary or contingent beneficiaries survive me, my spouse will be deemed my beneficiary. If there is no surviving spouse at the time of my death, my estate will be deemed my beneficiary. If I live in a state with community property statutes or the account is a 403(b)(7) subject to Title 1 of ERISA and do not designate my spouse as the sole primary beneficiary, I certify that my spouse has consented to such designation.*

- *Per Stirpes -- If any primary beneficiary dies before me, my estate will need to identify the heirs who are to receive that primary beneficiary's share of my TOD assets. If no primary beneficiary with the per stirpes designation survives me, that beneficiary's share shall be paid to the living descendants of such beneficiary, subject to state law. The percentage share of the remaining primary beneficiaries will remain the same.*

| Primary / Contingent | | Pro Rata / Per Stirpes | | Name | Relationship | SSN | Date of Birth | % |
|---|---|---|---|---|---|---|---|---|
| ⦿ | ◯ | ⦿ | ◯ | Daniel Davis | Relative/Friend | | ███████ | 33.34 |
| ⦿ | ◯ | ⦿ | ◯ | Jordan Davis | Relative/Friend | | ███████ | 33.33 |
| ⦿ | ◯ | ⦿ | ◯ | Claire Davis | Relative/Friend | | ███████ | 33.33 |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |
| ◯ | ◯ | ◯ | ◯ | | | | | |

**F1AR**
Revised 0620

## Section IX: Account Holder Acknowledgment and Execution

1. **Delivery Preferences** If you have provided your email address in this application, you may elect to receive documents from LPL electronically.

Email

○ Yes, I want to receive all documents from LPL electronically (including, but not limited to, communications, account statements, trade confirmations, performance reports and legal and regulatory notices and disclosures), to the extent permitted by applicable law. I acknowledge that I need to (i) maintain an active email account to receive notifications from LPL when documents are available, (ii) login to Account View and accept its terms and conditions of use before I am able to view the documents electronically, and (iii) be responsible for certain costs associated with electronic access, such as Internet service fees. This preference for electronic delivery will remain in effect until revoked.

◉ No, I do not want to receive documents from LPL electronically.  Please send me paper copies of all communications related to my account. This is the default selection if "Yes" is not selected above.

You may revoke your election to receive electronic documents or request paper copies of electronic documents at any time by logging into Account View or contacting your Financial Advisor.

2. **Suppression of Confirmations (for PWP, MWP and Manager Select accounts only):**

By initialing below, I hereby elect not to receive immediate trade confirmations from LPL for each transaction in the account. Information from the confirmation will be reported on my brokerage account statement.

| _____ | _____ | _____ | _____ |
| Initials | Initials | Initials | Initials |

3. **Name Differences/One and the Same Information** (not to be used in lieu of court documentation for legal name changes)

List any name differences that you are known by or commonly use in the space provided.  By listing the names below and signing Section IX, you are authorizing LPL to accept transactions and follow instructions under all names listed.

4. **Acknowledgment**

I acknowledge by signing below that I have received, read, understand and agree to the terms of this Account Application and the applicable Account Agreement (included in the Account Packet specified in Section I).  Additionally I certify the following:

• All of the information provided in this Account Application is true, correct, and complete and I agree to notify LPL of any changes to the information.
• I have received the LPL Relationship Summary and the Advisory Program Brochure (included as part of the applicable Account Packet) and the Brochure Supplement of the financial advisor servicing my advisory account.
• I understand and agree to the terms of the Automatic Cash Sweep Program set out in the Account Agreement.
• I understand and acknowledge that I have granted discretionary authority in the Account Agreement to trade securities in my account to my financial advisor in the case of SAM/SAM II accounts, to my financial advisor and LPL in the case of OMP, PWP and MWP accounts, to LPL in the case of Manager Select - Model Delivery Platform accounts, and to the SMA Portfolio Manager in the case of Manager Select - SMA Platform accounts.
• I have discussed with my financial advisor the investment objective selected for the account in Section II of this Application, and for MWP, PWP, OMP and Manager Select - Model Delivery Platform accounts, the model portfolios to be selected for my account.
• I understand that investing through an advisory account involves investment risk, including the risk of loss. I am prepared to bear the risks associated with my investments.
• I understand that LPL will supply my name to issuers of any securities held in my account so that I may receive important information regarding those securities, unless I notify LPL in writing not to do so.
• I acknowledge that proceeds from liquefied home equity on my primary residence will not be used to fund this account.
• I authorize LPL to contact my trusted contact person listed above.  I understand that providing this information is optional and I may withdraw it at any time.
• I understand the differences between an advisory and brokerage account and by signing below affirm my decision, based on discussions with my financial advisor and information provided to me, to work with my financial advisor in an advisory relationship.

For accounts with PTC as Custodian or Trustee, I acknowledge that I have received, read, understand and agree to the terms of the applicable Custodial Agreement or Trust Agreement and I certify that I am eligible to establish the type of account referenced above.  I release the Custodian or Trustee, LPL Financial LLC and their affiliates, from all liability and agree to indemnify the same from any and all losses, damages or cost for acting in good faith in accordance with the account privileges selected herein. In no event shall the indemnified parties be liable for consequential damages.

Additionally, for accounts with PTC as Custodian or Trustee, I certify the following:

• If I make a rollover contribution, I certify that I understand the rules and conditions of the deposit and that I am eligible to make the deposit under the Internal Revenue Code.
• If this is a SEP IRA, I certify that I have received, read and accept my employer's plan document (5305-SEP or SEP prototype).
• If this is a SAR-SEP, I certify that I have received, read and accept my employer's plan document (5305A-SEP or SEP prototype), I have verified that my employer's plan was established in a year beginning before 1997 and I have entered into a SAR-SEP Elective Deferral Agreement with my employer.

**F1AR**
Revised 0620



A2

## Section IX: Account Holder Acknowledgment and Execution (continued)

**4.   Acknowledgment** (continued)

- If this is a SIMPLE IRA, I certify that I have received, read and accept the  summary description and notice (Form 5304-SIMPLE) from my employer relating to my employer's SIMPLE IRA Plan and I have entered into a SIMPLE Elective Deferral Agreement with my employer.
- If this is a 403(b)(7), I have verified with my employer that it is an educational organization described in Code Section 170(b)(1)(A)(ii) or a tax-exempt organization described in Code Section 501(c)(3) of the Internal Revenue code and neither the Custodian or Trustee, LPL nor any of their affiliates have any responsibility for any applicable contribution or distribution limitations under Internal Revenue Code 403(b), and I am establishing the account under my employer's 403(b)(7) plan and in connection, have entered into an elective deferral arrangement with my employer.
- If this is a 403(b)(7), I designate LPL as the brokerage firm to invest assets and agree to invest all assets solely in regulated investment companies.
- This account is governed by and I acknowledge receipt of the predispute arbitration clause located in the Account Agreement (included in the Account Packet specified in Section I), which is incorporated by reference into this Account Application.

**5.   Important Information about IRA Rollovers from Employer Sponsored Retirement Plans**

If you are planning to fund this IRA account with a rollover from an employer sponsored retirement plan, like a 401(k) plan, it is important for you to fully understand the following:
- **If terminating from your employer, you have options with respect to the assets in your plan, including that you can:**
  o Remain invested in the plan (subject to certain minimum assets)
  o Transfer your plan assets to a plan of a new employer (if applicable)
  o Transfer your assets to an IRA with a financial institution
  o Receive a cash distribution (which may be fully taxable)
- **There are pros and cons of each of the options, which are described in the IRA Custodial Agreement or Trust Agreement you received in connection with opening this account**
- **If you decide to transfer assets out of the plan and into an IRA, you understand that:**
  o Those assets will no longer be subject to the protections of ERISA or other applicable pension laws
  o There will no longer be a responsible plan fiduciary making decisions about the investments
  o Depending on the investments and services you select for your IRA, you will likely pay more in fees, commissions and other costs than if the assets remained in your plan, and your Financial Advisor may receive more compensation for servicing your IRA than if you selected a different option.
- **By signing this Account Application, you acknowledge that:**
  o You reviewed and understand the above information regarding rollovers, including the pros and cons and other information contained in the IRA Custodial Agreement or Trust Agreement and other documents required to open this account
  o You have discussed with your Financial Advisor the pros and cons of funding an IRA with a rollover
  o Your Financial Advisor only provides education regarding the options available to transfer or roll your Plan assets to an IRA, and does not recommend one option over another
  o The decision to transfer assets from a plan to fund an IRA has been or will be made by you based on a full understanding of the options available to you

**6.   Plan Trustee or Plan Fiduciary Acknowledgment**

- If this account is for a participant that is part of a group Retirement Plan, the trustee or plan fiduciary must sign below and include the information in Section III-2  - Secondary Information in addition to the participant.
- If the Plan is a 401k, Profit Sharing, Money Purchase or Defined Benefit, you are signing as a plan trustee.
- If the Plan is an ERISA 403(b) or 457, you are signing as a plan fiduciary.

Under penalties of perjury, I hereby certify that: (1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, (3) I am a U.S. person (including a U.S. resident alien), and (4) I attest I am exempt from FATCA Reporting. (However, if you provide an IRS W-8 form, it will supersede this statement and you may be subject to FATCA Reporting.) (Cross out (2) if subject to backup withholding.)  The Internal Revenue Service does not require my consent to any provision of this document other than the certifications required to avoid backup withholding.

DocuSigned by:

*JOSEPH DAVIS*   Joseph Davis   2/8/2021
13BB42D669A1481
Account Holder / Plan Trustee / Fiduciary Signature | Account Holder / Plan Trustee / Fiduciary Name (print) | Date (required)

_____ | _____ | _____
Account Holder / Plan Trustee / Fiduciary Signature | Account Holder / Plan Trustee / Fiduciary Name (print) | Date (required)

_____ | _____ | _____
Account Holder / Plan Trustee / Fiduciary Signature | Account Holder / Plan Trustee / Fiduciary Name (print) | Date (required)

_____ | _____ | _____
Account Holder / Plan Trustee / Fiduciary Signature | Account Holder / Plan Trustee / Fiduciary Name (print) | Date (required)

Account Number

**F1AR**
Revised 0620

## Section IX: Account Holder Acknowledgment and Execution (continued)

**7. Branch Use Only**

I have reviewed this document for completeness, accuracy, suitability, and proper disclosures. If this account was opened online and the automated check against the OFAC list of specially designated nationals (SDNs) resulted in a match to the account holder's name, I have confirmed that the account holder is not the same person listed by OFAC. If this account is opened by the home office, I have checked the list of SDNs and either the account holder's name does not appear or, if the account holder's name is the same as the name of a SDN, the account holder is not the person listed by OFAC. I have also provided the account holder with the CIP disclosure either in writing or verbally. I acknowledge and accept that I am a party to the applicable Account Agreement. I have determined that any liquidation of previously purchased investments to deposit assets into this account is suitable for the account holder and have disclosed to the account holder all costs incurred by the account holder to liquidate such investments.

DocuSigned by:

*JASON SOLODKIN*

501696EDB55B4B6...

| Financial Advisor / Authorized Person Signature | JASON SOLODKIN | M0NN | 2/9/2021 |
|---|---|---|---|
| | Financial Advisor / Authorized Person Name (print) | Rep ID | Date (required) |

| Joint Financial Advisor / Authorized Person Signature | Joint Financial Advisor / Authorized Person Name (print) | Rep ID | Date (required) |
|---|---|---|---|

| Joint Financial Advisor / Authorized Person Signature | Joint Financial Advisor / Authorized Person Name (print) | Rep ID | Date (required) |
|---|---|---|---|



**Historical Trade-Off Between Risk, Volatility & Investment Return:**

This chart illustrates five investment objectives. Match your investment needs with the characteristics listed below each investment objective to determine which objective most accurately represents your situation.

Account Number

**F1AR**
Revised 0620

# LPL FINANCIAL LLC (LPL) RELATIONSHIP SUMMARY

Effective March 31, 2022

LPL (referred to as "we" or "us") is registered with the U.S. Securities and Exchange Commission as a broker-dealer and an investment adviser. We have a network of financial professionals ("Professionals") who offer brokerage and investment advisory services. Brokerage and investment advisory services, and the fees we charge for them, differ, and it's important that you understand the differences. This relationship summary will explain the various services we offer, how we charge for those services, and conflicts of interest that exist when we provide our services. To help you research firms and financial professionals, you can access free and simple tools at Investor.gov/CRS, which also provides educational materials about broker-dealers, investment advisers, and investing.

## What investment services and advice can you provide me?

Our Professionals offer brokerage services, investment advisory services, or both, depending on their licenses. Each Professional generally provides access to a range of investment products, such as stocks, bonds, exchange-traded funds (ETFs), mutual funds, annuities, and alternative investments. Please note that the range of investment options available to you may be limited depending on the licenses your Professional holds or if he or she is located at a financial institution that does not offer certain options. Your Professional or account program may also have specific requirements, such as account or investment minimums. We encourage you to ask your Professional whether any investment limitations or account requirements apply.

If your Professional offers you both brokerage and advisory services, your Professional will inform you when he or she offers an investment recommendation or advice, and whether the recommendation or advice is part of a brokerage or advisory service. Some of the key differences between brokerage and investment advisory services are described below.

### Brokerage Services

- Brokerage services include taking your orders and executing your securities transactions; making recommendations for you to buy, sell, or hold securities; and holding your securities for safekeeping (known as having "custody" of your securities).

- In most cases, we provide recommendations to you on specific investments, but you make the final investment decisions for your account. We also have a program available through a limited number of financial institutions in which you make investment decisions on your own without any recommendations from us.

- We don't monitor brokerage account investments for you, unless we state otherwise in writing.

- We may provide brokerage services (but not investment recommendations) to you if your Professional is providing advisory services through a separate investment advisory firm.

### Investment Advisory Services

- Some of the investment advisory services we offer include wrap fee programs and non-wrap fee programs; mutual fund asset allocation programs; advisory programs offered by third-party investment advisory firms; financial planning services; retirement plan consulting; investment research; digital advice programs; and other custom advisory services.

- You'll typically grant us discretion to buy and sell investments in your account without asking you in advance. You may limit our discretion, such as by imposing reasonable restrictions on investing in certain securities or groups of securities. In other investment advisory accounts, you grant investment discretion to another financial institution.

- Some of our investment advisory accounts are nondiscretionary, which means you are required to preapprove each investment transaction that we recommend.

- We'll typically monitor accounts, and specific investments within accounts, on an ongoing basis to align with your investment goals. However, in limited-scope consulting or advisory relationships, we won't provide ongoing monitoring.

**LPL Financial**

**More detailed information** about our advisory services can be found in the Form ADV for your advisory program. Detailed information about our brokerage services can be found at Brokerage Compensation Information and Related Conflicts of Interest. If viewing a paper version of this form, please visit lpl.com/CRS for hyperlinks to these documents.

**Questions to ask your Professional:**

- *Given my financial situation, should I choose an investment advisory service? Should I choose a brokerage service? Should I choose both types of services? Why or why not?*
- *How will you choose investments to recommend to me?*
- *What is your relevant experience, including your licenses, education, and other qualifications? What do these qualifications mean?*

## What fees will I pay?

Investing is an individual journey, and we want to provide you with options. Below we outline the fees you could be charged for both brokerage and advisory accounts depending on your investment choices. Fee Schedules for our brokerage and advisory programs can be found lpl.com.

### Fees Associated with Brokerage Services

- For brokerage services, we charge a transaction-based fee (sometimes referred to as a commission) every time you buy or sell an investment. The amount you pay as a transaction-based fee varies according to the particular investment and amount invested. The more trades you make, the more transaction-based fees we earn. This creates an incentive to encourage you to trade often.

- For investments in stocks or ETFs, the transaction-based fee is usually charged as a separate commission or sales charge. For investments in bonds, this fee is typically included as part of the price you pay for the investment (called a markup or markdown).

- For investments in certain products like mutual funds, annuities, and alternative investments, we receive transaction-based fees from the investment product sponsor in the form of asset-based sales charges (e.g., sales loads). These fees are based on the amount invested in a product and, depending on the product, may be based on how long you hold the investment. Our receipt of asset-based sales loads creates an incentive to recommend products or sponsors that include such charges.

### Fees Associated with Investment Advisory Accounts

- For investment advisory services, we typically charge an ongoing quarterly fee (sometimes referred to as an asset-based fee). This fee is a percentage of the value of your account. You pay this fee even if you don't buy or sell investments. The more assets you have in an asset-based fee account, the more you'll pay us in fees. This creates an incentive to encourage you to increase the size of your account, including by transferring or rolling over assets from other accounts. For some types of accounts, there is a per transaction charge in addition to an asset-based fee. We may also charge an hourly fee or fixed fee for additional services such as financial planning and consulting services that are of limited duration or nature.

- For wrap fee program accounts, you will pay us a single asset-based fee for advisory services. This fee also covers most transaction costs and certain administrative and custodial costs associated with your investments. If you expect to trade infrequently or to pursue a "buy and hold" strategy, a wrap fee program may cost you more than paying for the program's services separately, and you may want to consider a brokerage relationship rather than an advisory relationship.

- The fee you pay to your Professional is generally negotiated with him or her directly, and subject to different maximums, depending on the advisory program selected.

### Other Fees and Costs

If applicable to your account, we'll charge you directly for other fees in addition to brokerage commissions and advisory fees, including: (1) account maintenance fees such as custody, trade confirmation processing, corporate actions, and transfer fees; (2) cash management fees such as cash sweep, checking, and wire fees; and (3) investment specific fees such as those for administration of alternative investments or for foreign securities. See the Fee Schedules for our brokerage and advisory programs at lpl.com for more information. You should understand that these fees are not charged by us if your investment is in an account that is held directly with the sponsor, and not in an LPL investment account.

2

You may also incur fees charged by the particular investment product in which you are invested, including mutual funds, ETFs, and other pooled funds, in addition to brokerage commissions and advisory fees charged by us. Some of these fees may be shared, as described below in Third-Party Payments. Certain investment products have significant fees triggered by particular events, e.g., annuities may include mortality, expense, and administrative fees, and fees for excessive transfers or early withdrawals.

You will pay fees and costs whether you make or lose money on your investments. Fees and costs will reduce any amount of money you make on your investments over time. Please make sure you understand what fees and costs you are paying. Detailed information on our advisory fees can be found in the Form ADV for your advisory program. Detailed information on our brokerage fees can be found at Brokerage Compensation Information and Related Conflicts of Interest and, depending on the investment product in which you invest, may be included in the product's prospectus or other offering document. If viewing a paper version of this form, please visit lpl.com/CRS for hyperlinks to these documents.

### ▧ Questions to ask your Professional:
*Help me understand how these fees and costs might affect my investments. If I give you $10,000 to invest, how much will go to fees and costs, and how much will be invested for me?*

---

## What are your legal obligations to me when providing recommendations as my broker-dealer or when acting as my investment adviser? How else does your firm make money and what conflicts of interest do you have?

*When we provide you with a recommendation as your broker-dealer or act as your investment adviser,* we have to act in your best interest and not put our interest ahead of yours. At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the recommendations and investment advice we provide you. Here are some examples to help you understand what this means. If you have questions about whether any of these situations could apply to your investments, ask your Professional.

### Third-Party Payments

We receive compensation from third parties related to investments you make in certain products, including mutual funds, ETFs, annuities, alternative investments, and other investments. This compensation includes ongoing distribution charges (e.g., 12b-1 fees or trail payments), which an investment product charges you and then pays to us. We also receive fees from investment products and/or their sponsors for recordkeeping and other administrative services we provide in relation to your investments. In some accounts we offer, uninvested cash is automatically placed into interest-bearing federally insured bank accounts. We receive fees for your participation in these "cash sweep" programs from the banks sponsoring the programs. The fees we receive are typically higher than the interest you earn on the cash held in the bank accounts and are in addition to any fees you pay to us. This creates an incentive for LPL if you maintain a cash balance in your account. Revenue sharing payments are another type of third-party compensation we receive from sponsors who participate in our marketing programs. These programs support our product marketing to our Professionals and for education and training efforts, and facilitate communications between sponsors and our Professionals. Finally, certain sponsors pay us to make their investment products available on our platform. Because we receive payments from these third parties, there is an inherent incentive for us to recommend or invest your assets in those investment products. Detailed information regarding third-party payments can be found in the Third-Party Compensation and Related Conflicts of Interest document on lpl.com.

### Principal Trading

In brokerage accounts, we sometimes directly buy from you or sell to you investments including bonds or certain shares of mutual funds, unit investment trusts (UITs), or alternative investments. These are called principal trades. If the principal trade involves a bond, we receive a markup or markdown by either buying the bond from you at a lower price than we will sell it for or by selling the bond to you at a higher price than we bought it for. That creates an incentive for us to either buy the bond from you at the lowest price possible or sell the bond to you at the highest price possible and maximize our profit on the principal trade. In advisory accounts, purchases of mutual funds, UITs, or alternative investments may be processed through our proprietary account, but we do not receive a markup or markdown in these trades. Also, in certain advisory accounts where a third-party investment advisory firm has discretion, we trade as principal and receive a markup or markdown.

Detailed information on our conflicts of interest can be found in the Form ADV for your advisory program and in Brokerage Compensation Information and Related Conflicts of Interest. If viewing a paper version of this form, please visit lpl.com/CRS for hyperlinks to these documents.

### ▧ Questions to ask your Professional:
*How might your conflicts of interest affect me, and how will you address them?*

## How do your financial professionals make money?

Our Professionals are primarily independent contractors, although a portion are employees or employees of an affiliated company. The agreement between each Professional and LPL sets out the payments we make to them. Those who provide investment advisory services receive a portion of the advisory fee you pay. Professionals who provide you brokerage services receive a portion of the commissions or markups/markdowns from your trades. Receiving a portion of the advisory or brokerage fees you pay to us creates an incentive for them to encourage you to increase your investment account size or trade more frequently. We also compensate Professionals based on production, including payments based on the amount of client assets they service and the products they sell. In addition, our Professionals receive different levels of compensation for selling different types of investments or services. This could include, for example, a share of the 12b-1 fees, trail payments, or sales loads paid to us by an investment product. Although your Professional must recommend investment products or manage your account in your best interest, these additional forms of compensation create an incentive for them to recommend specific financial products.

Our Professionals may receive compensation from us in other ways, including:

- Transition assistance if he or she moves to LPL from another company. This assistance can include forgivable loans, advance payment of advisory fees, and/or waiving or reducing other

costs associated with transitioning the Professional's business. This assistance creates an incentive to migrate and maintain business on our platform from another investment platform, and to sell or recommend the sale of investments held in an account if we do not offer those investments.

- Waived or reduced costs and fees (e.g., for administrative services that we provide for your accounts, attending our conferences and events, and free or reduced-cost marketing materials). These waived and reduced costs and fees create an incentive for Professionals to associate with us instead of other financial firms.

- Equity awards in our parent company, LPL Financial Holdings Inc., which give your Professional an incentive to remain with us during the vesting period applicable to his or her stock holdings (the period of time before the stock is unconditionally owned). This also gives the Professional a financial interest in the success of our business.

Your Professional is legally required to act in your best interest and not put his or her interests ahead of your own. We have systems in place to mitigate the conflicts of interest that arise from the way he or she makes money, including systems to review whether a recommendation is in your best interest. More information on compensation can be found at Brokerage Compensation Information and Related Conflicts of Interest. If viewing a paper version of this form, please visit lpl.com/CRS for a hyperlink to this document.

## Do you or your financial professionals have legal or disciplinary history?

Yes. Visit Investor.gov/CRS for a free and simple search tool to research LPL and our Professionals.

**⬚ Questions to ask your Professional:**

*As a financial professional, do you have any disciplinary history? For what type of conduct?*

## Additional Information

Please visit the Disclosures page on lpl.com for more information, including a copy of the agreement for the account and/or program you are considering, the Form ADV Brochure for any advisory program you are considering, detailed information on our brokerage services under Brokerage Compensation and Related Conflicts of Interest, and more information regarding our brokerage and advisory programs under Third Party Compensation and Related Conflicts of Interest.

Please visit the Investor Regulatory & Educational Resources page on lpl.com to learn more about how to determine your investment objective and risk tolerance, among other items.

We are affiliated with other investment firms. If your Professional works with Fortigent, LLC, you can find the relationship summary for that firm at lpl.com/fortigent.html. More information on our affiliations can be found in the Form ADV for your advisory program.

If viewing a paper version of this form, please visit lpl.com/CRS for hyperlinks to cross-referenced documents.

**To request up-to-date information or a copy of this relationship summary, please call us at (800) 558-7567.**

We also encourage you to review the general information provided by the U.S. Securities and Exchange Commission regarding investing, choosing an investment professional, and related considerations, available by visiting Investor.gov.

**⬚ Questions to ask your Professional:**

*Who is my primary contact person? Is he or she a representative of an investment adviser or a broker dealer? Who can I talk to if I have concerns about how this person is treating me?*





LPL Financial

# Strategic Asset Management (SAM) Account Packet

AP – SAM – 0126
LPL Financial, Member FINRA/SIPC

**⊿ LPL Financial**

# Strategic Asset Management Account Agreement

This Account Agreement ("Agreement") is entered into by and among LPL Financial LLC ("LPL"), a registered investment adviser and broker-dealer, the LPL Investment Adviser Representative indicated in Section V of the Account Application attached hereto ("IAR"), and the client indicated in Section I of the Account Application ("Client" or "you"), pursuant to which Client will open an account ("Account") with LPL and IAR for the purpose of participating in the Strategic Asset Management Program (the "Program"). Notwithstanding any other provision of this Agreement to the contrary, the advisory services to be provided under this Agreement by either LPL or IAR shall not begin until your Account paperwork has been accepted by LPL at its home office as being in good order.  LPL's acceptance of the Account will generally occur within 15 business days, but can take longer in certain circumstances, from the day you provide completed paperwork to your IAR. A description of the services to be provided and the parties providing the services are set forth below.

## 1. LPL SAM Program

Under the Program, Client authorizes IAR on a discretionary basis to purchase and sell no-load and load-waived mutual funds, unit investment trusts ("UITs"), closed-end funds and exchange-traded funds ("ETFs") pursuant to investment objectives chosen by Client, to liquidate previously purchased investments, and to purchase and sell separate accounts within Variable Annuities. Transactions in other securities approved by LPL for investment in the Account, including Equities, Fixed Income, Exchange-Traded Notes ("ETNs"), Certificates of Deposit, Interval Funds, Hedge Funds, Managed Futures, Real Estate Investment Trusts ("REITs"), Business Development Companies ("BDCs"), Structured Products and Options, may be effected in the Account at Client's direction.

IAR will obtain the necessary financial data from Client, assist Client in determining the suitability of the Program, and assist Client in setting appropriate investment objectives. IAR will initiate the steps necessary to open the Account. As discussed above, Client understands that, although the Account may be open, the obligation of IAR to manage the Account, or for LPL or IAR to provide advisory services with respect to the Account, begins only after LPL has accepted the Account. Client understands that the investment objective selected for the Account in the Account Application is an overall objective for the entire Account and may be inconsistent with a particular holding and the Account's performance at any time. Client understands that achievement of the stated investment objective is a long-term goal for the Account.

The minimum account size is $10,000 at inception. In certain instances, LPL will permit a lower minimum account size. Client may make cash additions to the Account at any time and may withdraw account assets on notice to IAR, subject to Section 8 below. In the event Client withdrawals cause the Account asset value to fall below the required minimum, Client understands this Agreement may be subject to immediate termination under the provisions of Section 8. Client understands that the Program is designed as a long-term investment program and that asset withdrawals (or requests to allocate all or a portion of Account assets into cash) will affect the performance of the Account.

LPL reserves the right to accept or reject this Agreement in its sole discretion and for any reason.

IAR may, in its sole discretion and as agreed from time to time with Client, provide financial planning or financial consulting services to Client under this Agreement at no additional cost. IAR may also, in its sole discretion, require Client to enter into a separate agreement with an agreed upon fee for financial planning or financial consulting services. The scope and duration of any financial planning and consulting services will be agreed upon at the time of the services and may or may not include a written, customized financial plan.



Strategic Asset Management (SAM) Account Agreement

## 2. Trading Authorization

Client hereby grants LPL and IAR complete and unlimited discretionary trading authorization with respect to the purchase and sale of no-load and load-waived mutual funds, UITs, closed-end funds and ETFs, the sale of previously purchased load mutual funds, and the purchase and sale ("Transfer") of separate accounts within Variable Annuities, in the Account. Client hereby appoints IAR as agent and attorney-in-fact with respect to this trading authorization. Client also authorizes IAR, acting at Client's direction, to effect transactions in other securities approved by LPL for investment in the Account. Other than as described in Section 16 and 17, LPL and IAR are not authorized to withdraw or transfer any money, securities or property either in the name of Client or otherwise.

Client hereby authorizes LPL to reinvest dividends in accordance with LPL's Dividend Reinvestment Program ("DRP"). Some securities held in the Account may be ineligible for DRP, including securities not custodied at LPL Financial. Client acknowledges (1) they can enroll or unenroll at any time by contacting their IAR or LPL; (2) DRP transactions will be confirmed on at least a quarterly basis as part of their regular periodic account statement; and (3) there is no requirement to participate in the DRP. Additional important disclosures about DRP, including eligibility, fees, how dividends are reinvested, and more can be found at lpl.com/disclosures.html.

Client understands that IAR is prohibited from taking personal possession of Client securities, stock powers, monies or any other personal or real property in which Client may have an interest. In addition, Client understands that IAR may not lend to or borrow from Client any monies or securities. Client further agrees not to enter into any other business relationship with IAR including, but not limited to, helping to capitalize or finance any business of IAR.

Client retains the right to Transfer separate accounts within Variable Annuities by contacting the Variable Annuity sponsor directly if desired. It is Client's responsibility to notify IAR promptly if this right is exercised so as to avoid potential adverse consequences to the Account.

Client understands that LPL, IAR and their affiliates perform advisory and/or brokerage services for various other clients, and that IAR may give advice or take actions for those clients that differ from the advice given or the timing or the nature of any action taken for the Account. In addition, LPL and IAR may, but are not obligated to, purchase or sell or recommend for purchase or sale any security which LPL or IAR or any of their affiliates may purchase or sell for their own accounts or the account of any other client.

In no event will LPL or IAR be obligated to effect any transaction for Client which it believes would violate any applicable state or federal law, rule or regulation, or the rules or regulations of any regulatory or self-regulatory body.

## 3. Proxies and Prospectus Delivery

Client understands and agrees that Client retains the right to vote all proxies which are solicited for securities held in the Account. LPL and IAR are hereby expressly precluded from voting proxies for securities held in the Account and will not be required to take any action or render any advice with respect to the voting of proxies.

LPL and IAR shall not be obligated to render any advice or take any action on behalf of Client with respect to any legal proceedings, including bankruptcies, involving securities or other investments held in the Account, or the issuers thereof. Client hereby retains the right and obligation to take action with respect to legal proceedings relating to securities held in the Account.

Client hereby designates LPL, as a broker-dealer and investment adviser, to receive all prospectuses, annual reports and disclosure statements for securities held in the Account.  Client may request prospectuses and reports from his or her IAR.



Strategic Asset Management (SAM) Account Agreement

---

## 4. Client Authority/ERISA and Retirement Accounts

If Client is a corporation, the party executing this Agreement on behalf of Client represents that execution of this Agreement has been duly authorized by appropriate corporate action, and the party executing the Agreement has the authority to enter into this Agreement on behalf of corporation.

If this Agreement is entered into by a trustee or other fiduciary, including but not limited to someone meeting the definition of fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA"), of (i) an employee benefit plan subject to the fiduciary provisions of ERISA (an "ERISA Plan"), (ii) a "plan" within the meaning of Section 4975(e) of the Internal Revenue Code of 1986 (the "Code"), (iii) any entity whose assets are treated as "plan assets" for purposes of ERISA or Section 4975 of the Code (a "Plan Asset Entity"), or (iv) a plan, trust or entity subject to laws similar to the fiduciary duty provisions of ERISA or the prohibited transaction rules under Section 4975 of the Code (each of the foregoing, including any related trust or funding vehicle, a "Plan" and, collectively, "Plans"), such trustee or other fiduciary ("Responsible Plan Fiduciary") represents and warrants that Client's participation in the Program is permitted by the relevant governing instrument of such Plan and laws applicable to such Plan, and that Client is duly authorized to enter into this Agreement on behalf of such Plan.

If Client is an ERISA Plan or a Plan Asset Entity holding assets of one or more ERISA Plans, Responsible Plan Fiduciary additionally represents and warrants that the Responsible Plan Fiduciary executing and delivering this Agreement on behalf of Client is a "named fiduciary" (as defined under ERISA) who has power under the ERISA Plan(s) to appoint LPL and IAR to provide the services under this Agreement. If Client is a Plan, Client shall obtain and maintain during the term of this Agreement any bond required by ERISA or other applicable law with respect to fiduciaries and shall include LPL within the coverage of such bond. If Client is an ERISA Plan of Plan Asset Entity holding assets of one or more ERISA Plans, this Agreement, the Account Application, and the Program Brochure include disclosures required to be provided to an ERISA Plan under ERISA Section 408(b)(2). The 408(b)(2) Disclosure Guide attached hereto contains a guide to this important information that Client should consider in connection with the services to be provided by LPL to the Plan. Responsible Plan Fiduciary agrees that it has been provided all disclosures required to be provided by the Department of Labor Regulations under ERISA Section 408(b)(2) in connection with the Program and has determined that the compensation Client pays for the services provided under this Agreement is reasonable.

If Client is an ERISA Plan or a Plan Asset Entity holding assets of one or more ERISA Plans, Client acknowledges that it has sole responsibility for compliance with the restrictions on investment in employer securities under Section 407 of ERISA. Client further acknowledges that LPL and IAR only undertake responsibility with respect to assets of Client allocated to the Account and do not have responsibility for making decisions regarding the following types of assets: employer securities; real estate (except for real estate funds and REITs); self-directed brokerage accounts; participant loans; non-publicly traded partnership interests; other non-publicly traded securities (other than collective trusts, unitized models and similar vehicles); or other hard-to-value securities or assets. If Client is an ERISA Plan or a Plan Asset Entity holding assets of one or more ERISA Plans, Client acknowledges and agrees that (i) the Responsible Plan Fiduciary assumes full responsibility for making the investment decision to invest assets of Client in the Account and is aware of and has taken into consideration its fiduciary duties (including, without limitation, the diversification requirements of Section 404(a)(1)(C) of ERISA), (ii) the decision to invest assets of Client in the Account was made by a Responsible Plan Fiduciary that is independent of LPL and IAR and the Responsible Plan Fiduciary has not relied and is not relying on LPL or IAR to provide any kind of investment advice with respect to Client's decision to invest assets in the Account, (iii) neither LPL, IAR nor any of their affiliates shall be responsible for compliance by Client with the provisions of ERISA requiring that investments of Client be diversified, (iv) the Responsible Plan Fiduciary has sole responsibility with respect to decisions regarding the allocation of Client's assets and has considered the liquidity constraints of the Account and overall liquidity needs of Client in making the decision to invest Client assets in the Account, (v) the investment of Client assets in the Account does not constitute a non-exempt prohibited transaction under ERISA or Section 4975 of the Code or any similar law, and (vi) in providing services under this Agreement, neither LPL nor IAR has or will have any discretionary authority or discretionary responsibility in the administration of the Plan or interpretation of the Plan documents, the determination of participant eligibility, benefits, or vesting, or the approval of loans or distributions by the Plan, and neither LPL nor IAR is the "administrator" of the Plan as defined in



## Strategic Asset Management (SAM) Account Agreement

ERISA or undertakes any responsibility with regard to the operation of the Plan (including, without limitation, the Plan's contribution, loan, or distribution provisions), or the Plan's compliance with ERISA or the Code.

If the Account is being managed for a particular participant in a Plan (a "Self-Directed Account"), the term Client as used in this Agreement refers to the Responsible Plan Fiduciary and the participant, and both the Responsible Plan Fiduciary and participant must sign the Account Application. In the case of a Self-Directed Account, Client represents to LPL that the Plan's governing documents (including any applicable adoption agreement) and laws governing the Plan permit the participant to self-direct his or her investment of all assets in the Account. If LPL or IAR receives trade instructions from participant, rather than from the Responsible Plan Fiduciary or its designee, such as a trustee, plan administrator or other delegate, Client represents that the Plan's governing documents, including any procedures established by the Responsible Plan Fiduciary, and laws governing the Plan permit the participant to provide trade instructions directly to LPL and IAR.

In the case of a Self-Directed Account, although the Plan's governing documents allow participant to direct investments of the Account, the Plan trustee(s) remains the legal owner of the assets in the Account, and the rules regarding withdrawals, contributions and other actions are primarily governed by the Plan documents, including any related trust agreement. If participant is entitled to a distribution or withdrawal from the Account, Client is aware that an LPL distribution/withdrawal request will need to be authorized and directed by the Responsible Plan Fiduciary in addition to participant's authorization requesting the transaction. If participant invests through this Account instead of designated investment options as may be provided by the Responsible Plan Fiduciary under the Plan, if applicable, Client acknowledges that the services (including investments) under this Agreement may be different, and the fees may be higher, than if participant invested through those designated Plan investment options. Client understands that the investment objective for this Account will be based on the investment objective of the participant as provided in the Account Application, and generally will be different from the investment objectives of other Plan accounts for different participants of the same or different Plans.

LPL provides advisory services under this Agreement as a registered investment adviser under the Investment Advisers Act of 1940 (the "Advisers Act"). To the extent that LPL and IAR have or exercise discretionary authority under this Agreement with respect to the management of assets of the Account (or otherwise provide "investment advice" under this Agreement as defined under Section 3(21) of ERISA or Section 4975 of the Code with respect to the assets of the Account), LPL and IAR acknowledge that they will be deemed a "fiduciary" as such term is defined under Section 3(21) of ERISA or Section 4975 of the Code, as applicable, with respect to such advisory services. This acknowledgment of status under ERISA is not intended to create or expand any "fiduciary" relationship, capacity, or obligations of LPL and your LPL IAR under other federal, state or local laws. Client is solely responsible for considering all relevant services, fees and conflicts of interest applicable to the services contemplated under this Agreement (and related disclosures) before making a decision to participate in the Program, or to contribute to or withdraw assets from the Program. Client understands and agrees that neither LPL nor IAR undertakes to act as a "fiduciary" within the meaning of ERISA or Section 4975 of the Code with respect to Client's decision to participate in the Program, accept the terms and conditions of the Agreement, or to contribute to or withdraw assets from the Account. Client should consider whether to seek the advice of counsel or other independent experts as necessary. LPL and IAR each acknowledge that, to the extent it is authorized in Sections 1, 2 and 3, as in effect at any given time, to exercise discretionary authority to manage, acquire, or dispose of assets of the Account, it will be a fiduciary and serve as an "investment manager," as such term is defined under Section 3(38) of ERISA. As discussed herein, LPL and IAR do not undertake to provide advisory services under this Agreement nor become fiduciaries to any Plan until the Account has been accepted by LPL.

If Client is a Plan, the person executing this Agreement authorizes LPL to collect transaction fees or transaction-related fees in connection with brokerage transactions, as permitted by Prohibited Transaction Class Exemption 86-128 (51 F.R. 41686, as amended and restated effective June 9, 2017). This authorization is terminable at will by the Plan. Client acknowledges and agrees that LPL has furnished the following documents to the Plan: (a) a form for terminating this authorization; (b) a description of LPL's brokerage placement practices; and (c) a copy of the Prohibited Transaction Class Exemption 86-128. Client acknowledges and agrees that these disclosures are available on LPL's website at lpl.com/disclosures.html under "Retirement Plans and Individual Retirement Accounts Disclosures." Client



Strategic Asset Management (SAM) Account Agreement

acknowledges and agrees that Client has accessed and reviewed these disclosures to the extent Client believes necessary to provide this authorization.  Copies of these disclosures are available upon request by contacting your IAR.

Client agrees to furnish IAR and LPL with governing plan documents as they shall reasonably request with respect to the foregoing. Client agrees to advise LPL and IAR of any event which might affect this authority or the validity of the Agreement.

## 5. Custody and Reporting

LPL maintains custody of client funds and securities in the Account. For any month that there is activity in the Account, Client will receive a periodic account statement showing account activity as well as positions held in the Account at month or quarter end.  Additionally, Client will receive a confirmation of each transaction that occurs within the Account unless the transaction is the result of a systematic purchase, systematic redemption, or systematic exchange. Client will also receive performance information annually from LPL describing account performance, positions and activity. Additional performance information is available upon request. By signing the Account Application, you authorize LPL to combine statements as instructed by you through your IAR and understand that such instructions will mean that LPL will share your account information with members of the combined group. LPL will confirm such instructions after receipt of the request. Client understands that it is important to review promptly confirmations, account statements, disclosures, and other documents and communications that LPL or IAR provides. Client agrees to notify LPL or IAR promptly if anything in the account documents appears inaccurate or suspicious.

Although most securities available to be purchased in the Account are held at LPL, there are certain securities that may be managed as part of the Account that are held at third parties, and not LPL.  For example, Variable Annuity, Hedge Fund, REITs and Managed Futures positions are often held directly with the investment sponsor. For those outside positions, Client will receive confirmations and statements directly from the investment sponsor.  LPL and IAR do not have authority to withdraw assets from these outside positions on behalf of Client.

LPL may receive information from these investment sponsors regarding the outside positions (e.g., number of shares held and market value) and display that information on statements and reports prepared by LPL. Such information also may be used to calculate performance in performance reports prepared by LPL. Although LPL believes that the information it receives from the investment sponsors is reliable, Client should refer to the statements and reports Client receives directly from the investment sponsor and compare them with the information provided in any statements or reports from LPL. The statements and reports Client receives from LPL with respect to outside positions should not replace the statements and reports received directly from the investment sponsor.

If Client has purchased a Variable Annuity that is part of the Account, Client acknowledges that Client has received the prospectus and is relying solely on the disclosure contained in the prospectus with respect to the terms and conditions of the Variable Annuity. Client understands that certain riders purchased with a Variable Annuity may limit the investment options and the ability to manage the subaccount.

## 6. Conflicts of Interest

Client understands that, once accepted by LPL, the Account will be charged an ongoing fee for investment advisory services and that the ongoing fee may cost more than if the assets were held in a traditional brokerage account. In a traditional brokerage account, a client pays commission to the representative for each transaction, and the representative has no duty to provide ongoing advice and monitoring with respect to the account. If Client plans to follow a buy and hold strategy for the assets in the Account or does not wish to purchase ongoing management services, Client should consider instead a brokerage account.

LPL is appointed by Client as the sole and exclusive broker-dealer with respect to processing securities transactions for the Account. LPL may aggregate transactions for Client with other clients to improve the quality of execution. The Account Fee described in Schedule A represents compensation for the asset management and quarterly reporting services provided to SAM program clients.  Upon request, the Account Fee may be structured on a tiered basis and/or



## Strategic Asset Management (SAM) Account Agreement

grouped basis, with a reduced percentage rate based on reaching certain thresholds in the Account or in a group of eligible advisory accounts.

If Client participates in the Program, the transaction charges set forth in Schedule B represent the brokerage trade processing component of compensation paid by Client for the Account and may be higher or lower than commissions otherwise payable in the absence of the Account Fee.  Client understands that engaging in frequent trading will result in paying more transaction charges and will increase the overall costs associated with the Account.  Those costs impact the performance of the Account.  LPL has a conflict of interest insofar as it has a financial incentive to engage in trading of the account to generate transaction charges. IAR may agree separately with Client to bear the transaction charges. If IAR agrees to bear transaction charges, Client understands that IAR will be subject to different conflicts of interest described further below.

Except with respect to cash sweep money market funds ("Sweep Funds") described in Section 20 below, LPL makes available for purchase only one share class per mutual fund in the Program which can be titled, for example, as "Class I," "institutional," "investor," "retail," "service," "administrative" or "platform" share classes ("Program Shares"). Program Shares are no-load or load-waived share classes and therefore not subject to any upfront sales charge. Share classes previously available in the Program prior to November 21, 2016, such as Class A Shares that are subject to 12b-1 fees, can still be held but not purchased in the Program ("Non-Surviving Share Classes"). A Client may transfer Non-Surviving Share Classes into Client's Account.  Any 12b-1 fees received by LPL from mutual funds in the Program (other than Sweep Funds) will be credited to Client's Account. Client understands that if a Non-Surviving Share Class is held in the Account, that share class may be more expensive than the Program Shares even after the 12b-1 fee is credited back to the Account.

Client understands that the share class offered for a particular mutual fund through the Program in many cases will not be the least expensive share class that the mutual fund makes available.  Program Share classes are selected by LPL in certain cases because the share class pays LPL compensation for the administrative and recordkeeping services LPL provides to the mutual fund.  As a result, LPL will not achieve best execution for purchases of share classes that are more expensive because the recordkeeping and other expenses make it a more expensive share class than Client otherwise would be eligible to purchase had LPL chosen to make that share class available.  Client understands that another financial services firm may offer the same mutual fund at a lower overall cost to the investor than is available through the Program.

If Client participates in the Program, Client further understands that LPL charges Client a transaction charge of $0, $4.50 or $26.50 for mutual fund purchases and redemptions. The applicable transaction charge varies depending on the amount of recordkeeping fees that LPL receives from the mutual fund and/or whether the sponsor of the mutual fund participates in LPL's Mutual Fund No Transaction Fee Network ("MF NTF Network") described below. For mutual funds, transaction charges vary based on the amount of recordkeeping fees that LPL receives from the fund and/or whether the sponsor of the fund participates in the MF NTF Network.

When a mutual fund participating in the MF NTF Network is purchased in an Account, the mutual fund's sponsor directs a payment to LPL on behalf and for the benefit of Client that is used exclusively as a credit to defray bona fide transaction charge obligations of Client's Account.  When a participating mutual fund is sold in an Account, LPL waives the transaction charge.

The Program also offers an ETF No Transaction Fee Network ("ETF NTF Network"). LPL typically charges $9 for transactions in ETFs, however, for certain ETFs in the ETF NTF Network, the ETF sponsors direct a payment to LPL on behalf and for the benefit of Client that is used as a credit to defray all or a portion of the bona fide transaction charge obligations of the Account. To the extent the sponsor does not pay the entire $9 transaction charge amount, LPL waives the remaining portion to bring the cost to Client to $0.

For purchases of other ETFs in the ETF NTF Network in the Program, the sponsor pays LPL a flat annual amount and/or a fee based on the non-retirement client assets invested in ETF NTF Network funds, and LPL waives the transaction charge. In the case of certain of these fee arrangements, the sponsor pays LPL a combination of a flat fee and/or asset based fee for ETFs. The asset based fee paid to LPL for certain ETFs is higher based on the ETF's expense ratio.



Strategic Asset Management (SAM) Account Agreement

These arrangements present a conflict of interest because LPL has an incentive to select more expensive ETFs. However, this conflict is mitigated because the sponsor fees are not shared with the IAR who selects the ETFs for Client.  For further details and an updated list of ETF sponsors in the ETF NTF Network, please refer to lpl.com/disclosures.html.

LPL receives a fee from the issuers of structured products for administrative services and related support LPL provides in connection with the structuring and distribution of these products. This fee can be up to 0.75% of the principal amount of a trade and generally varies among products according to the complexity of the structuring.  This fee creates a conflict of interest because LPL has an incentive to recommend structured products over other products that do not pay LPL a similar fee. This conflict is mitigated insofar as the amount LPL receives is consistent for similar types of structured products across different product issuers, and is not shared with its IARs. Client should review the product offering documents for additional details.

Client understands that, if IAR agrees to bear transaction charges for the Account, there will be different conflicts of interest.  The cost to the IAR of transaction charges may be a factor that the IAR considers when deciding which securities, ETFs or mutual funds to select and whether or not to place transactions in the Account. In particular, the IAR will have a financial incentive to recommend transactions in securities that carry lower fees (e.g., transactions involving equity securities may be recommended over fixed income securities because of the lower transaction charge) or to limit the overall number of transactions it recommends to Client. Client should note that the Account Fee being charged may take the payment of transaction charges into consideration.  That is, the Account Fee charged to accounts may be lower than the Account Fee charged to accounts for which the IAR agrees to bear transaction charges. If the IAR agrees to bear transaction charges, Client understands that engaging in a "buy and hold" strategy would not capitalize on any higher Account Fee being charged in light of the IAR paying charges for transactions in certain securities.  Client understands and acknowledges that all such conflicts also may have an impact on investment performance of Client's Account.

In connection with servicing the Account, Client acknowledges and agrees that Client will be charged by LPL certain incidental miscellaneous fees and charges. These fees are set out in the Miscellaneous Account and Service Fees Schedule attached hereto.  These fees include, as applicable, a cash sweep fee, an annual IRA maintenance fee and an account termination fee for processing a full account transfer to another financial institution. LPL also makes available a current list of these fees on its website at lpl.com/disclosures.html.  These fees are not directly based on the costs of the transaction or service by LPL, often include a profit to LPL, and certain of the fees are lowered or waived for certain clients. In some cases, LPL waives these fees for clients of IARs who have agreed to share a greater portion of the Account Fee with LPL.  These fees are subject to change at the discretion of LPL. Client will be notified of these charges and any changes through information provided with periodic statements for the Account. These fees and charges shall continue until thirty (30) days after LPL has notified Client in writing of any change in the amount of the fees or charges applicable to the Account, at which time the new fees or charges will become effective unless Client notifies LPL in writing that the Account is to be closed.

LPL serves as a sub-services agent with respect to the Optimum Funds, which are available for investment in the Program. As such, LPL will provide all sub-accounting and shareholder recordkeeping with respect to Optimum Fund shares, and will provide the following administrative services among others: 1) establishing and maintaining sub-account records reflecting the issuance, transfer or redemption of shares, 2) assisting shareholders in designating and changing account designations and addresses, and 3) responding to inquiries for shareholders with respect to the status of sub-accounts, fund performance, sub-account histories and making adjustments to sub-accounts to correct sub-account files. As compensation for these services, LPL receives administrative servicing fees from the service agent of the Optimum Funds.

LPL provides investment consulting services to the adviser to the Optimum Funds including, but not limited to: 1) assisting the adviser in determining whether to employ, maintain or terminate sub-advisers for the Optimum Funds, 2) providing quarterly fact sheets describing the performance of the Optimum Funds, 3) providing quarterly analysis consisting of statistical information and analysis regarding the Optimum Funds and sub-adviser performance, 4) meeting with sub-advisers selected by the adviser to the Optimum Funds to discuss their performance and prepare



## Strategic Asset Management (SAM) Account Agreement

reports regarding their evaluations, and 5) helping the adviser make recommendations on sub-advisers to the Board of Trustees by providing the adviser to the Optimum Funds with potential sub-adviser options. As compensation for these services, LPL receives investment consulting compensation from the adviser to the Optimum Funds.

LPL has fee arrangements with investment advisors or distributors ("sponsors") of mutual funds, ETFs, annuities, alternative investment products and structured products that are available for purchase in an Account, called revenue sharing. Under these arrangements, the sponsor pays LPL a fee based on the amount of client assets invested in the sponsor's products, and/or a fixed fee, and LPL provides marketing support, data analytics, and administrative services to the sponsor and allows the sponsor to access LPL IARs so that the sponsor can promote such products. Client understands that this type of arrangement gives LPL a financial incentive to have LPL clients invest in participating products instead of those whose sponsors do not make such payments to LPL.  LPL accepts revenue sharing fees for assets held in retirement accounts, to the extent permitted by applicable law, including ERISA. This conflict is mitigated insofar as the revenue sharing payments LPL receives are not shared with LPL IARs who select or recommend the investment products for client accounts.

LPL does not receive compensation for directing orders in equity securities to particular broker-dealers or market centers for execution.

LPL credits to the Account funds belonging to Client such as dividends, interest, redemptions, and proceeds of corporate reorganizations on the day such funds are received by LPL. These funds come to LPL from issuers and various intermediaries in which LPL is a participant, such as the Depository Trust Company ("DTC"). Information regarding when LPL credits the Account with funds due the Account, when those funds are available to Account, and/or when Client begins earning interest on the funds is available from LPL.

Securities held in the Account which are in "street name" or are being held by a securities depository are commingled with the same securities being held for other clients of LPL. Client ownership of these securities is reflected in LPL's records. Client has the right at any time to require delivery of any such securities which are fully paid for. The terms of many bonds allow the issuer to partially redeem or "call" the issue prior to the maturity date. Certain preferred stocks are also subject to being called by the issuer. Whenever any such security being held by LPL is partially "called", LPL will determine, through a random selection lottery process as prescribed by DTC, the ownership of the securities to be submitted for redemption without regard to unsettled sales. In the event that such securities owned by Client are selected and redeemed, the Account will be credited with the proceeds. Should Client wish not to be subject to this random selection process, Client must instruct LPL to register and deliver the securities to Client. Delivery will be effected provided that Client's securities are unencumbered or have not already been called prior to the receipt of Client's instructions. If Client takes delivery of the securities, they are still subject to call by the issuer and they will no longer be considered assets in the Account for management purposes. The probability of one of Client's securities being called is the same whether they are held by Client or by LPL for Client. Please refer to the "Marketing & Trading Disclosures" section on lpl.com/disclosures.html for LPL's Call Securities Lottery Disclosure. In addition, a detailed description of the random selection procedure is available upon request.

Consistent with the overriding principle of best execution, LPL directs orders in equity securities to exchanges and market makers based on an analysis of their ability to provide rapid and quality executions. In an effort to obtain best execution for equities, LPL may consider several factors, including price improvement opportunities (executions at prices superior to the then prevailing inside market on OTC or national best bid or offer for listed securities).

**Plan to IRA Rollovers.** If Client is a participant in an employer-sponsored retirement Plan such as a 401(k) plan, and decides to roll assets out of the plan into the Account, LPL and LPL IAR have a financial incentive to encourage Client to invest those assets in the Account, because LPL will be paid on those assets, for example, through advisory fees. Client should be aware that such fees likely will be higher than those a participant pays through an employer-sponsored plan, and there can be maintenance and other miscellaneous fees.  As securities held in employer-sponsored plans are generally not transferrable to the Account, commissions and sales charges may be charged when liquidating such securities prior to the transfer, in addition to commissions and sales charges previously paid on transactions in the plan. This conflict of interest is mitigated by LPL's policy regarding rollovers from an employer-sponsored plan into an LPL individual retirement account ("IRA").



## Strategic Asset Management (SAM) Account Agreement

LPL and LPL IARs may assist Clients contemplating a rollover by providing general investment education to assist plan participants in making informed investment decisions about the distribution options available to them. LPL's educational services are intended to be consistent with the Department of Labor's Interpretive Bulletin 96-1. LPL is not acting in a fiduciary capacity under ERISA when providing educational services. The general investment education provided is not intended to be viewed or construed as a suggestion for Client to take a particular course of action with respect to employer-sponsored plan assets (including, a distribution therefrom). With respect to employer-sponsored plan rollovers, LPL makes information available that outlines the many factors Client should consider (including the types of fees and costs of an IRA and IRA investments) before making a decision.  IARs may also agree to assist Clients seeking a recommendation on whether to roll out of their employer-sponsored plan based on an analysis of the Client's personal financial needs, savings objectives and other financial and non-financial considerations, that is designed to determine whether such is in the Client's best interest under ERISA.

**IRA to IRA Transfers.**  If LPL or LPL IAR recommends that Client move assets from an LPL brokerage IRA account or from an IRA account at another financial institution into the Account, they are required to consider, based on the information Client provides, whether Client will be giving up certain investment-related benefits, such as the effects of breakpoints or rights of accumulation, and has determined that the recommendation is in Client's best interest because (1) greater services and/or other benefits (including discretionary management, trust services, holistic advice and planning, and automatic account rebalancing) can be achieved with the Account; (2) access to your chosen financial professional and asset consolidation (in the case of a transfer from another financial institution) and (3) the asset based fees and transaction charges are justified by these services and features.

Notwithstanding whether a recommendation has been made, Client understands and agrees that with respect to any assets Client decides to move into the Account, Client must: (1) evaluate the investment and non-investment considerations important to Client in making the decision; (2) review and understand the fees and costs associated with the Account; (3) recognize that higher net fees (if applicable) will reduce Client's investment returns and ultimate retirement assets; and (4) understand the conflicts of interest raised by the financial benefits to LPL and its IARs resulting from Client's decision to move assets into the Account.

## 7. Limitation of Liability

To the fullest extent permitted under applicable law, neither LPL, IAR nor any of their officers, directors, employees, or affiliates shall be liable for any loss incurred with respect to the Account, except where such loss directly results from such party's negligence or misconduct.

Client acknowledges that neither LPL, IAR nor their employees are agents of each other or of any of their affiliates, and that no party shall be liable for any act or omission of another party or their agents or employees. Nothing in this Agreement shall in any way constitute a waiver or limitation of any rights which Client may have under federal or state securities laws (or ERISA, where applicable).

Client further understands that there is no guarantee that Client's investment objectives will be achieved. Neither LPL nor IAR shall have any liability for Client's failure to inform IAR in a timely manner of any material change in Client's financial circumstances which might affect the manner in which Client's assets are allocated, or to provide IAR with any information as to Client's financial status as IAR may reasonably request.

LPL shall not be liable for any loss or loss of profits caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, lack of access to or latency of trading systems, rioting, mayhem, acts of terrorism, war, outbreak of sickness or disease, strikes, fire, flood, cyber attack, sabotage, network failure, system outage, computer viruses, or other conditions beyond LPL's control, to the extent losses are not otherwise covered by the LPL Cyber Fraud Guarantee, which can be viewed at lpl.com.

Client also understands that IAR and LPL do not provide tax, accounting, or legal advice. In making tax, accounting or legal decisions, Client will consult with and rely on Client's own advisors and not IAR or LPL, and IAR and LPL shall have no liability therefor.



Strategic Asset Management (SAM) Account Agreement

---

LPL is a member of the Securities Investor Protection Corporation ("SIPC"). SIPC provides protection for the Account for up to $500,000, including $250,000 for claims for cash. The Account protection applies when a SIPC member firm fails financially and is unable to meet obligations to securities customers, but it does not protect against losses from the rise and fall in the market value of investments. More information on SIPC, including obtaining a SIPC Brochure, may be obtained by calling SIPC directly at (202) 371-8300 or by visiting www.sipc.org.

## 8. Assignment/Termination

This Agreement may not be assigned or transferred in any manner by any party without the written consent of all parties receiving or rendering services hereunder; provided that LPL may assign this Agreement upon consent of Client in accordance with the Advisers Act. In addition, LPL may add or replace the IAR servicing the Account without Client consent.

This Agreement may be terminated by any party effective upon receipt of written notice to the other parties ("Termination Date"). Upon termination, LPL will deliver securities and funds held in the Account as instructed by Client. Client may also request that the Account be liquidated either in whole or in part. If upon termination, Client does not provide LPL with instructions to deliver the securities and funds held in the Account within 60 days, LPL may at its discretion (i) disburse certificates of outstanding securities from the Account to Client; (ii) notify the transfer agent that LPL no longer custodies or services Account assets and they will thereafter remain at the transfer agent until Client instructs them otherwise; or (iii) liquidate the Account and disburse the funds to Client by check, subject to applicable law. LPL will initiate instructions to deliver funds and/or securities within two weeks of Client's written request. If the Account is liquidated as a result of a termination notice, LPL will have a period of 72 hours to begin liquidations unless special circumstances apply. Proceeds will be payable to Client upon settlement of all transactions in the Account. Client will be entitled to a prorated refund of any pre-paid quarterly Account Fee based upon the number of days remaining in the quarter after the Termination Date. Client understands and agrees that after the Termination Date, the Account will be deactivated.  In a deactivated account, no advisory fees are charged, and the IAR have no responsibility to provide ongoing investment advice.

If the Account is closed within the first six months by Client or as a result of withdrawals which bring the Account value below the required minimum, LPL reserves the right to retain the pre-paid quarterly Account Fee for the current quarter or cancel and rebill all transactions in the Account at normal and customary brokerage commission rates, in order to cover the administrative cost of establishing the Account which may include costs to transfer positions into and out of the Account, data entry costs to open the Account, costs associated with reconciling of positions in order to issue performance information, and the cost of re-registering positions.

In the case of an Account held by an individual, this Agreement shall terminate upon death of Client; provided, however, that the authority of LPL and IAR under this Agreement shall remain in full force and effect until such time as LPL and IAR have been notified otherwise in writing by the authorized representative of Client or Client's estate.

Termination of the Agreement will not affect the liabilities or obligations of the parties from transactions initiated prior to termination.

## 9. Confidentiality

LPL and IAR will keep Client information confidential and will not use or disclose it to others without Client's prior consent except as described in LPL's privacy policy below. Client acknowledges, understands and agrees that for our mutual protection, LPL may electronically record telephone conversations. Client agrees not to record any telephone conversation without express written authorization of LPL and the individual(s) engaged in the conversation.



Strategic Asset Management (SAM) Account Agreement

## 10. Severability

If any provision of this Agreement shall be held or made nonenforceable by a statute, rule, regulation, decision of a tribunal or otherwise, such provision shall be automatically reformed and construed so as to be valid, operative and enforceable to the maximum extent permitted by law or equity while most nearly preserving its original intent. The invalidity of any part of this Agreement shall not render invalid the remainder of this Agreement and, to that extent, the provision of this Agreement shall be deemed to be severable.

## 11. Valuation

In computing the market value of any security or other investment in the Account, each security listed on a national securities exchange shall be valued, as of the valuation date, at the closing price on the principal exchange on which it is traded. Any other security or investment in the Account shall be valued in a manner determined in good faith by LPL to reflect fair market value.

For any assets purchased within the Account, the cost basis is the actual purchase price including transaction charges. For any assets transferred into the Account, original purchase price is used as the cost basis to the extent such information was submitted to LPL by Client or a former service provider. It is Client's responsibility to advise LPL immediately if the cost basis information is portrayed inaccurately. Statement calculations and figures should not be relied upon for tax purposes.

## 12. Governing Law

This Agreement shall be construed under the laws of The Commonwealth of Massachusetts in a manner consistent with the Advisers Act and the rules and regulations of the Securities and Exchange Commission thereunder (and ERISA, where applicable).

## 13. Receipt of Disclosure Documents

Client acknowledges receipt of LPL's Relationship Summary, SAM Program Form Brochure and IAR's Brochure Supplement as required under the Advisers Act. Client understands the investment approach, related risk factors, and the fees associated with investing in the Account. The 408(b)(2) Disclosure Guide attached hereto provides a guide to the information in this Agreement, the Account Application and the SAM Program Form Brochure that constitute disclosure required to be provided to an ERISA Plan under ERISA Section 408(b)(2). This Agreement will not take effect until LPL has accepted the Account.

## 14. Entire Agreement/Amendment

This Agreement represents the entire agreement between the parties with respect to the subject matter contained herein. This Agreement may be amended by LPL upon thirty (30) days' notice to all parties. To access the most current version of this Agreement, please reference lpl.com/disclosures.html.

## 15. Account Application

The Account Application, incorporated herein by reference and made a part of this Agreement, must be completed in full by Client and the accuracy of its contents is hereby acknowledged by Client. By signing the Account Application, Client agrees to the terms and conditions of this Agreement.  LPL may accept the Account electronically. Client further acknowledges that it is Client's responsibility to provide LPL and IAR with updated information as necessary and that LPL and IAR have the right to rely on this information. Client agrees to promptly notify LPL in the event that his or her country of residence or citizenship status changes he or she is no longer a U.S. citizen or U.S. resident, and Client



Strategic Asset Management (SAM) Account Agreement

acknowledges and agrees that such notification will be deemed to be a notice from Client to terminate his or her account result in termination of his or her account by LPL under Section 8 above if LPL does not service accounts in the new jurisdiction.

Important information about procedures for opening this Account: To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. Client is required to provide the following information, among other items, on the Account Application: name, address, date of birth and other information that will allow LPL to confirm Client's identity. In addition, IAR may also ask to see a valid driver's license or other identifying documents.

## 16. Authorization To Purchase Certain Securities

Client may effect transactions in certain alternative investments and annuities in the Account at Client's direction. Upon execution of an application for such an alternative or annuity product, Client hereby authorizes the purchase of such an alternative or annuity product, in the amount specified on the application. If a separate check made payable to alternative or annuity product sponsor is not attached, Client hereby authorizes and instructs IAR and LPL to withdraw funds from the Account in the form of a check made payable to alternative or annuity product sponsor.

## 17. Authorization To Debit Account

Client hereby authorizes LPL to debit all Account Fees payable pursuant to Section 18 directly from the Account and, with respect to an Account of an IRA, the Account Fees related to another IRA or individual retirement annuity of the same beneficial owner. It is agreed by Client and LPL that the Account Fee will be payable, first, from free credit balances, if any, in the Account, second, from the liquidation or withdrawal (which Client hereby authorizes) by LPL of Client's shares of any money market fund or balances in the ICA or DCA, as applicable. LPL reserves the right to liquidate at any time a portion of the other assets in the Account to cover the Account Fee or other charges. The Account Fee will not be withdrawn or deducted by LPL from any Variable Annuity that is part of the Account. The Account may establish procedures to pay the Account Fee directly rather than through a debit to the Account. Any different method of billing Account Fees may result in the imposition of additional charges to cover the administrative costs of billing.

## 18. Fees and Charges

As a participant in the Program, Client agrees to pay an annualized fee ("Account Fee"). Additional details, as well as the maximum Account Fee and applicable transaction charges and other miscellaneous account and service fees, are set forth in Schedule A and Schedule B, respectively, attached hereto. For purposes of calculating quarterly Account Fees and providing performance information, the Account quarter will begin on the first day of the month in which the Account is accepted by LPL unless IAR chooses a different quarterly cycle.

If Client has paid a commission on the purchase of a security in a brokerage account held at LPL within up to two years of the transfer of the security into the Account, Client may be entitled to a credit for a portion of the Account Fee.

The initial Account Fee is due at the beginning of the quarterly cycle following LPL acceptance of the Account and will include the prorated amount for the initial quarter in addition to the standard quarterly fee for the upcoming quarter. Subsequent Account Fees will be assessed at the beginning of each quarterly cycle thereafter and will be based on the value of the Account assets under management as of the close of business on the last business day of the preceding quarter (as valued by an independent pricing service, where available, or otherwise in good faith as reflected on Client's account statement) and based on the fee rate in effect at the time of assessment.  At the time of a subsequent Account Fee assessment, the Account Fee will be adjusted for deposits or withdrawals during the prior quarter pro



## Strategic Asset Management (SAM) Account Agreement

rata based on the asset value of the transaction and based on the fee rate in effect at the time of the assessment.  If there is a change in the Account Fee rate negotiated between IAR and Client during the quarter, the effective date of any increase or decrease will be at the beginning of the next quarterly cycle.

All Account Fees will be deducted from the Account pursuant to the authorization granted under Section 17.  In addition to the Account Fee described in Schedule A, the Account will be assessed the transaction charges as stated in Schedule B to help defray the cost associated with trade execution. Although the transaction charge may be identified under the commission column on the confirmations, it represents a payment of transaction costs and not commissions to IAR.  IAR will not receive any portion of the transaction charge.  Client authorizes LPL to deduct from the Account all Account Fees, transaction charges, and any other fees or charges associated with the Account, unless other arrangements have been made for the Account pursuant to Section 17. Many of such fees and charges are noted on Client's statements or confirmations.

Client also incurs certain charges imposed by LPL or third parties other than IAR in connection with investments made through the Account, including among others, the following types of charges: mutual fund 12b-1, sub-transfer agent, networking and omnibus processing fees, mutual fund management fees and administrative servicing fees, mutual fund transaction fees, contingent deferred sales charges on the sale of certain mutual funds, annuities and alternative investments (such as REITs, BDCs and hedge funds), Annuity expenses, REIT dealer-management fees, other transaction charges and service fees, IRA and qualified retirement plan fees, administrative servicing fees for trust accounts, creation and development fees or similar fees imposed by UIT sponsors, hedge fund investment management fees, managed futures investor servicing fees, participation fees from Auction Rate Preferred fixed income securities, and other taxes and charges required by law or imposed by exchanges or regulatory bodies. In addition, in the case of a Variable Annuity in the Account, there may be additional fees and charges including mortality, expense and administrative charges, subaccount management fees, fees for additional riders on the contract and charges imposed for excessive Transfers within a calendar year. LPL and IAR receives a portion of these third party fees. Further information regarding charges and fees assessed by a mutual fund or an annuity are available in the appropriate prospectus.

As an example of the foregoing, transaction fees imposed by the SEC on all sales of securities, options and single stock future effected on a national securities exchange are passed on to your Account. The amount of this regulatory fee may vary over time, and because variations might not be immediately known to LPL, the amount may be estimated and assessed in advance. To the extent that such estimated amount differs from the actual amount of the regulatory fee, LPL retains the excess. These charges will be reflected on transaction confirmations and/or periodic statements.

Client understands and agrees that LPL may waive any fee it charges Client or IAR in its sole discretion in whole or in part.

Client understands that LPL and IAR, in connection with the performance of their respective services, shall be entitled to and will share in the Account Fees payable hereunder. LPL shall not be compensated on the basis of a share of capital gains upon or capital appreciation of the funds or any portion of the funds of Client. Client acknowledges and agrees that the Fee Schedule and transaction charges set forth in Schedule B or as otherwise provided to Client by LPL and in effect for the Account, shall continue until thirty (30) days after LPL has notified Client in writing of any change in the amount of the fees or charges applicable to the Account, at which time the new fees or charges will become effective unless Client notifies LPL in writing that the Account is to be closed.

## 19. Notices and Communications

To the extent permitted by applicable law, notices and communications may be sent to Client through mail, overnight express delivery, or electronically, at LPL's or the IAR's discretion. Notices and communications will be sent to the postal or electronic address, which includes a telephone number ("E-Address"), shown on the Account Application or at such other postal or E-Address as Client may hereafter provide to LPL in accordance with procedures LPL may establish from time to time. The E-Address may be an e-mail address, other Internet address, fax number, telephone number, or other electronic access address. To the extent permitted by applicable law, notices and communications



Strategic Asset Management (SAM) Account Agreement

will be deemed delivered when sent, whether actually received or not, even if LPL has notice of non-delivery. Notices and communications posted to an online location by LPL will be deemed to be delivered to, and received by, Client at the time that LPL sends notice to Client in accordance with this Agreement that the notice or communication is posted online and available for review.

LPL may, at its option, send notices and communications to Client electronically either:

- to Client's E-Address, or
- by posting the information online and sending Client a notice to Client's postal address or E-Address telling Client that the information has been posted and providing instructions on how to view it.

Communications may include text (SMS) messages, which may be informational, transactional or commercial (marketing) in nature and which may be sent using an automatic telephone dialing system, from or on behalf of LPL or the IAR.  By completing the Account Application and providing a telephone number to LPL and/or the IAR, Client provides consent for LPL and/or the IAR to send communications by text (SMS) message. Client may be charged by his or her wireless service provider in connection with receipt of such messages. Client may stop the receipt of text (SMS) messages by contacting their IAR.

Client agrees that Client will notify LPL and the IAR immediately in the event of a change to Client's postal address or E-Address.

All notices and communications to LPL or the IAR must be provided in writing at LPL's or the IAR's postal address, as applicable, and as such address may be updated by notice to the other parties from time to time. Any notice Client sends LPL or the IAR will not be effective until actually received. Client assumes the risk of loss in the mail or otherwise in transit.

## 20. Automatic Cash Sweep Program

By signing the Account Application, Client is selecting and agreeing, with respect to assets held at LPL, to have cash balances in the Account transferred automatically into a sweep program, depending on the type of Account.  Below is a summary of the general terms and conditions of the sweep programs offered by LPL.

The applicable sweep program will be implemented upon LPL's acceptance of the Account, as discussed above. Pending our acceptance, cash balances not otherwise invested at your direction will be held in your Account as a free credit balance, as discussed more fully below.

### Multi-Bank Insured Cash Account ("ICA") or Deposit Cash Account ("DCA") Program General Terms and Conditions

If the Account is eligible for the ICA or DCA program, you hereby authorize and direct LPL to automatically deposit available cash balances (from securities transactions, dividend and interest payments, deposits and other activities) in the Account into interest-bearing Federal Deposit Insurance Corporation ("FDIC") insured deposit accounts ("Deposit Accounts") at one or more banks or other depository institutions (each, a "Bank"), as provided for in such programs. In selecting the ICA or DCA program for your eligible Account, you agree that: you have independently chosen the ICA or DCA program for your Account, fees of LPL and the program administrator, as discussed below, are reasonable and appropriate for the services being provided under the program, you have reviewed the ICA Disclosure Booklet or the DCA Disclosure Booklet (as applicable) and you have not relied on the advice or recommendation of LPL or IAR in making this selection. You understand and agree that LPL and IAR have no obligations to consider, choose or recommend alternative sweep products to the one you have chosen.

**Eligibility.** The ICA program is available for accounts of individuals, trusts, sole proprietorships and entities organized or operated to make a profit, such as corporations, partnerships, associations, business trusts, and other organizations. In the future, LPL may, at its sole discretion, make additional account types eligible for the ICA program or may choose to treat an otherwise eligible person as  ineligible if LPL becomes aware that the person is prohibited



## Strategic Asset Management (SAM) Account Agreement

as a matter of law from holding balances at any Bank. The DCA program is available only to IRAs subject to Section 4975 of the Code in certain LPL advisory programs, including traditional, rollover, Roth, inherited IRAs and Coverdell education savings accounts (ESAs) held by an eligible person. Please note that if your IAR is located at a bank that offers a SBICA (as defined below), you are not eligible for the ICA, but eligible Accounts will still participate in the DCA Program. Please consult your IAR for additional details concerning eligibility.

**FDIC Insurance**. Cash balances deposited through the ICA or DCA program are eligible for insurance by the FDIC up to $250,000 in principal and accrued interest per depositor for each FDIC-defined ownership category in an individual bank. As your agent, LPL will sweep cash out of your LPL Account and into the participating Banks, subject to certain capacity limits, but not to exceed the maximum levels of insurance as defined by the FDIC per category. LPL will limit your total deposit at any participating Bank to allow for the monthly interest being applied to your Account in an effort to maintain deposit levels that do not exceed the maximum levels of insurance (as defined by the FDIC per category). Should your assets reach the maximum amount of insurance as defined by the FDIC per category, LPL will continue to place funds with other participating banks to provide the maximum deposit insurance limits established for ICA or DCA. To view the current program maximum deposit insurance limits for ICA or DCA, which assumes that you hold no FDIC-insured deposits at a Bank other than through ICA or DCA and that all Banks have capacity to accept additional deposits, see the ICA or DCA Current Interest Rate pages on lpl.com/disclosures.html under "Automatic Cash Sweep Programs and SIPC Coverage" and "FDIC-Insured Bank Deposit Sweep Programs (LPL ICA and DCA)." After you reach the ICA or DCA program's maximum insurance coverage for you, which is subject to Bank capacity limits and your decision to opt out of one or more Banks, any additional cash will be deposited into one or more of the Excess Banks (as defined in the applicable ICA or DCA Disclosure Booklet). Additional cash held through the ICA or DCA program that is above the ICA or DCA program's maximum insurance coverage for you will not be eligible for FDIC deposit insurance. Cash held uninvested or invested in a money market mutual fund is not eligible for FDIC deposit insurance, but is eligible for protection by the SIPC. Deposit Accounts are not protected by the SIPC. LPL itself is not an FDIC-insured depository institution. The FDIC's deposit insurance coverage only protects against the failure of an FDIC-insured depository institution. Pass-through insurance coverage is subject to conditions. Please see the ICA Disclosure Booklet and the DCA Disclosure Booklet, as applicable, for more information. A list of applicable banks into which your cash may be deposited is available by visiting https://www.lpl.com/disclosures/lpl-financial-fdic-insured-bank-deposit-sweep-programs.html and following the links for the applicable bank lists based upon your account type, or ask your financial professional for this information.

The ability of the ICA and DCA program to sweep your uninvested cash into Bank Deposit Accounts depends, however, on the capacity of the Banks to accept new deposits. "Overflow Balances" are cash in the ICA or DCA in excess of the applicable program maximum FDIC insurance limits or cash for which there is insufficient deposit capacity in the ICA or DCA Banks.  When Overflow Balances exist, LPL will temporarily deposit into one or more of the Banks in excess of FDIC coverage limits resulting in deposits not being eligible for FDIC insurance or will otherwise use the overflow mechanisms described below. When Bank capacity is restored, your funds are re-allocated to Banks within the program to fully insure your assets up to the program maximum.

**Lack of Deposit Availability or FDIC Insurance; Overflow Mechanisms**. If there are Overflow Balances in ICA, such balances may be placed into an "overflow" Client Cash Account; such balances are considered to be "free credit balances" and represent a direct liability of LPL to you. LPL will pay you interest on such balances in an amount equal to the rate otherwise payable on cash balances in ICA. Please see the disclosures below regarding Free Credit Balances.

If there are Overflow Balances in DCA, such balances may be placed into an "overflow" money market mutual fund. You hereby authorize LPL to direct such DCA Overflow Balances held in your Account to the Goldman Sachs Asset Management ("GSAM") Financial Square Government Fund. LPL receives compensation of up to 0.45% annually of LPL client assets invested in GSAM from the money market fund sponsor in connection with recordkeeping fees and other compensation. Please see the other disclosures below regarding Money Market Mutual Sweep Funds for additional disclosures applicable to Overflow Balances invested in GSAM.

**Interest.** In both the ICA and DCA program, Client will earn the same rate of interest for the respective program as stated on lpl.com/disclosures.html regardless of the Bank in which the Client deposits are held. Interest will accrue



## Strategic Asset Management (SAM) Account Agreement

daily on balances from the day funds are deposited into a Bank through the business day preceding the date of withdrawal from that Bank. In the ICA program, interest will be compounded daily and credited monthly. In the DCA program, interest is credited to the Client Account monthly (or when you close the Account, if done prior to month-end). This process is described in more detail in the ICA Disclosure Booklet or DCA Disclosure Booklet (as applicable) available from IAR or on lpl.com/disclosures.html. The interest rates paid are determined by the amount the Banks are willing to pay minus the fees paid to LPL and other parties for administering the program. The interest rates accruing on funds may change as frequently as daily without prior notice. The most up-to-date interest rates are found on lpl.com/disclosures.html. Different rates apply for amounts invested in money market mutual funds.

**Fees**. In the ICA program, LPL receives a fee equal to a percentage of the average daily deposit balance in each ICA Deposit Account. The fee paid to LPL will be at an annual rate of up to an average of 600 basis points as applied across all ICA Deposit Accounts taken in the aggregate. In the DCA program, LPL receives a flat fee per account with the fee indexed to the Fed Funds Target (FFT) interest rate. If the FFT interest rate is represented as a range, then the FFT interest rate will equal the midpoint of such range rounded up to the nearest basis point. For details on how the fees are determined, please reference the ICA Disclosure Booklet or DCA Disclosure Booklet (as applicable) available from IAR or on lpl.com/disclosures.html.

**Tax Information.** In the ICA Program, for most clients, interest earned on deposits in the Deposit Accounts will be taxed as ordinary income in the year it is received. A Form 1099 will be sent to you each year showing the amount of interest income you have earned on deposits in the Deposit Accounts. In the DCA Program, for most clients, interest earned on deposits in Deposit Accounts will generally not be taxed in the year earned. Tax interest earned by your IRA is generally not taxed until you take a distribution, and may not be liable to tax if your IRA is a Roth IRA, subject to certain conditions. You should consult with a tax advisor about how the ICA or DCA program, as applicable, affects you.

**Termination of Participation.** You can terminate your Account's participation in the ICA or DCA program, as applicable, upon notice to LPL. If you terminate your participation in ICA or DCA, your cash that would have been eligible for the sweep programs will be treated as a "free credit balance" and represent a direct liability of LPL to you.  Please see the disclosures related to free credit balances reflected below.

**More Information.** For more specific information about the terms and conditions of the ICA or DCA program, please see the ICA Disclosure Booklet or DCA Disclosure Booklet (as applicable) available from IAR or on lpl.com/disclosures.html.

### Single Bank Insured Cash Account Program ("SBICA") General Terms and Conditions

If IAR is located at a bank that offers a SBICA, you hereby authorize and direct LPL to automatically deposit available cash balances (from securities transactions, dividend and interest payments, deposits and other activities) in your account into an interest-bearing bank deposit account at that bank that is generally insured by the FDIC up to $250,000 for individuals and $500,000 for joint accounts.  SBICA accounts are not protected by the SIPC. LPL itself is not an FDIC-insured depository institution.  The FDIC's deposit insurance coverage only protects against the failure of an FDIC-insured depository institution. Pass-through insurance coverage is subject to conditions. Please see the applicable SBICA Disclosure Booklet for more information.

**Fees**. In the case of a SBICA program, LPL receives a fee from the bank of up to 0.50% of the LPL client assets deposited at the bank under the program for its sweep processing services.

**Tax Information**. For most clients, interest earned on deposits in the SBICA accounts will be taxed as ordinary income in the year it is received. A Form 1099 will be sent to Client each year showing the amount of interest income Client has earned on deposits in the SBICA accounts. Client should consult with a tax advisor about how the SBICA program affects Client.

**More Information**. For additional information on the SBICA, please see the applicable disclosure booklet available from IAR.



Strategic Asset Management (SAM) Account Agreement

---

## Money Market Mutual Fund Sweep Program General Terms and Conditions

**Eligibility**. If the Account is not eligible for an ICA, DCA, or SBICA, or you have been notified that your Account will be eligible for money market sweep through a negative consent letter in connection with a transfer of your Account to LPL from another firm, you hereby authorize and direct LPL to automatically invest available cash balances (from securities transactions, dividend and interest payments, deposits and other activities) in shares of a money market mutual fund.  If your Account is a non-retirement account, and a specific Sweep Fund is not otherwise directed by you, you hereby authorize LPL to direct the cash balances held in your Account to the J.P. Morgan U.S. Government Money Market Fund (unless you own a foreign account and then it will be the J.P. Morgan U.S. Treasury Liquidity Fund).  A non-retirement account is one not held by an ERISA Plan or otherwise subject to Section 4975 of the Code.  Contact your Advisor to learn about the specific share class you will be invested in or to learn about other Sweep Funds that may be available.

**No FDIC Insurance.** Investments in money market mutual funds are not guaranteed or insured by the FDIC or any other government agency.  Although money market mutual funds seek to preserve a net asset value of $1.00 per share, there is no guarantee that this will occur.  LPL is a member of SIPC.  For accounts held at LPL, SIPC provides account protection up to a maximum of $500,000 per client, of which $250,000 may be claims for cash. This account protection applies when a SIPC member firm fails financially and is unable to meet obligations to securities customers, but it does not protect against losses from the rise and fall in the market value of investments.  More information on SIPC, including obtaining a SIPC Brochure, may be obtained by calling SIPC directly at (202) 371-8300 or by visiting www.sipc.org.

**Fees.** LPL receives compensation of up to 1.00% annually of LPL client assets invested in the Sweep Funds from the money market fund sponsor in connection with 12b-1 fees, recordkeeping fees and other compensation.  .

**More Information**. For more complete information about any of the Sweep Funds available under this sweep program, including all charges and expenses, please contact IAR for a free prospectus. Client may obtain information with respect to the current yields available on the Sweep Funds by contacting IAR.

## Changes to Sweep Programs

LPL may make changes to the sweep programs, for example, to replace one Sweep Fund with another money market mutual fund or to adjust its overflow mechanisms. If the Account is not eligible for the ICA, DCA, or SBICA program, but later becomes eligible for one of the programs, LPL may switch the sweep program from the money market mutual fund sweep program to the ICA, DCA, or SBICA program. Client will be provided with notice of such change prior to the effective date of the change.

## Alternatives to Sweep Programs

Shares in the money market mutual funds that LPL offers as a non-sweep investment alternative may be purchased by IAR. Cash balances in the Account, however, will not be automatically swept into these money market mutual funds. Debits in the Account will be paid automatically from available cash balances in the Account and then from funds in the sweep programs. In the event there are no funds available in these accounts to cover debits, Client or IAR would need to liquidate separately purchased money market fund holdings or other securities to cover the required debits.

## Free Credit Balances

Your selection of a sweep program above will not be effected until your Account paperwork has been accepted by LPL as being in good order, or, in the case of an account converting via negative consent to LPL, at the time your Account transfers to LPL. Until such time, available cash balances (from securities transactions, dividend and interest payments, deposits and other activities) will not be automatically swept and will be held as a free credit balance. A free credit balance is a liability of LPL and payable to the Account on demand. Interest will not be paid to the Account on free credit balances, other than for ICA Overflow Balances maintained in Client Cash Accounts. Unless we hear from you to the contrary, it is our understanding that any free credit balances held in your Account are pending investment.



Strategic Asset Management (SAM) Account Agreement

Free credit balances may be used by LPL in the ordinary course of its business subject to the requirements of Rule 15c3-3 under the Securities Exchange Act of 1934. The use of client free credit balances generally generates revenue for LPL in the forms of interest and income, which LPL retains as additional compensation for its services to its clients. Under these arrangements, LPL will generally earn interest or a return based on short-term market interest rated prevailing at the time.

If you are acting on behalf of a Plan, the Responsible Plan Fiduciary agrees that it has determined that holding cash balances, pending LPL's acceptance of the Account, as a free credit balance, which does not earn income for the Plan, is both (i) reasonable and in the best interests of the Plan and (ii) that the Plan receives no less, nor pays no more, than adequate consideration with respect to this arrangement. If the Responsible Plan Fiduciary chooses to avoid holding un-invested cash as a free credit balances, the Plan should not fund the Account until after the Account paperwork has been accepted by LPL as being in good order.

### Further Information

For further information about LPL's sweep programs or the Account, please contact IAR.

## 21. Margin

### Operation of the Account on Margin

The terms of this Section apply if you indicate on the Account Application that you wish to establish a margin account for the Account. Your signature on the Account Application confirms that you agree to abide by the terms and conditions outlined in this Section. Purchase of securities on credit, commonly known as margin purchases, enables Client to increase the buying power of Client's equity and thus increase the potential for profit - or loss. This presents an additional element of risk for the Account. A portion of the purchase price is deposited when buying securities on margin and LPL extends credit for the remainder. This loan appears as a debit balance on your periodic account statement. LPL charges interest on the debit balance and requires margin clients to maintain securities, cash, or other property to secure repayment of funds advanced and interest due. For performance illustration purposes, the margin interest charge will be treated as a withdrawal and will, therefore, not negatively impact the performance figures reflected in your performance information.

Interest will be charged for any credit extended to you for the purpose of buying, trading or carrying any securities, for any cash withdrawals made against the collateral of securities, or for any other extension of credit. This interest charge is in addition to the Account Fee charged in connection with the Account. The Account Fee will not be charged on any margin debit balance, rather only on the net equity of the Account. When funds are paid in advance of settlement on the sale of securities, interest will be charged on such amount from the date of payment until settlement date. In the event that any other charge is made to the Account for any reason, interest may be charged on the resulting debit balances.

### Deposit of Collateral, Lien on Accounts and Liquidation

In the event that additional collateral is requested, you may deposit cash or acceptable securities into your margin account. If satisfactory collateral is not promptly deposited after a request is made, LPL may, at its discretion to the extent permitted under applicable law, liquidate securities held in any of your accounts at LPL, including the Account. In this connection, pursuant to this Agreement, LPL retains a security interest in all securities and other property held in its accounts, including securities held for safekeeping, so long as any credit extended remains outstanding. Notwithstanding any other provision in this Agreement to the contrary, any lien or security interest arising out of fees, charges or other obligations owed to LPL by an account of an IRA or other plan subject to the prohibited transaction provisions of section 4975(c) of the Code shall be limited to and enforceable against only the assets of such plan account and any lien or security interest arising out of fees, charges or other obligations owed to LPL by a non-plan account shall not extend to or be enforceable against the assets of any plan account.



Strategic Asset Management (SAM) Account Agreement

---

### Liquidation

If, in LPL's discretion, LPL considers it necessary for its protection to require additional collateral or in the event that a petition in bankruptcy, or for appointment of a receiver is filed by or against you, or an attachment is levied against your accounts, or in the event of your death, LPL shall have the right to the extent permitted under applicable law to sell any or all securities, commodities, and other property in your accounts with LPL, whether carried individually or jointly with others, to buy any or all securities, commodities, and other property which may be short in such accounts, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase or other notice or advertisement. Any such sales or purchases may be made at LPL's discretion on any exchange or other market where such business is usually transacted, or at public auction or private sale. It is understood that a prior demand, or call, or prior notice of the time and place of such a sale shall not be considered waiver of LPL's right to sell or buy without demand or notice. The liquidation of securities in the Account to cover a margin debit balance may be disadvantageous to the long term management of the Account.

### Payment of Indebtedness upon Demand and Liability for Costs of Collection

You shall at all times be liable for the payment upon demand of any debit balance or other obligations owing in any of your LPL accounts and you shall be liable to LPL for any deficiency remaining in any such accounts in the event of the liquidation thereof, in whole or in part, by LPL or by you; and, you shall make payments of such obligation and indebtedness upon demand. The reasonable costs and expense of collection of the debit balance, recovery of securities, and any unpaid deficiency in Client's accounts with LPL, including, but not limited to, attorneys' fees, incurred and payable or paid by LPL shall be payable to LPL by you.

### Pledge of Securities

Securities purchased on a cash or margin basis may be hypothecated under circumstances which will permit the co-mingling thereof with securities carried for other customers, but such securities, if hypothecated, will be withdrawn from hypothecation as soon as practicable upon receipt of payment therefor.

Pursuant to industry standards, in signing this Agreement, you are agreeing to allow LPL to borrow your stock from your margin account. If your stock pays a dividend or other distribution and is loaned out over the record date for that payment, you may receive a substitute payment or payment in lieu of dividends instead of a qualifying dividend. Substitute payments are subject to a higher tax rate and would be reported to you on an IRS Form 1099-MISC instead of an IRS Form 1099-DIV.

Since you may be subject to a higher tax rate on these payment types, you should consult with your tax advisor to discuss the possible implications of this exception from the reduced tax rates. By signing this Agreement, you further certify that no tax advice has been given to you by LPL, unless IAR is employed, as an outside activity, as a duly qualified tax advisor for which separate and distinct consideration may have been paid and is unrelated in any way to LPL. By entering into this Agreement, you expressly assume responsibility for tax implications and adverse consequences, which may arise from entering into this Agreement.

### Margin Requirements and Credit Charges

You will at all times maintain such securities, commodities, and other property in your accounts for margin purposes as LPL shall require from time to time and the monthly debit balances or adjusted balances in your accounts shall be charged, in accordance with LPL's practice, with interest at a rate permitted by the laws of the Commonwealth of Massachusetts. It is understood that the interest charge made to your account at the close of a charge period will be added to the opening balance for the next charge period unless paid.

### Interest Rates

Interest charged on any debit balances in cash accounts or credit extended in margin accounts will be charged interest at an annual rate ("Schedule Rate") based on the following factors: (1) the LPL Base Lending Rate; and (2) a tiered schedule of premiums or discounts based on your account or group margin balance. The Schedule Rate will change,



## Strategic Asset Management (SAM) Account Agreement

without notice, based on changes in the LPL Base Lending Rate and account or group margin balance. Your Schedule Rate will reflect changes in margin balance one to two business days after any changes in your account or group margin balance. The LPL Base Lending Rate will be set with reference to commercially recognized interest rates, industry conditions relating to the extension of credit, and general market conditions. It is your obligation to notify your financial professional or LPL of accounts that you would like to be grouped for calculating margin balance and verify that such accounts are included in the group.  In determining your group margin balance, the eligible accounts of all persons at the same address may generally be included in the group.  LPL may grant requests to group other accounts at its discretion. Certain accounts may not be eligible for grouping. LPL may change or terminate group margin balance eligibility without notice. If the Schedule Rate charged to you is increased for any reason, other than changes in the LPL Base Lending Rate or your group margin balance, you will be notified at least 30 days in advance. When your Schedule Rate changes during an Interest Period due to a change in the LPL Base Lending Rate or your margin balance, interest will be calculated according to the number of days each Schedule Rate is in effect during that period. The actual margin interest rate charged may be a customized rate. LPL may, without prior notice, change (increase or decrease) a customized rate to the Schedule Rate. LPL retains a portion of any interest charged on margin debit balances. The LPL Base Lending rate and tiered schedule of premiums and discounts can be found at lpl.com/disclosures.html.

### Interest Period

Interest charges for the months shown on periodic statements reflect the second to last business day of the month prior to the period covered by the statement through the third to last business day of the last month shown on the statement ("Interest Period"). Accordingly, the interest charges for the period shown on your periodic statement are based only on the daily net debit and credit balances for the Interest Period.

### Method of Interest Computation

At the close of each Interest Period during which credit was extended to you, an interest charge is computed by multiplying the average daily debit balance by the applicable Schedule Rate and by the number of days during which a debit balance was outstanding and then dividing by 360. If there has been a change in the Schedule Rate, separate computations will be made with respect to each rate of charge for the appropriate number of days at each rate during the Interest Period. The interest charge for credit extended to your account at the close of the Interest Period is added to the opening debit balance for the next Interest Period unless paid.

With the exception of credit balances in your short account, all other credit and debit balances in each portion of your account will be combined daily and interest will be charged on the resulting average daily net debit balances for the Interest Period. If there is a debit in the cash account (type 1) and there is a margin account (type 2), interest will be calculated on the combined debit balance and charged to the margin account. Any credit balance in the short account is disregarded because such credit collateralizes the stock borrowed for delivery against the short sale. Such credit is disregarded even if you should be long the same position in your margin account (i.e., short against the box).

If the security that you sold short (or sold against the box) appreciates in market price over the selling price, interest will be charged on the appreciation in value. Correspondingly, if the security that you sold short depreciates in market price, the interest charged will be reduced since your average debit balance will decline. This practice is known as "marking to market." The daily closing price is used to determine any appreciation or depreciation of the security sold short.

If your account is short shares of stock on the record date of a dividend or other distribution, however such short position occurs, your account will be charged the amount of dividend or other distribution on the following Business Day.

### General Margin Policies

The amount of credit that may be extended by LPL and the terms of such extension are governed by rules of the Federal Reserve Board and FINRA. Within the guidelines of these rules and subject to adjustment required by changes



## Strategic Asset Management (SAM) Account Agreement

in such rules and our business judgment, LPL establishes certain policies with respect to margin accounts. If the market value of securities in a margin account declines, LPL may require the deposit of additional collateral. Margin equity is the current market value of securities and cash deposited as security less the amount owed LPL for credit extended at its discretion. It is LPL's general policy to require margin account holders to maintain equity in its margin accounts of the greater of 30% of the current market value or $3.00 per share for common stock purchased on margin. LPL applies other standards for other types of securities. For example, securities may be ineligible for margin credit from time to time. For information with respect to general margin maintenance policy as to municipal bonds, corporate bonds, listed United States Treasury notes and bonds, mutual funds, and other securities, as well as information about the eligibility of particular securities for margin credit, please contact your LPL representative.

Notwithstanding the above general policies, LPL reserves the right, at its discretion, to require the deposit of additional collateral and to set required margin at a higher or lower amount with respect to particular accounts or classes of accounts as it deems necessary. In making these determinations, LPL may take into account various factors including the size of the Account, liquidity of a position, unusual concentrations of securities in an account, or a decline of credit worthiness. If you fail to meet a margin call in a timely manner, some or all of your positions may be liquidated.

### Credit Investigation

LPL may exchange credit information about you with others. LPL may request a credit report on you and upon request, LPL will state the name and address of the consumer reporting agency that furnished it. If LPL extends, updates, or renews your credit, LPL may request a new credit report without notifying you.

### Client Acknowledgment

By establishing the Account as a margin account, Client acknowledges the foregoing information and the following disclosures:

- Purchasing securities on margin presents additional investment risks.  If the securities or other assets that you purchase decline in value, you are still required to pay back the loan.  Losses on securities or other assets purchased on margin increase the impact of those losses on the value of your Account.

- To the extent permitted under applicable law, LPL has the ability to liquidate all or part of the securities in the Account and any other accounts you have at LPL without notice if you fail to maintain sufficient collateral for your margin loan.  As a practical matter, this may cause you to sell assets and realize losses in a declining market.  These actions may interrupt your long-term investment goals and result in adverse tax consequences and additional fees to LPL.

- The returns on assets purchased on margin may not cover the cost of loan interest and Account Fees.  Your IAR may recommend a more aggressive investment strategy with more inherent investment risks to support the cost of borrowing and Account Fees.  It is also possible that your IAR will recommend more conservative investments in uncertain market conditions in an effort to preserve the value of margin collateral in your Account.  Either could have an adverse impact on the performance of your Account.

- LPL has a financial incentive to encourage margin borrowing because LPL earns interest on the amounts that you borrow.  LPL and your IAR also earn Account Fees on borrowed amounts and transaction charges and other fees on investments made with borrowed amounts.  That financial incentive creates a conflict of interest insofar as LPL and IAR benefit from your decision to borrow and incur the various risks described above.

- You are responsible for your decision to establish the Account as a margin account.  You have determined that establishing a margin account is consistent with your long-term financial goals; provides benefits greater than the costs and risks; and does not pose a risk greater than is appropriate given your financial condition.



## 22. Right to Advocate and Refusal To Accept Orders

LPL shall have the right at its sole discretion to advocate administratively or judicially on your behalf where LPL suspects exploitation of any kind, dementia and/or undue influence.

In addition, LPL shall have at its sole discretion the authority to pause or refuse to obey any instructions or orders for, including but not limited to, transactions, disbursements, or account transfers. For UTMA or UGMA accounts in which the beneficiary reaches the age of majority, LPL reserves the right to refuse orders or instructions and to terminate or deactivate the account.

## 23. Trusted Contact Person Disclosure

You understand by providing a trusted contact person in the Account Application, you give permission to LPL and its associated persons, including your IAR, to use their discretion to contact the trusted contact person and disclose information about you and your Account in order to:

- address concerns that you might be a victim of financial exploitation which could include fraud, coercion, or unauthorized transactions,

- address a temporary hold on a disbursement of funds or securities pertaining to possible financial exploitation or other concerns,

- confirm your current contact information,

- confirm and address your whereabouts and health status, and/or

- confirm the identity of any legal guardian, executor, trustee, holder of a power or attorney, or other person who may be acting on your behalf (such as an attorney or accountant).

## 24. Joint and Several Liability: Joint Account

If more than one individual is establishing an account with LPL, the obligations of all persons establishing such Account under this Agreement shall be joint and several. If this is a joint account, each of you signing the Account Application and Agreement (each a "joint owner") agrees that each joint owner shall have authority to (a) buy, sell, and otherwise deal in, through LPL as a broker, securities and/or other property on margin or otherwise, (b) to receive confirmations, statements and communications of every kind related to the Account, (c) to receive and dispose of money, securities and/or other property in the Account, (d) to make, terminate, or modify this Agreement and any other written agreement relating to the Account or waive any of the provisions of such agreements, and (e) generally to deal with LPL as if each of you alone was the sole owner of the Account, all without notice to the other joint owner(s). Each of you agrees that notice to any joint owner shall be deemed to be notice to all joint owners. LPL may follow the instructions of any of the joint owners concerning the Account and make delivery to any of the joint owners of any and all securities and/or other property in the Account, and make payments to any of the joint owners, of any or all moneys in the Account as any of the joint owners may order and direct, even if such deliveries and/or payments shall be made to one of the joint owners personally. LPL shall be under no obligation to inquire into the purpose of any such demand for such deliveries and/or payments.

In the event of the death of any of the joint owners, the surviving joint owner(s) shall immediately give LPL written notice thereof. The estate of any deceased joint owner shall be liable and each survivor will be liable, jointly and severally, to LPL for any debt or loss in the Account resulting from the completion of transactions initiated prior to LPL's receipt of a written notice of such death or debt or loss incurred in the liquidation of the Account or the adjustment of the interests of the joint owners. LPL reserves the right to require written instructions from all Account holders, at its discretion.



Strategic Asset Management (SAM) Account Agreement

## 25. Survival

The terms of Sections 7 – "Limitation of Liability", 9 – "Confidentiality", 12 – "Governing Law", 24 – "Joint and Several Liability: Joint Account", and 26 – "Arbitration" shall survive the termination or expiration of this Agreement.

## 26. Arbitration

Client agrees to direct any complaints regarding the handling of Client's account to IAR and the LPL Legal Department in writing.

This agreement contains a pre-dispute arbitration clause. By signing an arbitration agreement the parties agree as follows:

- All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

- Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

- The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

- The arbitrators do not have to explain the reason(s) for their award, unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first hearing date.

- The Panel of Arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.

In consideration of opening one or more accounts for you, you agree that any controversy or claim arising between you and LPL and/or your IAR, and their parents, subsidiaries, affiliates, officers, directors, employees, agents, and Third-Party Service Providers (as defined below) (whether or not a FINRA (as defined below) member or associated person), arising out of or relating, in whole or in part, to Account, transactions with or for you, this agreement or any other agreement you have entered into with LPL, or the construction, performance, or breach of this Agreement whether entered into prior, on or subsequent to the date hereof, shall be settled by arbitration to be filed at and to be conducted in accordance with the rules, then in effect, of the Financial Industry Regulatory Authority (FINRA). If the claim or controversy is not arbitrable before FINRA, then such claims shall be filed and adjudicated in a court of competent jurisdiction. To the extent any claim on a class or collective or representative basis is nonarbitrable under the law, then such claims shall be filed and adjudicated in a court of competent jurisdiction, and not in arbitration. A court of competent jurisdiction (and not an arbitrator) shall resolve any dispute about the formation, validity, or enforceability of any provision of this arbitration agreement. Further, in the event of a forum dispute, a court of competent jurisdiction shall determine whether such claim is arbitrable. Any arbitration award hereunder shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction. Nothing in this this Agreement requires arbitration of any claim that under the law cannot be made subject to a pre-dispute agreement to arbitrate claims, including any dispute or controversy nonarbitrable under federal law.

This arbitration agreement will be binding upon and inure to the benefit of the parties hereto and their respective representatives, attorneys-in-fact, heirs, successors, assigns, and any other persons having or claiming to have a legal or beneficial interest in any account you maintain at LPL, including court-appointed trustees and receivers. This



Strategic Asset Management (SAM) Account Agreement

arbitration agreement will also inure to the benefit of third-party service providers that assist or enable LPL to provide services hereunder including investment and investment product manufacturers and insurance and annuity carriers ("Third-Party Service Providers"), and such Third-Party Service Providers are deemed to be third-party beneficiaries of this arbitration agreement.

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.



Strategic Asset Management (SAM) Account Agreement

## SAM Schedule A – Account Fee

Client agrees to pay the following fee for the Account (the "Account Fee"):

MAXIMUM FEE (ANNUALLY)............................................................................................................................... 2.50%

The Account Fee will be stated in the Account Application or as otherwise agreed to between the parties in the event of an Account Fee increase. The Account Fee is charged for the investment advisory services of LPL and IAR, as well as the administrative, custody, and clearing services of LPL. The Account Fee is negotiable and is based on the value of the assets in the Account, including cash holdings, and payable quarterly in advance. The Account Fee will not exceed 2.50%. Upon request, the Account Fee may be structured on a tiered and/or grouped basis, with a reduced percentage rate based on reaching certain thresholds. LPL reserves the right to increase the upper limit of the Account Fee upon 30 days' prior notice to Client.

## SAM Schedule B – Transaction Charges and Other Miscellaneous Account and Service Fees

Please reference the attached Miscellaneous Account and Service Fees Schedule – Advisory, which is also available at https://www.lpl.com/disclosures/fee-schedules.html



**LPL Financial**

## ERISA 408(b)(2) Disclosure Guide – Applicable for ERISA Retirement Plans

This information is being provided to you as the sponsor or other responsible fiduciary of a retirement plan ("Plan") subject to the Employee Retirement Income Security Act of 1974 ("ERISA") that maintains an investment account at LPL. In accordance with ERISA Section 408(b)(2), the table below provides a guide to the location of important information regarding the services that LPL may make available to the Plan pursuant to this Agreement and compensation related to such services. For more information regarding such services and compensation, please refer to lpl.com/disclosures.html and any related disclosures, documents, or other agreements you receive in connection with the Plan's investments. Please review this disclosure document in conjunction with such other related disclosures, documents or other agreements. To the extent we have referenced agreements or other documents herein, you should review those agreements or other documents in full, as they may contain additional information that may be relevant to required disclosures under ERISA. If you have any questions concerning this disclosure document or the information provided to you concerning our services and compensation or require copies of any documents referenced herein, please ask your Investment Adviser Representative ("IAR") or LPL Client Services at (800)-558-7567.

| Required Information | Location(s) |
| --- | --- |
| **Description of the services that LPL will provide to the Plan** | Account Agreement, Section 1 "LPL SAM Program"<br>Account Agreement, Section 2 "Trading Authorization"<br>Account Agreement, Section 5 "Custody and Reporting"<br>Program Brochure, Item 4 "Advisory Business"<br>Program Brochure, Item 13 "Review of Accounts" |
| **A statement concerning the services that LPL will provide as an ERISA fiduciary and a registered investment adviser** | Account Agreement, Section 4 "Client Authority/ERISA and Retirement Accounts" |
| **Compensation LPL will receive from the Plan ("direct" compensation)** | Account Agreement, Section 18 "Fees and Charges"<br>Account Application, Section V.2. "Annual Account Fee Information"<br>Account Agreement, SAM Schedule A – Account Fee<br>Miscellaneous Account and Service Fees Schedule – Advisory<br>Program Brochure, Item 5 "Fees and Compensation," subheadings "Fee Schedule," "How the Account Fee is Charged," "Payment in Advance and Refund of Pre-Paid Fees," "Other Types of Fees and Expenses of LPL," and "Understanding Transaction Charges in SAM Accounts" |
| **Compensation LPL will receive from other parties that are not related to LPL ("indirect" compensation)** | Account Agreement, Section 6 "Conflicts of Interest"<br>Account Agreement, Section 18 "Fees and Charges"<br>Account Agreement, Section 20 "Automatic Cash Sweep Program," subheading "Fees"<br>Program Brochure, Item 5 "Fees and Compensation," subheadings "Fees Charged by Third Parties," "Important Information When Funding an Account," and "Mutual Fund 12b-1 Fees; Recordkeeping Services and Compensation; Revenue Sharing Arrangements; Other Product Related Compensation"<br>Program Brochure, Item 11 "Code of Ethics, Participation or Interest in Client Transactions and Personal Trading," subheadings "Cash Sweep Service Options" and "Non-Sweep Money Market Mutual Fund Investments" |
| **Compensation that will be paid among LPL and related parties** | Program Brochure, Item 5 "Fees and Compensation," subheading "Fee Schedule" |
| **Compensation LPL will receive if this agreement is terminated** | Account Agreement, Section 6 "Conflicts of Interest"<br>Program Brochure, Item 5 "Fees and Compensation," subheading "Other Types of Fees and Expenses of LPL"<br>Miscellaneous Account and Service Fees Schedule – Advisory |



**LPL Financial**

# Miscellaneous Account and Service Fees Schedule - Advisory

The listed fees below do not include advisory fees. These fees apply to the following LPL Financial program accounts: Strategic Asset Management (SAM), Optimum Market Portfolios (OMP), Model Wealth Portfolios (MWP), Personal Wealth Portfolios (PWP), Manager Select, and Guided Wealth Portfolio (GWP). Some of these fees may not apply to all of these account types. Some of these fees may be waived under certain conditions.[1]

| Account or Service | Fee | Frequency |
|---|---|---|
| **Account Maintenance** | | |
| Transaction Fee/Service Charge[2] | $5 | Per transaction |
| Corporate Actions — Mandatory (if securities are in physical form) | $15 | Per security |
| Corporate Actions — Voluntary or Mandatory with Options (if election is made) | $25 | Per security |
| Express Mail/Overnight Delivery | $15 | Per shipment unless otherwise noted |
| Extension for Money or Securities Received Past Settlement | $15 | Per event |
| Interest Charged for Money or Securities Received Past Settlement 'Cash Due Interest Rate.' Only charged if accrued interest exceeds $25 for the period. | 10.25% | Begins accruing 3 days after trade settlement |
| Legal Transfer — *for processing of certificate requiring legal documentation (e.g., power of attorney, court appointment, death certificate, corporate resolution, etc.)* | $20 | Per security |
| Outgoing Account Transfer — *for processing full account transfer of all assets and positions to another financial institution (excludes retirement accounts)* | $125 | Per account |
| Outgoing Account Transfer Check — *for processing outgoing account transfer of physical checks* | $15 | Per check over $1,000 |
| Return/Rejected Item/Non-Sufficient Funds (NSF) | $20 | Per item |
| Small Account Fee[3,4] | $60 | Per year |
| **Retirement Account Fees:** | | |
| **Annual IRA, QRP, 403(b)(7) Maintenance —** *for custodial and tax reporting services provided to maintain an individual retirement account (IRA), qualified retirement plan (QRP), or 403(b)(7) account[4,5]* | $60 | Per year/per account |
| IRA/QRP and 403(b)(7) Termination | $125 | Per account |
| QRP and 403(b)(7) Loan Processing | $50 | Per loan |
| Roth IRA Conversion | $25 | Per conversion |
| 990-T Filing | $100 | Per 900-T |
| 1099-R for Omnibus/Pooled QRPs | $50 | Per 1099-R |
| **Cash Management Services** | | |
| Deposit Cash Account sweep fee[6] | $1.75 (as of 7/1/2021, subject to change) | Monthly, per account |
| Stop Payment | $10 | Per check |
| Wired Funds | $25 | Per wire |
| **Investment Specific** | | |
| **Alternative Investment (AI) Products[7]:** | | |
| AI Product Processing | $50 | Per transaction |
| AI Administration | $35 | Per year/per position ($100 max) |
| AI Unrelated Business Taxable Income (UBTI) Filing — *for preparation and filing of tax forms for UBTI, if applicable* | $100 | Per required filing |
| **Foreign Securities:** | | |
| Foreign Transaction Tax[8] | 0.3% | Per purchase transaction |
| Transaction (not applicable to American Depository Receipts) | $40 | Per transaction or transfer |
| Transfer and Ship | $250 | Per transfer |
| **Physical Certificates / Transfer and Ship** — *for issuance of physical certificate upon request (rate depends on transfer agent)* | $0 - $25 | Per certificate |
| **Restricted Securities** — Legend Removal | $50 | Per legal transfer |
| **Stock Option** — Exercise (Cashless) | Margin Interest Rate | Per transaction |
| **Transaction Charges[7]:** | | |
| Equities (including Closed-end Funds) | $7 | Per transaction |
| ETFs[9] | $0, $9 | Per transaction |
| Fixed Income[10] | $50 | Per transaction |
| Mutual Funds[11] | $0, $4.50, $26.50 | Per transaction |
| Systematic Trade[12] | $0 | Per transaction |
| Options | $25 | Per transaction |
| Unit Investment Trusts | $35 | Per transaction |

[1] See account agreements for more information. These fees generally are not based directly on the costs of the transaction or service by LPL, and may include a profit to LPL.

[2] This fee applies to OMP accounts only and is waived if systematic contributions are set up for the account.

[3] A $60 per year fee applies to SAM accounts below $50,000.

[4] LPL may, at its discretion, waive this fee for clients with a minimum aggregate balance in eligible accounts and investments. Please ask your financial professional for additional information.

[5] This fee does not apply to OMP, MWP, PWP, and GWP accounts.

[6] This fee only applies to IRAs that participate in the DCA Program. This monthly fee is based on a fee schedule tied to current Fed Funds Target Rate as detailed in the DCA Disclosure Booklet located on LPL.com. The current fee can be found at lpl.com. It is expected that this fee will be recouped from the DCA Program Banks and will not be a fee directly applied to your account. For more information, see the DCA Disclosure booklet.

[7] These fees apply to SAM accounts only.

[8] A Foreign Transaction Tax is charged by LPL on foreign equity security purchases where the underlying non-U.S. securities are from French or Italian issuers. This tax is levied by the French or Italian governments, and the charge offsets the tax incurred by LPL as a result of executing the transaction on your behalf.

[9] The charge is $0 for an ETF whose sponsor participates in LPL's ETF No Transaction Fee Network.

[10] This charge does not apply to Structured Product purchase transactions.

[11] The charge is $0 for a Full Participating Fund (a fund that pays a certain level of recordkeeping fees to LPL and/or is part of LPL's Mutual Fund No Transaction Fee Network), $4.50 for a Participating Fund (a fund that pays a certain level of recordkeeping fees to LPL), and $26.50 for a Non-Participating Fund (a fund that does not pay recordkeeping fees or pays below a certain level of recordkeeping fees to LPL).

[12] Systematic trades will not be subject to any trading costs if a minimum of 4 executions occur. If the execution minimum is unmet, standard trading fees will be applied retroactively. Systematic trades can only be established for existing positions.

Make Checks Payable as Follows:



Security Endorsement Instructions:

For value received, (Leave Blank) hereby sells, assigns and transfers unto (Leave Blank) shares represented by the within certificate and do hereby irrevocably constitute and appoint (LPL Financial) as Attorney to transfer the said shares on the books of the within named Corporation with full power of substitution in the premises.

Dated: (Date Signed)
Signed: (Sign Exactly as Registered on the Front, With All Signature



FS06-LPL Revised 0126 (Effective 1/1/26)
LPL Financial, member FINRA/SIPC

**LPL Financial**

Updated June 1, 2025

| Facts | What Does LPL Financial, LLC Do with Your Personal Information? |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and Income<br>• Investment experience and Assets<br>• Account transactions and Retirement assets<br>When you are no longer our customer, we continue to share your information as described in this notice. |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons LPL chooses to share personal information; and whether you can limit this sharing. |

| Reasons We Can Share Your Personal Information | Does LPL Share? | Can You Limit This Sharing? |
|---|---|---|
| **For our everyday business purposes** — such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | **Yes** | **No** |
| **For our marketing purposes** — to offer our products and service to you | **Yes** | **No** |
| **For joint marketing with other financial companies** | **Yes** | **No** |
| **For our affiliates' everyday business purposes** — information about your transactions and experiences | **Yes** | **No** |
| **For our affiliates' everyday business purposes** — information about your creditworthiness | **No** | **We don't share** |
| **For our affiliates to market to you** | **No** | **We don't share** |
| **For nonaffiliates to market to you**<br>For more information, please see the below section '**Additional Information About How to Opt-out**' | **Yes\*** | **Yes** |

| Questions? | Go to **www.LPL.com** |
|---|---|

*LPL does not share information relating to clients of Equitable Financial, Equitable Advisors, or their affiliates or subsidiaries with non-affiliates for marketing purposes. This is an exception to the "Yes" response provided above with respect to such information and LPL's practices.

Securities and advisory services offered through LPL Financial, a registered investment advisor.
Member FINRA/SIPC.

| Who We Are | |
|---|---|
| **Who is providing this notice?** | LPL Financial LLC and its affiliates (collectively, LPL). Our affiliates include the following: <br><br> • Allen & Company of Florida, LLC, DBA Allen & Company <br> • PTC Holdings, Inc. <br> • The Private Trust Company, N.A. <br><br> • Bay Financial Associates, LLC FRG Holdings, LLC Fortigent, LLC <br> • LPL Insurance Associates, Inc. <br> • Fiduciary Trust Company of New Hampshire |

| What We Do | |
|---|---|
| **How does LPL protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law.  These measures include computer safeguards and secured files. <br><br> Our online environment uses security technologies, including layered security and access controls over personal information. For further information, please visit LPL.com and search "How LPL Financial Secures Your Information." |
| **How does LPL collect my personal information?** | We collect your personal information, for example, when you: <br> • Open an account. <br> • Enter into an investment advisory account. <br> • Apply for insurance. <br> • Tell us about your investment or retirement portfolio. <br> • Seek advice about your investments. <br><br> We also collect your personal information from others such as credit bureaus, affiliates or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only: <br> • sharing for affiliates' everyday business purposes—information <br> • about your creditworthiness <br> • affiliates from using your information to market to you <br> • sharing for nonaffiliates to market to you <br><br> State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| **What happens when I limit sharing on an account I hold jointly with someone else?** | Your choices will apply to everyone on your account. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies. <br><br> Our affiliates include companies with an LPL Financial name; financial companies such as The Private Trust Company, N.A; non-financial companies and others. |
| **Non-Affiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies. <br><br> We may share information with non-affiliates, which include an independent representative's new brokerage or investment advisory firm, or banks/credit unions associated with accounts established through LPL representatives. |
| **Joint Marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you. |

Securities and advisory services offered through LPL Financial, a registered investment advisor.
Member FINRA/SIPC.

| | This may include banks, credit unions or other financial institutions with which we have a joint marketing agreement. |
|---|---|

## Other Important Information

**California Residents**: We will not share information we collect about state residents with companies outside LPL unless we have your consent or the law allows. We will limit sharing for joint marketing to where you have provided consent consistent with California law.

**North Dakota Residents**: We will not share information we collect about state residents with companies outside LPL unless we have your consent or the law allows.

**Vermont Residents**: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

## Additional Information About How to Opt-out

**For clients of LPL financial professionals also affiliated with a bank, credit union or other financial institution ("Institution"):**
LPL may share your information with your financial professional's Institution so they may inform you about their products and services that may be of interest to you. You can exercise your right to opt-out from this type of sharing by visiting https://privacy.lpl.com/content/lpl-www/ccpa/financialinstitution.html or by calling (855) 804-3041.

**For clients of independent investment advisor firms or independent financial professionals:**
Should your independent financial professional terminate their relationship with LPL, they may be permitted to share your personal information with their new brokerage or investment advisory firm. If you would like to opt-out from this type of information sharing, please complete and mail the form ("Mail-In Opt-Out Form") below to:

**LPL Financial**
**Attn: Privacy Office**
**1055 LPL Way**
**Fort Mill, SC 29715**

By completing and returning this form, I am instructing LPL to limit the personal information that my financial professional is permitted to take if he or she moves to another brokerage or investment advisory firm. Please note that LPL Financial participates in the Protocol for Broker Recruiting ("Protocol"). LPL will permit your financial professional to take your name, address, phone number, email address and the account title of the accounts serviced (or additional information as permitted if the Protocol is amended) if your financial professional joins another Protocol firm. The retention of this limited information by your financial professional under the Protocol may occur even if you have exercised your rights to limit information sharing as described above. For accounts held jointly by two or more persons, the privacy choices made by any account holder apply to all joint holders with respect to the account.

**In order for your Opt-Out election to be effective, you must complete ALL of the following information:**

## Mail-In Opt-Out Form

Name (please print clearly):

Address:

| City: | State/Zip: | Phone Number: |
|---|---|---|

Name of LPL Financial Professional:

| Signature: | | Date: |
|---|---|---|

Securities and advisory services offered through LPL Financial, a registered investment advisor.
Member FINRA/SIPC.

**LPL Financial**

# Strategic Asset Management (SAM) Program Brochure

LPL Financial LLC
1055 LPL Way, Fort Mill, SC 29715
www.lpl.com (704) 733-3482

September 30, 2025

This program brochure provides information about the qualifications and business practices of LPL Financial ("LPL"). If you have any questions about the contents of this brochure, please contact your LPL financial advisor or LPL at lplfinancial.adv@lplfinancial.com. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission ("SEC") or by any state securities authority.

Additional information about LPL also is available on the SEC's website at https://adviserinfo.sec.gov/.

## Item 1: Cover Page

## Item 2: Material Changes

The following is a summary of certain changes made to this Brochure from the time of the most recent annual update dated March 28, 2024. Item 5 was updated to describe conflicts related to LPL's decision to make certain product sponsors available on the applicable platforms when certain sponsors reimburse LPL for technology development related costs associated with the launch or maintenance of a platform, tool, or service. Item 5 was also updated to reflect the following setup fee charges payable to LPL by model managers or product sponsors, if applicable to the program: (i) a yearly $5,000 per strategy fee for annual due diligence reviews and maintenance; (ii) the one-time sponsor-level mutual fund setup fee was reduced from $40,000 to $15,000, with the per-fund setup fee increasing from $5,000 to $7,500; (iii) up to $15,000 as a sponsor level due diligence fee for exchange traded products; (iv) a $5,000 per-trust fee for each unit investment trust; and (v) the initial one-time onboarding/networking setup fee for alternative investments was increased from $30,000 to $35,000. Additional risk disclosures were added in Item 8 related to third-party service providers' or any counterparties' potential use of artificial intelligence and machine learning, as well as risks related to investment strategies that seek to enhance after-tax performance, including funds that utilize a tax-managed strategy (e.g., an "exchange fund"). Item 9 was updated to provide information regarding disciplinary events, involving (i)  was updated to provide information regarding disciplinary events involving (i) a settlement with the SEC that included a $50 million fine for failing to maintain required records of certain business-related communications; and (ii) a settlement with the SEC that included an $18 million fine for LPL not following its anti-money laundering policies for its customer identification program and ongoing customer due diligence obligations. Item 11 was updated to provide that LPL financial advisors may assist clients by providing rollover investment advice when clients are contemplating whether to roll retirement assets out of an employer-sponsored plan, such as a 401(k), to an IRA. Item 12 was updated to disclose risks related to LPL's ability to block or review client orders before they are directed to an exchange or market maker for execution. This may result in a delay in execution, which could cause (i) a difference between execution price and the displayed quote at the time the order was entered; and (ii) a limit order becoming ineligible for execution. Item 12 was also updated to include additional information about LPL's Dividend Reinvestment Program (DRP).



Strategic Asset Management Program Brochure

## Item 3: Table of Contents

Item 1: Cover Page ...................................................................................................................... 32

Item 2: Material Changes............................................................................................................ 32

Item 3: Table of Contents........................................................................................................... 33

Item 4: Advisory Business .......................................................................................................... 33

Item 5: Fees and Compensation................................................................................................ 35

Item 6: Performance Based Fees and Side-by-Side Management............................................ 43

Item 7: Types of Clients.............................................................................................................. 44

Item 8: Methods of Analysis, Investment Strategies and Risk of Loss...................................... 44

Item 9: Disciplinary Information.................................................................................................. 52

Item 10: Other Financial Industry Activities and Affiliations...................................................... 55

Item 11: Code of Ethics, Participation or Interest in Client Transactions and Personal Trading ................................. 57

Item 12: Brokerage Practices..................................................................................................... 63

Item 13: Review of Accounts...................................................................................................... 63

Item 14: Client Referrals and Other Compensation................................................................... 64

Item 15: Custody......................................................................................................................... 69

Item 16: Investment Discretion................................................................................................... 69

Item 17: Voting Client Securities ................................................................................................ 69

Item 18: Financial Information..................................................................................................... 70

## Item 4: Advisory Business

### Introduction

LPL Financial LLC ("LPL") is an investment adviser registered with the SEC pursuant to the Investment Advisers Act of 1940 (the "Advisers Act"). LPL has provided advisory services as a registered investment adviser since 1975. Note that registration as an investment adviser with the SEC does not imply a certain level of skill or training. As of December 31, 2024, LPL managed approximately $618,298,600,000 of client assets on a discretionary basis and approximately $624,400,000 of client assets on a non-discretionary basis. LPL is owned 100% by LPL Holdings, Inc., which is owned 100% by LPL Financial Holdings Inc., a publicly held company.

LPL's advisory services are made available to clients primarily through individuals associated with LPL as investment adviser representatives ("IARs"). For more information about the IAR providing advisory services, client should refer to the Brochure Supplement for the IAR. The Brochure Supplement is a separate document that is provided by the IAR along with this Brochure before or at the time client engages the IAR. If client did not receive a Brochure Supplement for the IAR, the client should contact the IAR or LPL at lplfinancial.adv@lpl.com. IARs are required by applicable rules and policies to obtain licenses and complete certain training in order to recommend certain investment products and services. You should be aware that your IAR, depending on the licenses or training obtained, may or may not be able to recommend certain investments, models, programs, or services. In addition, your IAR may be located at a financial institution that does not offer certain products, investments, models, programs, or services. Please ask your IAR whether any limitations apply.



Strategic Asset Management Program Brochure

LPL conducts its advisory business under the name "LPL Financial LLC," as indicated in Form ADV and its communications and investment advisory agreements with clients. Although LPL and certain LPL IARs use separate marketing names or "doing-business-as" (DBA) designations, LPL does not conduct any advisory business primarily through any of those entities.

### Types of Advisory Services

LPL offers various types of advisory services and programs, including wrap fee programs, mutual fund asset allocation programs, an advisor-enhanced digital advice program, advisory programs offered by third party investment advisor firms, financial planning services, and retirement plan consulting services. This Brochure provides a description of the advisory services offered under LPL's Strategic Asset Management program (the "Program"). For more information about LPL's advisory services and programs other than the Program, please contact your LPL investment adviser representative ("IAR") for a copy of a similar brochure that describes such service or program or go to https://adviserinfo.sec.gov/.

LPL is also a broker-dealer registered with the Financial Industry Regulatory Authority ("FINRA"), and an IAR also may be registered with LPL as a broker-dealer registered representative. Therefore, an IAR may be able to offer a client both investment advisory and brokerage services. Before engaging with an IAR, clients should take time to consider the differences between an advisory relationship and a brokerage relationship to determine which type of service best serves the client's investment needs and goals. All recommendations regarding advisory accounts will be in an advisory capacity, and any recommendations regarding any brokerage account a client opens with LPL will be in a brokerage capacity, unless a client is expressly told otherwise. Clients should speak to the IAR to understand the different types of services available through LPL. Not all LPL IARs have access to all products and services.

In the Program, LPL, through its IARs, provides ongoing investment advice and management on assets in the client's account. IARs provide advice on the purchase and sale of various types of investments, such as mutual funds, exchange-traded funds ("ETFs"), exchange-traded notes ("ETNs"), interval funds, variable annuity subaccounts, business development companies ("BDCs"), private equity, real estate investment trusts ("REITs"), equities, and fixed income securities. IARs provide advice that is tailored to the individual needs of the client based on the investment objective chosen by the client. Clients may impose restrictions on investing in certain securities or groups of securities by contacting their IAR and providing the necessary written instructions. The Program also permits clients to select a third party investment advisor firm typically associated with an LPL registered representative, in lieu of an IAR, to provide the advisory services described in this brochure.

The IAR obtains the necessary financial data from the client and assists the client in setting an appropriate investment objective for the account. The IAR obtains this information by having the client complete an Account Application which is a part of the Account Agreement. In quarterly communications, LPL asks clients to contact the IAR if there have been any changes in the client's financial situation or investment objectives or if they wish to impose any reasonable restrictions on the management of the account or reasonably modify existing restrictions. Clients should be aware that the investment objective selected for the Program in the Account Application is an overall objective for the entire account and may be inconsistent with a particular holding and the account's performance at any time. Clients should further be aware that achievement of the stated investment objective is a long-term goal for the account.

LPL also acts as custodian to accounts, provides brokerage and execution services as the broker-dealer on transactions, and performs administrative services, such as performance reporting to clients.

IARs may, in their sole discretion and as agreed from time to time with clients, provide financial planning or financial consulting services to clients in connection with the program at no additional cost. IARs may also require clients to enter into a separate agreement with an agreed upon fee for financial planning or financial consulting services. The scope and duration of financial planning and consulting services varies, will generally be agreed upon at the time the IAR provides the services, and may include comprehensive financial planning or consulting on a particular issue such as retirement planning, education planning, estate planning, cash flow/budget planning, risk management planning, personal wealth planning, tax planning, business planning, investment planning/asset allocation, or other planning as needed. Financial planning and consulting may or may not include a written, customized financial plan.



Strategic Asset Management Program Brochure

## Item 5: Fees and Compensation

### Fee Schedule

Clients in the SAM Program pay LPL an annualized fee ("Account Fee") for the investment advisory services of LPL and IAR, as well as the administrative, custody and clearing services of LPL. The Account Fee is shared with the IAR. The Account Fee is negotiable between the client and the IAR and is typically a straight percentage based on the value of all assets in the account, including cash holdings, but excluding certain assets that are not billed upon in certain instances, and payable quarterly in advance. The maximum Account Fee is 2.50%. Upon request, the Account Fee may be structured on a tiered basis and/or grouped basis, with a reduced percentage rate based on reaching certain thresholds in the Account or in a group of eligible advisory accounts. LPL reserves the right to increase the upper limit of the Account Fee upon 30 days' prior notice to clients. LPL and IARs do not charge performance-based fees to accounts in the SAM program.

LPL retains a portion of the Account Fee, up to 0.20%, which is not shared with your IAR, for its administrative, custody and clearing services. A portion of the administrative fee may be shared with additional third parties for services, including the IAR's employer. LPL shares up to 100% (typically between 90% and 100%) of the remaining portion of the Account Fee with the IAR based on the agreement between LPL and the IAR. In certain circumstances, the IAR portion of the Account Fee may be shared with multiple IARs who jointly provide advisory and other services to you and/or in support of each other. A portion of the fee to the IAR may also be paid by the IAR to his or her LPL branch manager, another LPL representative for supervision or administrative support, or advisory services. There is a conflict of interest when a branch manager receives a portion of the Account Fee for supervision because the fee affects his or her ability to provide objective supervision of the IAR. There is also a conflict of interest when an IAR's employer or other LPL IARs receive a portion of the Account Fee for administrative support or advisory services, respectively, because LPL and its IARs have an incentive to recommend programs or strategies in which LPL and its IARs retain a greater portion of the Account Fee.

### How the Account Fee is Charged

LPL deducts the Account Fee and other fees and charges associated with a Program account from the account. LPL calculates and deducts the Account Fee in the method described in the Account Agreement, unless other arrangements are made in writing. If a client wishes to be billed for the Account Fee, rather than a deduction directly from the account, the client needs to make a request to LPL through the IAR. The Account Fee for certain alternative investments (such as non-exchange traded REITs, BDCs or hedge funds, each a "Non-Traded Alternative Investment") is calculated based on unaudited net asset values provided as estimates by the sponsor of the Non-Traded Alternative Investment (such unaudited net asset values, a "Fair Value"). Fair Values are provided by Non-Traded Alternative Investment sponsors on a reporting period basis, such as monthly or quarterly. LPL does not audit or confirm the accuracy of the Fair Values provided by the sponsors of Non-Traded Alternative Investments. Sponsors of Non-Traded Alternative Investments do not adjust previously determined Fair Values. The portion of the Account Fee calculated on a Non-Traded Alternative Investment reflects the Fair Value of the prior reporting period and will not reflect the current net asset value of the Non-Traded Alternative Investment as of the date of the Account Fee's calculation.

### Payment in Advance and Refund of Pre-Paid Fees

LPL deducts the Account Fee quarterly in advance. If the Account Agreement is terminated before the end of the quarterly period, LPL will pay the client a prorated refund of any pre-paid quarterly Account Fee based on the number of days remaining in the quarter after the termination date. However, if the account is closed within the first six months by the client or as a result of withdrawals that bring the account value below the required minimum, LPL reserves the right to retain the pre-paid quarterly Account Fee for the current quarter in order to cover the administrative costs of establishing the account (for example, the costs related to transferring positions in and out of the account, data entry in opening the account, reconciliation of positions in order to issue performance information, and re-registration of positions).



Strategic Asset Management Program Brochure

---

### Other Types of Fees and Expenses of LPL

LPL charges fees related to a Program account in addition to the Account Fee.

- In the Program, clients do not pay brokerage commissions to IAR for transactions in the account; however, the client pays LPL a transaction charge for the purchase and sale of certain securities in the account. The transaction charges are set out in the Account Agreement and the Miscellaneous Account and Service Fee Schedule-Advisory. The transaction charges are paid to LPL to defray costs associated with trade execution; however, they are not directly related to transaction-related expenses of LPL and are a source of revenue to LPL. Transaction charges present conflicts of interest. For example, transaction charges vary depending on the type of security being purchased or sold (e.g., $7 for equities, $50 for fixed income), and therefore LPL earns more from transactions that result in an investment with a higher charge. In addition, where transaction charges apply, the more transactions a client enters into, the more compensation LPL receives. Transaction charges will not reduce the Account Fee you pay. Transaction charges are not shared with IARs. In the case of mutual funds and ETFs, the transaction charges vary depending on the fund purchased or sold. For more information, see the section of this Item 4 titled "Understanding Share Classes and Transaction Charges in SAM Accounts".

- In the Program, the IAR may also separately agree with clients to bear the transaction charges for purchases and sales of certain securities in the account. If the IAR pays the transaction charges in an account, there is a different conflict of interest than if the client pays the transaction charges. Clients should understand that the cost to IAR of transaction charges will in certain instances be a factor that the IAR considers when deciding which securities to select and how frequently to place transactions in an account. For more information, see the section of this Item 5 titled "Understanding Share Classes and Transaction Charges in SAM Accounts" and the section of Item 12 titled "Brokerage Practices."

- LPL charges accounts with assets valued at less than $100,000 an additional $10 quarterly fee at the end of the quarter.

- Clients that hold hedge funds, managed futures, BDCs, and certain REITs pay a processing fee per transaction and an annual alternative investment administrative fee per position, subject to a maximum per account per year.

- If an account is approved for trading on margin and the client has entered into a margin agreement with LPL, the client will be charged margin interest on any credit extended to or maintained by the client. LPL will retain a portion of any interest charged. This interest charge is in addition to the Account Fee. The Account Fee is not charged on any margin debit balance, rather only on the net equity of the account.

- Clients also pay LPL other additional miscellaneous administrative or custodial-related fees and charges that apply to a SAM account. LPL notifies clients of these charges at account opening and makes available a current list of these charges on its website at lpl.com/disclosures.html. These fees include cash sweep fees, retirement account fees and termination fees, including, as applicable, an annual individual retirement account ("IRA") maintenance fee, an annual qualified retirement plan maintenance fee, a fee for loans processed for qualified retirement plan and 403(b)(7) plan accounts and an account termination fee for processing a full account transfer to another financial institution. These miscellaneous fees are not directly based on the costs of the transaction or service by LPL, will include a profit to LPL in certain instances, and certain of the fees will be lowered or waived for certain customers.

- LPL may waive any fee it charges to Client or IAR in its sole discretion in whole or in part.

### Fees Charged by Third Parties

There are other fees and charges that are imposed by third parties other than LPL that apply to investments in Program accounts. Some of these fees and charges are described below. If a client's assets are invested in mutual funds, ETFs or other pooled investment products, clients should be aware that there will be two layers of advisory fees and expenses for those assets. As a shareholder of a fund, Client will pay an advisory fee to the fund manager and other



Strategic Asset Management Program Brochure

expenses charged by the fund. In the case of mutual funds that are funds of funds, there could be an additional layer of fees, including performance fees that vary depending on the performance of the fund. Client will also pay LPL and IAR the Account Fee with respect to assets invested in mutual funds, ETFs and other pooled products. The mutual funds, ETFs and other pooled funds available in the program can be purchased directly outside of the Program. Therefore, clients could generally avoid an additional layer of fees by not using the advisory services of LPL and IAR and by making their own decisions regarding the investment.

Clients should understand that in many cases the mutual funds and mutual fund share classes offered through the Program charge higher fees and expenses than those that are not offered through the Program, and such other mutual funds and share classes may be equally or more appropriate for a client's account. As discussed below, a portion of the fees and expenses charged by certain mutual funds in the Program will be paid to LPL. Other financial services firms, including those LPL makes available through its third-party asset management programs, may offer the same mutual funds that are offered through the Program but at lower overall costs to investors than the costs that clients incur by investing through the Program.

Clients should also understand that in many cases the share class offered for a particular mutual fund available through the Program (the "Program Share Class") charges higher fees and expenses than other share classes that are offered by the same fund but are not available through the Program. Program Share Classes are selected by LPL, in certain cases, because the mutual funds pay to LPL a portion of the fees and expenses charged by Program Share Classes as compensation for the administrative and recordkeeping services LPL provides with respect to LPL clients who invest in the Program Share Classes, as discussed below under "Participation or Interest in Client Transactions."

If the account is invested in a mutual fund that charges a fee if a redemption is made within a specific time period after the investment under a fund's frequent trading policy, client will be charged a redemption fee. If a mutual fund has a frequent trading policy, the policy can limit a client's transactions in shares of the fund (e.g., for rebalancing, liquidations, deposits or tax harvesting).

If client holds a variable annuity as part of an account, there are mortality, expense and administrative charges, subaccount management fees, fees for additional riders on the contract and charges for excessive transfers within a calendar year imposed by the variable annuity sponsor. If a client holds a REIT or BDC as part of an account, there are dealer management fees and other organizational, offering and pricing expenses imposed by the REIT or BDC, as applicable. If client holds a UIT in an account, UIT sponsors charge creation and development fees or similar fees. Further information regarding fees assessed by a mutual fund, variable annuity, alternative investment (such as a REIT, BDC or hedge fund) or UIT is available in the appropriate prospectus or offering document, which is available upon request from the IAR or from the product sponsor directly.

### Important Information When Funding an Account

**Ineligible Securities.** When transferring securities into a Program account, client should be aware that certain securities may not be eligible for the account. In such case, the securities may be rejected, sold after the transfer, or moved to a brokerage account. Note that when an ineligible security is transferred into an account and subsequently sold or moved to a brokerage account, the advisory fee will be charged on such asset for the period of time the security was held in the Program account.

**Surrender Charges or CDSCs.** If client transfers a previously purchased investment into a Program account, such as a mutual fund, annuity or alternative investment, or liquidates the previously purchased investment and transfers the proceeds into an account, client may be charged a fee (sometimes called a "surrender charge," "contingent deferred sales charge" or "CDSC") upon the sale or redemption in accordance with the investment product's prospectus. In many cases, the CDSC is only charged if a client does not hold the security for a minimum period of time. In particular, if a client transfers a previously purchased mutual fund (such as a Class C share) into an account that is subject to a CDSC, then the client will pay that charge when the mutual fund is sold.

**Previously Paid Commissions.** Clients should be aware that securities transferred into an account may have been subject to a commission or sales load when the security was originally purchased. Client should understand that, after the transfer into an account, an advisory fee will be charged based on the total assets in the account, including the



Strategic Asset Management Program Brochure

transferred security.  Depending on the share class and fee structure of the previously purchased mutual fund, LPL can receive fees such as 12b-1 fees, recordkeeping fees and revenue sharing from the previously purchased mutual fund until the position is liquidated and subsequently invested.  In other words, if you paid IAR or another financial professional recently an upfront commission on the previously purchased security, you will be paying a new ongoing advisory fee going forward to IAR for advice on that same security.

**Loss of Benefits.** If client will be funding the account with the proceeds of a sale or liquidation of an annuity, client should understand that client may be giving up guaranteed living or death benefits that were provided through the annuity, and will not be provided through a Program account.

When transferring securities into an account, client should consider and speak to IAR about whether:

- a CDSC will apply, and the length of time before the CDSC expires;
- there will be a loss of a guaranteed benefit, in the case of an annuity;
- a commission was previously paid on the security;
- client wishes for the security to be managed as part of the account and be subject to an advisory fee; or
- client wishes to hold the security in a brokerage account that is not managed and not subject to an advisory fee.

Clients also incur charges imposed by third parties or LPL in connection with investments made through their accounts, including, but not limited to, taxes and charges required by law or imposed by exchanges or regulatory bodies. For example, an industry-wide charge mandated by a regulator applies to sales of certain securities. The amount of this regulatory fee may vary over time, and because variations might not be immediately known to LPL, the amount may be estimated and assessed in advance. To the extent that such estimated amount differs from the actual amount of the regulatory fee, LPL retains the excess. These charges will be reflected on transaction confirmations and/or periodic statements.

### Understanding Share Classes in SAM Accounts

Except with respect to Sweep Funds described in the section of Item 11 labeled "Participation or Interest in Client Transactions," LPL makes available for purchase only one share class per mutual fund in the Program, which can be titled, for example, as "Class I," "institutional," "investor," "retail," "service," "administrative" or "platform" share classes ("Program Shares"). Program Shares are no-load or load-waived share classes and therefore not subject to any upfront sales charge. Share classes previously available in the Program prior to November 21, 2016, such as Class A Shares that are subject to 12b-1 fees, can still be held but not purchased in the Program ("Non-Surviving Share Classes").  A client also may transfer Non-Surviving Share Classes into client's account.  Any 12b-1 fees received by LPL from mutual funds in the Program (other than Sweep Funds) will be credited to the client account.  Because the Non-Surviving Share Class could have a higher overall expense ratio than the Program Shares, the Non-Surviving Share class could cost the client more than Program Shares, even after the 12b-1 fees is credited to the account.

Clients should understand that the Program Share class offered for a particular mutual fund through the Program in many cases will not be the least expensive share class that the mutual fund makes available.  Program Share classes are selected by LPL in certain cases because the share class pays LPL compensation for the administrative and recordkeeping services LPL provides to the mutual fund.  Other financial services firms may offer the same mutual fund at a lower overall cost to the investor than is available through the Program.

### Understanding Transaction Charges in SAM Accounts

Clients, when participating in the Program, should understand that LPL charges clients a transaction charge of $0, $4.50 or $26.50 for mutual fund purchases and redemptions.  The applicable transaction charge varies depending on the amount of recordkeeping fees that LPL receives from the mutual fund and/or whether the sponsor of the mutual fund participates in LPL's Mutual Fund No Transaction Fee Network ("MF NTF Network") described below.



## Strategic Asset Management Program Brochure

When a mutual fund participating in the MF NTF Network is purchased in an account, the mutual fund's sponsor directs a payment to LPL on behalf and for the benefit of the client that is used exclusively as a credit to defray the bona fide transaction charge obligations of the client's account. When a participating mutual fund is sold in an account, LPL waives the transaction charge. Clients also should be aware that mutual funds participating in the MF NTF Network typically have higher ongoing internal expenses that can be used to offset payments made by sponsors for transaction charge waivers, and this can reduce the investment returns over time relative to other share classes of the same fund.

The Program also offers an ETF No Transaction Fee Network ("ETF NTF Network"). LPL typically charges a transaction charge of $9 for transactions in ETFs, however, for certain ETFs in the ETF NTF Network, the ETF sponsors direct a payment to LPL on behalf and for the benefit of Client that is used as a credit to defray all or a portion of the bona fide transaction charge obligations of the Account. To the extent the sponsor does not pay the entire transaction charge amount, LPL waives the remaining portion to bring the cost to Client to $0.

For purchases of other ETFs in the ETF NTF Network in the Program, the sponsor pays LPL a flat annual amount and/or a fee based on the non-retirement client account assets invested in ETF NTF Network funds, and LPL waives the transaction charge. In the case of certain of these fee arrangements, the sponsor pays LPL a combination of a flat fee and asset based fee for ETFs. The asset based fee paid to LPL for certain ETFs will be higher based on the ETF's expense ratio. These arrangements present a conflict of interest because LPL has an incentive to select more expensive ETFs. In addition, as described in more detail below in Item 8, LPL Research provides asset allocation model portfolios for IARs to use with clients. Certain of these model portfolios include ETFs participating in the ETF NTF Network that are more expensive and pay more fees to LPL. However, these conflicts are mitigated insofar as the sponsor fees are not shared with the IAR who selects the ETFs for Client.  For further details and an updated list of ETF sponsors for the ETF NTF Network, please refer to the Disclosures page on lpl.com/disclosures.html.

The ETF NTF Network creates a conflict of interest because IAR has a financial incentive to select ETFs participating in the ETF NTF Network to avoid paying the transaction charges.  Clients should consider such conflict when monitoring the purchase of ETFs in recognition of the overall fee and other arrangements with LPL and IAR for management of the account.  This conflict can cause clients to pay higher overall fees and expenses and have an impact on the investment performance of the account.  In particular, clients should be aware that participating ETFs typically have higher ongoing internal expenses than other ETFs that can be used to offset payments made by sponsors for transaction charge waivers.  To the extent that LPL receives from a sponsor of a an ETF participating in the ETF NTF Network a flat fee or an asset based fee that exceeds bona fide transaction charge obligations of the participating client accounts, the payment creates a conflict of interest as further described below as revenue sharing.

When an IAR agrees to bear transaction charges on behalf of a client and a participating mutual fund or ETF is purchased in the account, the mutual fund or ETF sponsor defrays all or a portion of the transaction charge otherwise borne by the IAR, and LPL waives the remaining amount of the transaction charge. For all ERISA Accounts for which an IAR agrees to bear transaction costs on behalf of a client, LPL waives the transaction charge to the IAR when a participating mutual fund or ETF is purchased or sold.

### Transaction Charge Considerations

When the client pays the transaction charges, an IAR may recommend greater volume of trading activity than when it has a financial incentive to limit such transactions. Moreover, clients should understand that engaging in frequent trading will result in paying more transaction charges and will increase the overall costs associated with the Account. These costs impact the performance of the Account. LPL has a conflict of interest insofar as it has a financial incentive to engage in trading for the Account to generate transaction charges. Clients should also note that the Account Fee being charged in the Program may take the payment of transaction charges into consideration.  That is, the Account Fee charged to SAM accounts may be lower than the Account Fee charged to other types of accounts to the extent that the transaction charges are factored into the overall Account Fee charged to such accounts.

If the IAR has agreed to pay transaction costs on behalf of the client, the cost to the IAR of transaction charges may be a factor that the IAR considers when deciding which securities, mutual funds or ETFs to select and whether or not



to place transactions in the account.  Similar to clients, the transaction charges borne by the IAR vary based on the type of transaction (e.g., mutual fund, ETF, equity or fixed income security). The IAR has a financial incentive to recommend transactions in certain securities that carry lower fees (e.g., transactions involving equity securities may be recommended over fixed income securities because of the lower transaction charge) or to limit the overall number of transactions it recommends to clients. In particular, the IAR has a financial incentive to select NTF Funds or ETFs that participate in the ETF NTF Network to avoid paying or to lower the transaction charges over others that may be more suitable for the client. Clients should consider such conflict when monitoring the purchase of NTF Funds or ETFs that participate in the ETF NTF Network in recognition of the overall fee and other arrangements with LPL and IAR for management of the account.  All such conflicts may have an impact on the investment performance of the client's account.

For certain IARs that have agreed to bear transaction fees on behalf of clients, LPL will agree to charge the IAR an asset-based fee for transactions instead of a per transaction fee. LPL will also waive transaction charges for certain transactions by IARs. Where LPL charges IAR an asset-based fee for transactions or waives transaction fees, conflicts regarding the number and variability of transaction charges are mitigated but Client will not receive any additional financial benefit.

## Mutual Fund 12b-1 Fees; Recordkeeping Services and Compensation; Revenue Sharing Arrangements; Other Product Related Compensation

Some mutual funds and Program Share Classes in the Program charge shareholders a 12b-1 fee.  To the extent a mutual fund or a Program Share Class charges a 12b-1 fee, the fee will be paid to LPL by the mutual fund.  Any 12b-1 fees paid to LPL by mutual funds (other than the Sweep Funds) that are held in Program accounts will be credited to the account.

LPL performs recordkeeping, administrative and shareholder services on behalf of mutual funds and receives compensation for the services based on mutual fund holdings of Program clients. These services include establishing and maintaining accounts with the funds, facilitating settlement of funds, responding to customer inquiries and requests, and maintaining sub-account records reflecting the issuance, exchange or redemption of shares by the Program account. A type of recordkeeping service that LPL provides to certain mutual fund families is to process transactions on an omnibus basis, which means that LPL consolidates client trades into one daily trade with a fund, and maintains all pertinent shareholder information for the fund.  In some cases LPL earns recordkeeping compensation with respect to a Program Share Class but does not earn recordkeeping compensation, or earns less recordkeeping compensation, with respect to other share classes of the same fund that are not offered through the Program.  The compensation LPL receives from a fund for recordkeeping, administrative and shareholder services is based on the amount of Program client assets that are invested in the fund (up to 0.30% annually), or the number of positions held by Program clients in the fund (up to $25 per position). If LPL does not provide omnibus services to a mutual fund, then fund shares are traded on a networked basis, which means LPL submits a separate trade for each individual client trade to the fund.  In that case, LPL maintains only certain elements of the fund's shareholder information.

In addition, LPL charges a setup fee to product sponsors when adding new investment products or share classes of an investment product to LPL's investment platforms. In the case of exchange traded products, LPL receives up to $15,000 as a sponsor level due diligence fee, up to $7,500 per fund and up to $15,000 per product for complex ETPs.  In the case of mutual funds, LPL receives a one-time set up fee of up to $15,000 as a sponsor level due diligence fee and a setup fee of $7,500 per fund. In the case of UITs, LPL charges up to $5,000 per trust. In the case of annuities, LPL typically receives a one-time onboarding/networking setup fee of up to $100,000 from the annuity product sponsor to reimburse LPL for associated technology-related costs. In the case of alternative investments, LPL receives up to $35,000 for initial products, and up to $15,000 for follow-on product offerings or additional share classes.  LPL also receives a one-time payment of up to $25,000 from certain alternative investment sponsors for training and education and other benefits such as prominent placement of sponsor logos, website links or content on materials disseminated to LPL's IARs and priority access to education programs and events and conference speaking opportunities. LPL does not share this compensation with its IARs.



Strategic Asset Management Program Brochure

When LPL incurs technology development related costs associated with the launch or maintenance of a platform, tool or service, LPL sometimes receives reimbursements from product sponsors for such costs. Because LPL benefits from product sponsors' reimbursements of technology development-related costs, LPL's financial interests are conflicted with its ability to use strictly objective factors when selecting product sponsors to make available on the applicable platforms.

LPL has fee arrangements with investment advisors or distributors ("sponsors") of mutual funds, ETFs, annuities, alternative investment products and structured products that are available for purchase through the Program, called revenue sharing. Under these arrangements, the sponsor pays LPL a fee (typically quarterly) based on the amount of client sales or assets invested in the sponsor's products and/or a fixed fee, and LPL provides marketing support, data analytics, and administrative services to the sponsor and allows the sponsor to access LPL IARs so that the sponsor can promote such products. The amount and form of revenue sharing fee received by LPL can vary depending on many factors, including the services provided by LPL and the sponsor's investment products. LPL marketing support compensation for mutual funds, interval funds, ETFs and positional money market funds (other than the Sweep Funds) consists of flat and asset based fees totaling up to 0.15% annually of LPL clients' investments in the investment product, or up to $1,000,000. For alternative investments, the maximum revenue sharing fee received by LPL under these arrangements is up to 0.35% on assets or 1.50% on new sales. Certain sponsors of alternative investments are not required to pay such fees. For annuities, the maximum revenue sharing fee received by LPL under these arrangements is up to 0.25% of assets or up to 0.50% of new sales. LPL does not require that a sponsor participate in revenue sharing arrangements for the sponsor's products to be selected for a Portfolio. However, LPL has a financial incentive to recommend participating products instead of those whose sponsors do not make such payments to LPL. In general, sponsors pay LPL a revenue sharing fee in addition to other product-related fees paid by a client, which include sales charges, deferred sales charges, distribution and service fees, redemption fees, and other fees and expenses disclosed in a product's offering documents. Revenue sharing fees may be paid by a particular investment fund, or its investment advisor or distributor, or an affiliate. LPL accepts revenue sharing fees for assets held in retirement accounts to the extent permitted by applicable law, including ERISA.

LPL offers product sponsors of mutual funds, closed funds, interval funds, ETFs, alternative investments, advisory strategies, annuities and life insurance contracts the opportunity to purchase analytical data, business intelligence and ad hoc reporting. This information helps product sponsors in their sales, distribution and product development efforts with respect to customers and clients and creates similar conflicts to those discussed above. LPL receives up to $600,000 annually from each product sponsor in third party compensation for this information.

LPL receipt of revenue sharing fees creates a conflict of interest for LPL, which means that there is an incentive for LPL and its respective financial professionals to recommend investment products that pay revenue sharing fees. LPL or its affiliate receives significantly more revenue sharing fees from the sponsors for which clients have the largest holdings, which creates a conflict of interest for LPL to promote and recommend these sponsors' investments.

Revenue sharing payments are generally higher for investment products with higher expense ratios (the overall fee paid by an investor in the product). Additionally, revenue sharing payments for some ETFs are based on management fees and will be higher for ETFs with higher expense ratios, both because LPL is paid a portion of the higher fees and because generally the percentage rate that LPL gets paid increases for investment products with higher expense ratios. As a result, LPL has an increased incentive to choose investment products that charge more in fees and to promote or recommend these investment products so that LPL earns more, and that could cause lower performance for client accounts. Other investment products with lower fees that are not party to revenue sharing agreements are available. Higher expense ratios will cause an investor to earn less on an investment than a comparable investment with a lower expense ratio. This results in a conflict of interest between clients and LPL because the revenue sharing arrangements give LPL an incentive to recommend investments that could cause lower performance for client accounts. The variations between amounts and forms of revenue sharing payments also create an incentive for LPL to recommend holding products which pay revenue sharing payments to LPL or its affiliate as an ongoing percentage of client assets. This conflict can cause clients to pay higher overall fees and expenses and have an impact on the investment performance of an account. Additionally, LPL receives significantly more revenue sharing from firms for which clients have the largest holdings, and some of LPL's contracts pay increased asset based fees when certain



Strategic Asset Management Program Brochure

---

threshold are met. This creates a conflict of interest for LPL to promote and recommend those investments. However, these conflicts are mitigated insofar as the revenue sharing payments LPL receives are not shared with the IAR who selects or recommends the investment products for client accounts.

LPL has network fee arrangements with sponsors of fee-based variable annuities, pursuant to which LPL receives compensation based on the number of LPL customer positions held with the variable annuity sponsor (up to $6.00 per position per year).  LPL does not share this compensation with its IARs. From time to time, LPL receives a reallowance of the public offering price per unit on units of certain UITs and structured products sold by LPL during the initial offering period.

The revenue that LPL receives from 12b-1 fees, recordkeeping compensation and revenue sharing arrangements is an important revenue stream and presents conflicts of interest that affect LPL's ability to provide clients with unbiased, objective investment advice concerning the selection of products and share classes for a Portfolio in the case of Portfolios designed by LPL. In particular, LPL has a financial incentive: (i) to select a product or a Program Share Class that charges a 12b-1 fee and/or pays recordkeeping compensation to LPL over another comparable fund or a share class that does not charge 12b-1 fees or pay recordkeeping compensation; (ii) to select a product sponsored by a company that makes revenue sharing payments to LPL, instead of another comparable product whose sponsor does not make such payments; and (iii) to select a product or a Program Share Class that charges 12b-1 fees, pays recordkeeping compensation to LPL, or whose sponsor makes revenue sharing payments to LPL that, in each case, are comparatively higher than those charged or paid by another comparable product or share class or a sponsor of such products or share classes.  Such other comparable products and/or share classes may be more appropriate for a client than the product or Program Share Class offered through the Program. Additionally, LPL receives significantly more revenue sharing from fund sponsors for which LPL's clients have the largest holdings, which creates a conflict of interest for LPL to promote and recommend those investments. LPL's website at lpl.com/disclosures.html identifies the mutual funds that pay recordkeeping compensation and the sponsors that make revenue sharing payments to LPL.

LPL credits to clients any 12b-1 fees it receives from mutual funds (other than the Sweep Funds), and therefore, LPL does not have an incentive to select one fund or Program Share Class over another solely on the basis of the 12b-1 fee.  In addition, LPL does not share 12b-1 fees, recordkeeping fees or revenue sharing payments with IARs, and, therefore, there is no financial incentive for an IAR to select one fund or a Program Share Class over another comparable fund or share class on the basis of the 12b-1 fee, recordkeeping compensation and revenue sharing payments that the fund or Program Share Class charges or provides to LPL. Although LPL does not share recordkeeping fees or revenue sharing payments with IARs, such fees and payments will increase LPL's profits and indirectly benefit IARs, for example by increasing the value of equity awards from LPL's parent company to IARs or by being used by LPL to support marketing or training costs.

LPL provides investment consulting services to the investment advisor of the Optimum Funds mutual fund family. These services include assisting the investment advisor in determining whether to engage, maintain or terminate sub-advisors for the Optimum Funds. As compensation for these services, LPL receives an investment consulting fee of up to 0.22% of fund assets from the investment advisor to the Optimum Funds. The receipt of this investment consulting compensation by LPL presents a conflict of interest, because LPL has a financial benefit if an Optimum Fund is purchased in an account. This fee is not shared with LPL IARs. In addition, a senior executive officer of LPL serves as a Trustee of the Optimum Funds. The Optimum Funds are available to be purchased and sold in a Program account.

LPL receives a fee from the issuers of structured products for administrative services and related support LPL provides in connection with the structuring and distribution of these products. This fee can be up to 0.75% of the principal amount of a trade and generally varies among products according to the complexity of the structuring.  This fee creates a conflict of interest because LPL has an incentive to recommend structured products over other products that do not pay LPL a similar fee. This conflict is mitigated insofar as the amount LPL receives is consistent for similar types of structured products across different product issuers, and is not shared with its IARs. Client should review the product offering documents for additional details.



**Important Things to Consider About Fees on a SAM Account**

- The Account Fee is an ongoing fee for investment advisory services and other administrative and custodial services. The Account Fee may cost the client more than purchasing the Program's services separately. Factors that bear upon the cost of the account in relation to the cost of the same services purchased separately include the:

    - type and size of the account

    - historical and or expected size or number of trades for the account; and

    - number and range of supplementary advisory and client-related services provided to the client.

- Clients participating in the Program do not pay IAR commissions on transactions but do pay LPL transaction charges.  Transaction charges for the securities purchased and sold in an account may also cost the client more than purchasing the Program's services separately. As with any fee, transaction charges reduce the overall amount of your investment portfolio.

- The Account Fee may cost the client more than if assets were held in a traditional brokerage account. In a brokerage account, a client pays the brokerage representative a commission for each transaction, and the representative has no duty to provide ongoing advice with respect to the account. If the client plans to follow a buy and hold strategy for the account or does not wish to purchase ongoing investment advice or management services, the client should consider opening a brokerage account rather than a Program account. In addition, LPL may only offer certain products in an advisory account, even though there is a version of the product or a similar product that may be lower cost and could be available in a brokerage account, and vice versa.

- LPL offers certain alternative products, including certain non-traded alternative investments, in certain accounts offering solely brokerage services and in certain accounts offering solely investment advisory services. This means that clients can only purchase those investments by paying a commission or other brokerage fee in the case of a brokerage account or advisory fee in the case of an advisory account. Depending on the length of time that a client holds such an investment, it may cost more to pay the commission than it would if the investment was available in a SAM program account and the client paid the annual Account Fee on the investment.

- The Account Fee may be higher than the fees charged by other investment advisors for similar services. This is the case in particular if the Account Fee is at or near the maximum Account Fee set out above. The IAR is responsible for determining the Account Fee to charge each client based on factors such as total amount of assets involved in the relationship, type of securities to be held in the account (e.g., mutual funds vs. individual securities), the complexity and mix of the portfolio, and the number and range of supplementary advisory and client-related services to be provided to the account. The IAR may charge a client more or less than another client.  Clients should consider the level and complexity of the advisory services to be provided when negotiating the Account Fee with IAR.

- The investment products available to be purchased in the Program can be purchased by clients outside of a SAM account, through broker-dealers or other investment firms not affiliated with LPL.

- Clients should consider the impact of fees and expenses on their investment portfolio, as described in the informational brochure titled "How Fees and Expenses Affect Your Portfolio" on lpl.com/disclosures.html under "Investor Regulatory & Educational Resources."

## Item 6: Performance Based Fees and Side-by-Side Management

This Item is not applicable. LPL and its IARs do not accept performance-based fees.



Strategic Asset Management Program Brochure

## Item 7: Types of Clients

The Program is available for individuals, IRAs, banks, thrift institutions, credit unions, pension and profit sharing plans, including plans subject to Employee Retirement Income Security Act of 1974 ("ERISA"), trusts, estates, charitable organizations, state and municipal government entities, corporations and other business entities.

A minimum account value of $10,000 is generally required for the Programs. In certain instances, LPL will permit a lower minimum account size.

## Item 8: Methods of Analysis, Investment Strategies and Risk of Loss

Each IAR managing a SAM account chooses his/her own research methods, investment strategy and management philosophy. It is important to note that no methodology or investment strategy is guaranteed to be successful or profitable. The IAR has access to various research reports, including those provided by LPL's Research Department, to which he/she may refer in determining which securities to purchase or sell.

LPL's Research Department makes available recommendations regarding asset allocation, mutual funds, model portfolios, and variable annuity subaccounts.  IARs may or may not follow these recommendations in managing program accounts. LPL Research also constructs asset allocation model portfolios and provides recommendations on the funds to populate the model portfolios. In constructing these models, LPL Research uses the following investment strategies: Diversified and Alternative Strategy. Although these descriptions are written in terms of individual equities and/or bonds, they include mutual funds or ETFs whose portfolios consist of the type of equities or bonds referenced.

- *Diversified.* The Diversified investment strategy seeks to promote capital appreciation while taking a reasonable amount of risk to achieve that goal. The strategy is subject to minimal constraints, which allows for a relatively pure implementation of LPL Research's recommendations. In general, Diversified portfolios should be considered by investors seeking investments in primarily stocks and bonds, along with the occasional non-traditional asset class to take advantage of potential market opportunities. Diversified portfolios will hold primarily traditional asset classes. Secondarily, if a non-traditional asset class represents the investment that provides the best means of taking advantage of a market opportunity, it will be included in the recommendation. The non-traditional investments included in Diversified portfolios are more standard, such as conservative balanced strategies. Diversified portfolios tend to be steady in their number of positions. These portfolios tend to remain consistently diversified.

- *Alternative Strategy*. The Alternative Strategy investment strategy seeks to promote capital appreciation while taking a reasonable amount of risk to achieve that goal. Unlike the Diversified investment strategy which may have an allocation to alternative strategy or non-traditional assets classes, this portfolio typically has an allocation to non-traditional asset classes. This strategy extends the diversification beyond the core style box asset classes into strategies with lower correlation to stocks and bonds in order to lower risk, as defined by standard deviation and maximum drawdown (peak to trough loss), while attempting to maintain long-term performance similar to other portfolios in the same investment objective.

For each of the above investment strategies, LPL Research recommends a strategic or tactical version.

- *Strategic.* Strategic portfolios typically have a three- to five-year time horizon. The allocations within these portfolios are intended to help take advantage of market opportunities LPL Research believes will occur or persist throughout that time frame. Although LPL Research recommends investments through a three- to five-year lens, LPL Research may recommend that these portfolios be traded for fine tuning throughout the year. For clients who take a longer term view or are more tax sensitive, a strategic implementation may be more appropriate.

- *Tactical.* Tactical portfolios are more flexible and are designed to help take advantage of short-, mid-, and long-term opportunities the markets present. LPL Research recommends that these portfolios invest in opportunities for as short as one week and as long as five years. Due to the tactical nature, the trading is



Strategic Asset Management Program Brochure

notably more frequent than strategic portfolios. Tactically managed portfolios should be considered by clients who wish to take advantage of shorter-term market opportunities that may arise and are not opposed to the prospect of more frequent trading.

It is important to note that although LPL Research makes available its recommendations and investment strategies, an IAR will not necessarily take into consideration these recommendations and strategies. Clients should contact the IAR managing his/her accounts for additional information on the IAR's particular investment strategy. It is also important to note that an IAR may use a combination of investment strategies.

## Types of Investments and Risks

In the Program, IARs can recommend many different types of securities, including mutual funds, unit investment trusts ("UITs"), closed end funds, ETFs, ETNs, variable annuity subaccounts, equities, fixed income securities, interval funds, options, hedge funds, managed futures, BDCs, private equity, REITs, and structured products. LPL determines the types of investments that are eligible to be purchased in program accounts. Investing in securities involves the risk of loss that clients should be prepared to bear. Described below are some risks associated with investing and with some types of investments that are available in the Program.

- *Market Risk*. This is the risk that the value of securities owned by an investor may go up or down, sometimes rapidly or unpredictably, due to factors affecting securities markets generally or particular industries.

- *Interest Rate Risk*. This is the risk that fixed income securities will decline in value because of an increase in interest rates; a bond or a fixed income fund with a longer duration will be more sensitive to changes in interest rates than a bond or bond fund with a shorter duration.

- *Economic Conditions Risk*. This is the risk that economic, political, or financial developments will, from time to time, result in periods of volatility or other adverse effects that could negatively impact your account.

- *Credit Risk*. This is the risk that an investor could lose money if the issuer or guarantor of a fixed income security is unable or unwilling to meet its financial obligations.

- *Liquidity Risk*. This is the risk that an investor would not be able to sell or redeem an investment quickly, or would not be able to sell or redeem an investment quickly without significantly affecting the price. Liquidity risk is heightened when markets are distressed. Generally, alternative investments have higher liquidity risk than equities, fixed income securities or mutual funds or ETFs.

- *Issuer-Specific Risk*. This is the risk that the value of an individual security or particular type of security can be more volatile than the market as a whole and can perform differently from the value of the market as a whole.

- *Investment Company Risk*. To the extent a client account invests in ETFs or other investment companies, its performance will be affected by the performance of those other investment companies. Investments in ETFs and other investment companies are subject to the risks of the investment companies' investments, as well as to the investment companies' expenses. If a client account invests in other investment companies, the client account may receive distributions of taxable gains from portfolio transactions by that investment company and may recognize taxable gains from transactions in shares of that investment company, which would be taxable when distributed.

- *Concentration Risk*. To the extent a client account concentrates its investments by investing a significant portion of its assets in the securities of a single issuer, industry, sector, country or region, the overall adverse impact on the client of adverse developments in the business of such issuer, such industry or such government could be considerably greater than if they did not concentrate their investments to such an extent.

- *Sector Risk*. To the extent a client account invests more heavily in particular sectors, industries, or sub-sectors of the market, its performance will be especially sensitive to developments that significantly affect those sectors, industries, or sub-sectors. An individual sector, industry, or sub-sector of the market may be more



Strategic Asset Management Program Brochure

volatile, and may perform differently, than the broader market. The several industries that constitute a sector may all react in the same way to economic, political or regulatory events. A client account's performance could be affected if the sectors, industries, or sub-sectors do not perform as expected. Alternatively, the lack of exposure to one or more sectors or industries may adversely affect performance.

- *Equity Securities*. Common and preferred stock represents the equity ownership of a company. Stock markets are volatile and the price of equity securities fluctuates based on changes in a company's financial condition and overall market and economic conditions. The value of equity securities may also decline due to factors that affect particular industries or particular issuers. The values of equity securities may be more volatile than those of other asset classes.

- *Debt Securities*. Debt securities, such as bonds, involve interest rate risk, credit risk, extension risk, prepayment risk, and other types of risks. In addition, the value of debt securities may fluctuate in response to market movements or issues that affect particular industries or issuers. When interest rates fall, the issuers of debt securities may prepay principal more quickly than expected, and investors may have to reinvest the proceeds at a lower interest rate. This is known as "prepayment risk." When interest rates rise, debt securities may be repaid more slowly than expected, and the value of the debt security can fall sharply. This is known as "extension risk." Certain types of debt securities may be subject to "call and redemption risk," which is the risk that the issuer may call a bond for redemption before it matures and the investor may lose income.

- *Foreign Securities Risk*. Foreign investments involve special risks not present in U.S. investments that increase an investor's potential to lose money. Among other issues, custody of securities in foreign markets, changes in foreign currency exchange rates, foreign economic and market conditions, actions adverse to investors taken by foreign governments, lack of governmental oversight or regulation of securities markets, underdeveloped settlement and clearing services, and foreign withholding taxes may negatively affect the value of investments in foreign securities.

- *Alternative Strategy Mutual Funds*. Certain mutual funds available in the Program invest primarily in alternative investments and/or strategies. Investing in alternative investments and/or strategies may not be appropriate for all investors and involves special risks, such as risks associated with commodities, real estate, leverage, selling securities short, the use of derivatives, potential adverse market forces, regulatory changes and potential illiquidity. Clients should be aware that alternative investments and/or strategies are generally considered speculative in nature and involve a high degree of risk, particularly if concentrating investments. There are special risks associated with mutual funds that invest principally in real estate securities, such as sensitivity to changes in real estate values and interest rates and price volatility because of the fund's concentration in the real estate industry. These types of funds tend to have higher expense ratios than more traditional mutual funds.  They also tend to be newer and have less of a track record or performance history.

- *Closed-End/Interval Funds*. Clients should be aware that closed-end funds available within the Program may not give investors the right to redeem their shares, and a secondary market may not exist.  Therefore, clients may be unable to liquidate all or a portion of their shares in these types of funds.  While the fund may from time to time offer to repurchase shares, it is not obligated to do so (unless it has been structured as an "interval fund"). In the case of interval funds, the fund will provide limited liquidity to shareholders by offering to repurchase a limited amount of shares on a periodic basis, but there is no guarantee that clients will be able to sell all of the shares in any particular repurchase offer.  In some cases, there may be an additional cost to investors who redeem before holding shares for a specified amount of time. The repurchase offer program may be suspended under certain circumstances.

- *Exchange-Traded Funds (ETFs)*. ETFs are typically investment companies that are legally classified as open end mutual funds or UITs. However, they differ from traditional mutual funds, in particular, in that ETF shares are listed on a securities exchange. Shares can be bought and sold throughout the trading day like shares of other publicly-traded companies. ETF shares may trade at a discount or premium to their net asset value. This difference between the bid price and the ask price is often referred to as the "spread." The spread varies over time based on the ETF's trading volume and market liquidity, and is generally lower if the ETF has a lot



Strategic Asset Management Program Brochure

of trading volume and market liquidity and higher if the ETF has little trading volume and market liquidity. Although many ETFs are registered as an investment company under the Investment Company Act of 1940 like traditional mutual funds, some ETFs, in particular those that invest in commodities, are not registered as an investment company. ETFs may be closed and liquidated at the discretion of the issuing company.

- *Unit Investment Trusts (UITs).* UITs are investment companies that generally offer a fixed portfolio of stocks and bonds as redeemable units to investors for a specified period of time. Like a mutual fund, UITs typically issue redeemable units. However, UITs differ from mutual funds in that UITs have stated expiration dates and are not actively traded. As a consequence, UITs will not be sold to take advantage of market conditions and their value may fluctuate, sometimes rapidly or unpredictably, due to factors affecting securities markets or particular industries. Upon the stated expiration date of a UIT, there is no assurance that the value of the UIT will be equal to or higher than the original price.

- *Exchange-Traded Notes (ETNs).* An ETN is a senior unsecured debt obligation designed to track the total return of an underlying market index or other benchmark. ETNs may be linked to a variety of assets, for example, commodity futures, foreign currency and equities. ETNs are similar to ETFs in that they are listed on an exchange and can typically be bought or sold throughout the trading day. However, an ETN is not a mutual fund and does not have a net asset value; the ETN trades at the prevailing market price. Some of the more common risks of an ETN are as follows. The repayment of the principal, interest (if any), and the payment of any returns at maturity or upon redemption are dependent upon the ETN issuer's ability to pay. In addition, the trading price of the ETN in the secondary market may be adversely impacted if the issuer's credit rating is downgraded. The index or asset class for performance replication in an ETN may or may not be concentrated in a specific sector, asset class or country and may therefore carry specific risks. ETNs may be closed and liquidated at the discretion of the issuing company.

- *Leveraged and Inverse ETFs, ETNs and Mutual Funds.* Leveraged ETFs, ETNs and mutual funds, sometimes labeled "ultra" or "2x" for example, are designed to provide a multiple of the underlying index's return, typically on a daily basis. Inverse products are designed to provide the opposite of the return of the underlying index, typically on a daily basis. These products are different from and can be riskier than traditional ETFs, ETNs and mutual funds. Although these products are designed to provide returns that generally correspond to the underlying index, they may not be able to exactly replicate the performance of the index because of fund expenses and other factors. This is referred to as tracking error. Continual re-setting of returns within the product may add to the underlying costs and increase the tracking error. As a result, this may prevent these products from achieving their investment objective. In addition, compounding of the returns can produce a divergence from the underlying index over time, in particular for leveraged products. In highly volatile markets with large positive and negative swings, return distortions may be magnified over time.  Some deviations from the stated objectives, to the positive or negative, are possible and may or may not correct themselves over time. To accomplish their objectives, these products use a range of strategies, including swaps, futures contracts and other derivatives. These products may not be diversified and can be based on commodities or currencies. These products may have higher expense ratios and be less tax-efficient than more traditional ETFs, ETNs and mutual funds.

- *Tax-Managed Investing Risk.* Investment strategies that seek to enhance after-tax performance might be unable to fully realize strategic gains or harvest losses due to various factors. Market conditions could limit the ability to generate tax losses. A tax-managed strategy could cause a client portfolio to hold a security to achieve more favorable tax treatment or to sell a security in order to create tax losses. A tax loss realized by a U.S. investor after selling a security will be negated if the investor purchases the security within thirty days. There is no guarantee that securities submitted for exchange will be accepted by a fund that utilizes a tax-managed strategy (e.g., an "exchange fund"), and exchange funds may accept "out-of-benchmark" securities at the sole discretion of portfolio managers. Although third-party managers of these strategies seek to avoid "wash sales" whenever possible and temporarily restrict securities they have sold at a loss to prevent them, a wash sale can occur inadvertently because of trading by a client in portfolios not managed by the third-party manager. A wash sale can also be triggered by the third-party manager when it has sold a security for loss harvesting and shortly thereafter the firm is directed by the client to invest a substantial amount of



Strategic Asset Management Program Brochure

cash resulting in a repurchase of the security. Changes to the tax code and other policy changes could result in unfavorable tax treatment for investors in tax-managed strategies.

- *Options.* Option trading is permitted in the Program. Clients should be aware that the use of options involves additional risks. The risks of covered call writing include the potential for the market to rise sharply. In such case, the security may be called away and a Program account will no longer hold the security. When purchasing options there is the risk that the entire premium paid (the purchase price) for the option can be lost if the option is not exercised or otherwise sold prior to the option's expiration date. When selling (or "writing") options, the risk of loss can be much greater if the options are written uncovered ("naked"). The risk of loss can far exceed the amount of the premium received for an uncovered option and in the case of an uncovered call option the potential loss is unlimited.

- *Direct Indexing.* Direct indexing strategies seek to replicate the performance of a market index by directly holding the individual securities, or a representative sample of the individual securities, that make up the index. Direct indexing may provide a more tax efficient means of investing, and may allow for more customized investment allocations, than investing in a fund or other commingled product that seeks to replicate the index. The potential benefits of direct indexing, however, will not necessarily be realized if you don't take advantage of tax planning or impose account restrictions, such as account level security or sector-based restrictions or customizations based on your specific tax, ESG or other preferences. Fees and expenses for the direct indexing strategy in some cases will be higher than the fees and expenses associated with alternative index products. Higher fees and expenses could adversely impact account performance. The size of your account and the number of securities in the index your account seeks to replicate also limit the ability of your account to replicate the index. As a result, the direct indexing strategy introduces the risk of tracking error relative to the index into your account and can cause your portfolio to underperform the index, including as a result of customization. LPL cannot guarantee that the dividend yield in your portfolio will accurately track a market index.

- *Other Complex Exchange Traded Products (ETPs).* Certain clients meeting qualification standards may also purchase other complex ETPs, which may be structured as ETFs, ETNs or as other types of securities. Similar to leveraged and inverse products, these other complex products differ, often significantly, from traditional ETFs, ETNs and mutual funds and can be significantly more speculative and volatile. Other complex ETPs are often not designed to be held long term. These products include, for example, single-inverse ETPs ("Single Inverse ETPs"), futures-linked ETPs ("Futures Linked ETPs") and cryptocurrency-related ETPs ("Cryptocurrency ETPs"). Single Inverse ETPs are complex financial instruments that seek investment results that are the opposite of the performance of an index for a stated trading period (or "reset frequency"), often a single day. When a Single Inverse ETP with a shorter reset frequency is held for a longer period, significantly different returns from the investment objective or returns of the underlying assets may result, including potential realized and unrealized losses. A Single Inverse ETP that resets each day is typically inappropriate as an intermediate or long-term investment unless it is recommended as part of a sophisticated trading or hedging strategy that will be closely monitored.  Futures Linked ETPs are intended to provide exposure to reference assets like commodities. However, Futures Linked ETPs are not designed to track the spot price of the referenced asset, but instead track the price of futures contracts. The performance of a Futures Linked ETP may deviate significantly from the performance of the spot price of the reference asset, especially over longer periods. Cryptocurrency ETPs are exposed to cryptocurrency, decentralized digitized assets that often rely on blockchain technology. Cryptocurrency ETPs are highly speculative and extremely volatile. Cryptocurrency is part of a new and evolving industry, and neither the technology nor regulatory regime for cryptocurrency is settled. Cryptocurrency ETPs may trade in over-the-counter markets and may not be afforded all of the investor protections of other exchange-traded products. Certain Futures Linked ETPs invest in cryptocurrency futures, which could magnify the risks described above.

- *Structured Products.* Structured products are securities derived from another asset, such as a security or a basket of securities, an index, a commodity, a debt issuance, or a foreign currency. Structured products frequently limit the upside participation in the reference asset. Structured products are senior unsecured debt of the issuing bank and subject to the credit risk associated with that issuer. This credit risk exists whether or not the investment



Strategic Asset Management Program Brochure

held in the account offers principal protection. The creditworthiness of the issuer does not affect or enhance the likely performance of the investment other than the ability of the issuer to meet its obligations. Any payments due at maturity are dependent on the issuer's ability to pay. In addition, the trading price of the security in the secondary market, if there is one, may be adversely impacted if the issuer's credit rating is downgraded. Some structured products offer full protection of the principal invested, others offer only partial or no protection. Investors may be sacrificing a higher yield to obtain the principal guarantee. In addition, the principal guarantee relates to nominal principal and does not offer inflation protection. An investor in a structured product never has a claim on the underlying investment, whether a security, zero coupon bond, or option. There may be little or no secondary market for the securities and information regarding independent market pricing for the securities may be limited. This is true even if the product has a ticker symbol or has been approved for listing on an exchange. Tax treatment of structured products may be different from other investments held in the account (e.g., income may be taxed as ordinary income even though payment is not received until maturity). Structured CDs that are insured by the FDIC are subject to applicable FDIC limits.

- *High-Yield Debt*. High-yield debt is issued by companies or municipalities that do not qualify for "investment grade" ratings by one or more rating agencies. The below investment grade designation is based on the rating agency's opinion of an issuer that it has a greater risk to repay both principal and interest and a greater risk of default than those issuers rated investment grade. High yield debt carries greater risk than investment grade debt. There is the risk that the potential deterioration of an issuer's financial health and subsequent downgrade in its rating will result in a decline in market value or default. Because of the potential inability of an issuer to make interest and principal payments, an investor may receive back less than originally invested. There is also the risk that the bond's market value will decline as interest rates rise and that an investor will not be able to liquidate a bond before maturity.

- *Hedge Funds and Non-Traded Managed Futures*. Hedge funds and non-traded managed futures funds are available to clients meeting certain qualification standards. Investing in these securities involves additional risks including, but not limited to, the risk of investment loss due to the use of leveraging and other speculative investment practices, currency and interest rate risk, lack of liquidity and performance volatility. In some cases, there may be an additional cost to investors who redeem before holding shares for a specified amount of time. In addition, these securities may not be required to provide periodic pricing or valuation information to investors and may involve complex tax structures and delays in distributing important tax information. Clients should be aware that these securities may not be liquid as there is no secondary trading market available. At the absolute discretion of the issuer of the security, there may be certain repurchase offers made from time to time. However, there is no guarantee that client will be able to redeem the security during the repurchase offer. Issuers typically accept redemption requests only periodically (monthly or quarterly), and often have the discretion to suspend redemptions in times of market stress. Even after a redemption request is accepted, the redemption proceeds may not be available for a significant period of time following the effective date of the redemption. A portion of the redemption proceeds may also be withheld to account for potential future adjustments to the valuation of the security. Funds of hedge funds are pooled investments in several hedge funds. Expenses in funds of hedge funds are typically higher than mutual funds. Because they may invest in a number of private hedge funds, funds of funds also bear a part of the fees and expenses of those underlying hedge funds.

- *Business Development Companies (BDCs)*. BDCs are types of closed-end investment companies, which are available to clients meeting certain qualification standards. Generally, BDCs invest primarily in the debt and equity of private and/or small U.S. companies and may offer distribution rates generated through potentially significant credit and liquidity risk exposures amplified through leverage. As with other high-yield investments, such as floating-rate/leveraged loan funds, private REITs and limited partnerships, investors are exposed to significant market, credit, interest rate and liquidity risks. In addition, BDCs run the risk of over-leveraging their relatively illiquid portfolios. Due to the illiquid nature of non-traded BDCs, investors' exit opportunities may be limited only to periodic share repurchases by the BDC. A tender offer pursuant to a share redemption program may be oversubscribed so that the BDC accepts only a pro rata portion of the shares a client tenders during a redemption program. In such cases, a client may experience significant delays



Strategic Asset Management Program Brochure

(including, potentially, indefinite delays) to exit from the investment. In addition, share redemption programs may be shut down at any time at the discretion of the issuer's board. Also, BDCs may fund distributions from offering proceeds or borrowings, which may constitute a return of capital and reduce the amount of capital available to make investments. In some cases, there may be an additional cost to investors who redeem before holding the shares for a specified number of years.

- *REITs*. REITs invest in real estate, and there are special risks associated with investing in real estate, including, but not limited to, sensitivity to changes in real estate values, the risk of investment loss due to the use of leveraging and other speculative investment practices, interest rate risk, lack of liquidity and performance volatility. Non-Traded REITs are not required to provide annual valuations until two years and 150 days after reaching the minimum capital raise required to begin purchasing properties.  This threshold is generally outlined in the product's prospectus. Non-Traded REITs, which are available to clients meeting certain qualification standards, may fund distributions from offering proceeds or borrowings, which may constitute a return of capital and reduce the amount of capital available to invest in new assets. Clients should be aware that these securities may not be liquid as there is no secondary trading market available. At the absolute discretion of the issuer of the security, there may be certain repurchase offers made from time to time. However, there is no guarantee that client will be able to redeem the security during the repurchase offer. Issuers may repurchase shares at a price below net asset value. The repurchase program may also be suspended under certain circumstances.

- *Private Equity Funds*. Private equity investments are speculative and involve significant risks. It is possible that investors may lose some or all of their investment. The risks associated with private equity include: limited diversification, the use of leverage, and limited liquidity. The investment timeline for private equity can be a decade or more. Some issuers or general partners may penalize limited partners who redeem before holding units for a specified amount of time, or may disallow redemptions entirely.

- *Variable Annuities*. If client purchases a variable annuity that is part of the Program, client will receive a prospectus and should rely solely on the disclosure contained in the prospectus with respect to the terms and conditions of the variable annuity. Clients should also be aware that certain riders purchased with a variable annuity may limit the investment options and the ability to manage the subaccounts.  Some products may charge a recapture or redemption fee for contracts or benefits not held for a specified period of time or that do not follow stated withdrawal terms.

- *Non-traded Products*. Non-traded products do not trade on a securities exchange and are not publicly traded. Consequently, non-traded products can be riskier than products that are publicly traded because the product cannot be sold readily in a market by the investor.  The non-traded product may offer to redeem shares from investors, but such share redemptions are typically subject to limitations. Share redemptions may also require that shares be redeemed at a discount and there is no guarantee that client will be able to redeem the security during the repurchase offer. In addition, non-traded products may lack share value transparency because there is no market price readily available.  Without share value transparency, investors may not be able to assess the value or performance of the non-traded product.

- *Margin Accounts*. Clients should be aware that margin borrowing involves additional risks. Margin borrowing will result in increased gain if the value of the securities in the account go up, but will result in increased losses if the value of the securities in the account goes down. LPL, acting as the client's creditor, will have the authority to liquidate all or part of the account to repay any portion of the margin loan, even if the timing would be disadvantageous to the client. For performance illustration purposes, the margin interest charge will be treated as a withdrawal and will, therefore, not negatively impact performance reports.

- *Pledging Assets*. LPL has partnered with certain banks to help facilitate clients' access to collateralized non-purpose lines of credit; however, clients are not required to use the banks in LPL's program, and can work directly with other banks ("non-partner banks") to negotiate loan terms or obtain other financing arrangements. Clients who choose to use non-partner banks should notify their IARs of the amount of the line of credit. In these collateralized lending arrangements, clients borrow from the bank and pay interest to the



Strategic Asset Management Program Brochure

bank. In some cases, an IAR may recommend that a client seeking to access funds (for purposes other than purchasing securities) hold his securities investments and instead utilize a non-purpose line of credit collateralized by the assets in his advisory account. Unless an IAR specifically recommends that a client hold his securities investments and instead utilize a collateralized line of credit to access funds, the decision regarding whether to arrange for a collateralized loan and the decision to draw down on such a loan are not covered by a client's advisory relationship with LPL or his IAR. While an IAR may assist the client with facilitating a line of credit, clients are responsible for independently evaluating the terms of the loan and deciding whether the loan meets their needs. Clients also should be aware that pledging assets in an account to secure a loan involves additional risks. The bank holding the loan has the authority to liquidate all or part of the securities at any time without your prior notice in order to maintain required maintenance levels, or to call the loan at any time. As a practical matter, this may cause you to sell assets and realize losses in a declining market. Moreover, an IAR's ability to make investment decisions or recommendations for the account may be restricted by collateral requirements imposed by the bank. These restrictions or a forced liquidation may interfere with your long term investment goals and/or result in adverse tax consequences. Further, you should note that the returns on accounts or on pledged assets may not cover the cost of loan interest and advisory fees. Clients should be aware that LPL's collateralized loan program is one way, among many, for clients to raise necessary cash. Before pledging assets in an account, clients should carefully review the loan agreement, loan application and any forms required by the bank and any other forms and disclosures provided by LPL. For a list of the banks currently participating in LPL's collateralized lending program, please visit lpl.com/disclosures.html, click on "Account Disclosures, Agreements, Fee Schedules & Conflicts of Interest," and then "Third Party Compensation and Related Conflicts of Interest."

- *Cybersecurity Risk*. Failures or breaches of the electronic systems of LPL, its service providers, securities market participants or the issuers of securities can cause significant losses for investors. Unintentional cyber events, such as the inadvertent release of confidential information, could also adversely impact investor account. Any cyber event could cause result in the loss or theft of investor data or cause investors financial loss and expense.

- *Use of Artificial Intelligence and Machine Learning.* Recent technological advances in artificial intelligence, generative artificial intelligence, and machine learning technology (collectively, "Machine Learning Technology") may pose risks to LPL and its IARs.  LPL and its IARs could be further exposed to the risks of Machine Learning Technology if third-party service providers or any counterparties, whether or not known to LPL or its IARs, also use Machine Learning Technology in their business activities.  LPL and its IARs will not be in a position to control the operations of third-party service providers or counterparties, the manner in which third-party products are developed or maintained or the manner in which third-party services are provided. Machine Learning Technology is generally highly reliant on the collection and analysis of large amounts of data, and it is not possible or practicable to incorporate all relevant data into the model that Machine Learning Technology utilizes to operate.  Certain data in such models will inevitably contain a degree of inaccuracy and error, potentially materially so, and could otherwise be inadequate or flawed, which would be likely to degrade the effectiveness of Machine Learning Technology.  To the extent that LPL or its IARs are exposed to the risks of Machine Learning Technology, any such inaccuracies or errors could have adverse impacts on LPL or its IARs, as applicable.  Machine Learning Technology and its applications, including in the financial services sector, continue to develop rapidly, and it is impossible to predict the future risks that will from time to time arise from such developments.

- *Values-Based and Environmental, Social and Governance (ESG) Investing Risk*. Values-based investing or ESG investing, also known as "socially responsible investing," "sustainable investing," or "impact investing," focuses on the social values or environmental, social, and governance standards or the sustainability factors of an investment. Some values-based investing strategies focus on factors relating to an individual investor's personal or religious values, such as "biblical investing," while other strategies focus on issues like environmental impact.  Some values-based investment strategies use values-based criteria to supplement financial analysis when considering a particular issuer or security, while others affirmatively select "socially



responsible" investments or screen out or exclude investments in companies that engage in certain activities. Values-based investing may limit the type and number of investments available in a strategy and cause the strategy to underperform other strategies without a values-based focus or with a focus that involves a different type of focus or screening methodology. Values-based strategies may underperform the market as a whole. Companies and issuers selected in a values-based strategy may not or may not continue to demonstrate values-based characteristics. Different investors likely have different opinions about what types of investments are socially responsible.

- *Comparable Products*. LPL offers various mutual funds, ETFs, and other investment products that have similar or identical investment strategies but different fee and expense arrangements. For example, LPL sells both mutual funds and ETFs that are designed to track an index of securities, such as the S&P 500 Index. A mutual fund and an ETF following an identical strategy have different fees and expenses that affect your investment return. Those fees and expenses include direct costs like sales loads, commissions, and other transaction costs, and indirect costs at the product level like advisory or management fees, distribution expenses (12b-1 fees), and other administrative, shareholder servicing and transfer agent fees. The impact of those fee and expenses on your investment returns also varies based on the size of your initial investment, the length of time you hold the investment, and other factors. The differences in fees and expenses, and additional differences in compensation paid directly by product sponsors like revenue sharing, mean that LPL and its IARs generally will earn more compensation for selling one investment product than another. As a result, LPL and its IARs have a conflict of interest because of the financial incentive to recommend investment products that pay more compensation if a less expensive comparable product could be used to achieve a customer's investment objective.

- *Annuity Products*. If investor client invests in annuity products in a Program account, client should be aware of the specific risks and limitations of the annuity products.  Clients should be aware that certain riders purchased with a variable annuity may limit the investment options and the ability to manage the subaccounts.  Some products may charge a recapture or redemption fee for contracts or benefits not held for a specified period of time or that do not follow stated withdrawal terms. Registered Index Linked Annuities (RILAs) are insurance products tied to the performance of a market index, offering the positive returns of the index up to a cap and providing a buffer for a certain level of negative returns. RILAs are subject to risks associated with other investment products, including market risk, and the total loss of principal is possible. If client purchases an annuity product that is part of the Program, client will receive a prospectus with respect to the terms and conditions of the annuity product.

## Item 9: Disciplinary Information

LPL entered into a settlement with the SEC in which the SEC found that LPL willfully violated its obligations under Section 17(a) of the Exchange Act and Rule 17a-8 thereunder, which require broker-dealers to comply with certain anti-money laundering ("AML") requirements. The SEC found that LPL did not follow its AML policies for its customer identification program and ongoing customer due diligence obligations by, among other things, not properly verifying new accounts; not timely closing accounts that did not pass its screening measures; and not closing or restricting certain accounts that were prohibited under LPL's AML Policies. The SEC censured LPL and ordered LPL to cease and desist from committing or causing any violations and any future violations of such section and rule, to pay a civil monetary penalty in the amount of $18 million, and to comply with certain undertakings (2025).

LPL entered into a settlement with the SEC in which the SEC found that LPL willfully violated Section 17(a) of the Exchange Act and Rule 17a-4(b)(4) thereunder and Section 204 of the Advisers Act and Rule 204-2(a)(7) thereunder in connection with the maintenance and preservation of off-channel communications; and failed to reasonably supervise its personnel within the meaning of Section 15(b)(4)(E) of the Exchange Act and Section 203(e)(6) of the Advisers Act. LPL admitted to the facts in the settlement order and acknowledged its conduct violated the federal securities laws. The SEC ordered LPL to cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Exchange Act and Rule 17a-4(b)(4) thereunder and Section 204 of the Advisers Act



Strategic Asset Management Program Brochure

and Rule 204-2(a)(7) thereunder, censured it for its conduct, ordered it to pay a civil monetary penalty in the amount of $50,000,000, and ordered it to comply with certain undertakings (2024).

LPL entered into a settlement with the SEC in connection with LPL's failure to comply with its Customer Identification Program procedures. The SEC found that LPL willfully violated Section 17(a) of the Exchange Act and Rule 17a-8 thereunder and was a cause of a third party's violations of Sections 17(a)(2) and (3) of the Securities Act and Section 206(2) of the Advisers Act. The SEC ordered LPL to cease and desist from committing or causing any further violations of these laws and regulations, censured LPL for its conduct, and ordered the payment of disgorgement and prejudgment interest totaling $141,202 (deemed satisfied based on LPL's voluntary remedial payment of $4,118,876 to the impacted client), and the payment of a civil money penalty of $750,000 (2021).

As part of a voluntary self-reporting initiative in 2019, LPL entered into a settlement with the SEC in which the SEC found that LPL willfully violated Section 206(2) and 207 of the Advisers Act in connection with inadequate disclosure to clients of its and its associated persons' conflicts of interest related to its receipt of 12b-1 fees and/or its selection of mutual fund share classes that pay such fees. The SEC ordered LPL to cease and desist from committing or causing any violations of Sections 206(2) and 207 of the Advisers Act, censured it for its conduct, and ordered the payment of disgorgement and prejudgment interest to affected investors totaling $9,333,516 (2019).

LPL, as a broker-dealer, is a member of FINRA and was found to be in violation of FINRA's rules related to its brokerage activities. In particular, LPL consented to sanctions related to the following matters:

- LPL's supervisory systems and maintenance of books and records relating to brokerage direct business transactions, supervisory systems and misstatements about fees relating to brokerage product switch transactions, and supervisory systems relating to brokerage recommendations of publicly traded securities of business development companies (BDCs) to customers, resulting in a censure, a fine of $5.5 million, restitution to impacted customers, and an undertaking to certify that LPL has remediated the systems and procedures for making recommendations of BDCs (2023).

- LPL's supervisory systems and procedures relating to the transmittal of customer funds by wire or check to third parties and maintenance of related books and records, resulting in a censure, a fine of $3,000,000, restitution to impacted clients, and an undertaking to identify and pay restitution to affected customers for certain other improper transfers (2023).

- LPL's failure to accurately calculate its customer reserve requirement, failure to maintain a sufficient customer reserve, failure to maintain policies and procedures reasonably designed to achieve compliance with the Securities and Exchange Act and FINRA rules, and failure to maintain accurate books and records, resulting in a censure and a fine of $300,000 (2022).

- LPL's self-reporting of potential issues related to certain C-share purchase suitability reviews and its supervisory systems and procedures relating to waivers of front-end sales charges for rollovers of 529 savings plan investments from one state plan to another, resulting in a censure and payment of restitution to impacted customers (2021).

- LPL's supervisory systems and procedures relating to record retention, fingerprinting and screening of certain associated persons, and supervision of consolidated reports, resulting in a censure, a fine of $6,500,000 and an undertaking to review and enhance related policies, systems and procedures (2020).

- LPL's supervisory systems and procedures relating to changes in the authority of custodians of accounts established under the Uniform Gifts to Minors Act and/or the Uniform Transfers to Minors Act, resulting in a censure, a fine of $300,000, and an undertaking to review and enhance its policies, systems, and procedures related to supervision of such accounts (2019).

- The effectiveness of LPL's anti-money laundering program, LPL's failure to amend certain Forms U4 and U5, and LPL's systems and supervisory procedures relating to Forms U4 and U5 reporting requirements, resulting in a censure and a fine of $2,750,000 and an undertaking to review the process used to disclose customer complaints on Forms U4 and U5 (2018).



Strategic Asset Management Program Brochure

- LPL's brokerage supervisory and disclosure procedures related to the sale of certain brokered certificates of deposit in brokerage accounts, resulting in a censure and a fine of $375,000 (2018).

- LPL's systems and supervisory procedures relating to the creation and distribution of certain required account notices, resulting in a censure, a fine of $900,000, and an undertaking to review affected processes (2016).

- LPL's systems and supervisory procedures relating to the format in which certain electronic records were retained, resulting in a censure and a fine of $750,000 (2016).

- LPL's various brokerage supervisory procedures, including those related to the sale of complex non-traditional ETFs, variable annuity ("VA") contracts, real estate investment trusts ("REITs") and other products in brokerage accounts, as well as LPL's failure to monitor and report trades and deliver trade confirmations, resulting in a censure and a fine of $10,000,000, and restitution of $1,664,592 (2015).

LPL, as a broker-dealer, is regulated by each of the 50 states and has been the subject of orders related to the violation of state laws and regulations in connection with its brokerage activities. In particular, LPL entered into consent orders related to the following matters:

- LPL's supervision of electronic signature practices at an LPL branch office in Massachusetts, resulting in a fine of $250,000 and an undertaking to conduct an internal review of certain related policies and procedures (Massachusetts or "MA", 2023).

- LPL's supervision of an LPL broker-dealer/investment adviser agent's sales of structured products, resulting in a censure, an offer of restitution to impacted clients, and a fine of $125,000 (Texas, 2022).

- LPL's supervision of two LPL broker-dealer and/or investment adviser agents who pled guilty to charges of fraudulent practices with LPL customers, resulting in a cease and desist order, a fine of $350,000 and a $150,000 contribution for financial literacy and investor education initiatives, training and related materials (Connecticut, 2021).

- LPL's supervision of an LPL representative under a heightened supervision plan, resulting in a cease and desist order; a fine of $275,000; payments of restitution, disgorgement and investigative costs; and offers of payment of surrender charges in connection with variable annuity contracts for impacted customers (New Hampshire or "NH", 2020).

- LPL's failure to timely register (or maintain the registration of) certain agents in Massachusetts ("MA") and failure to amend Forms U4 and U5 for certain agents registered in MA, resulting in a censure, a fine of $1,100,000, and an undertaking to review and enhance its policies and procedures related to registering its agents in MA and filing reportable events (MA, 2019).

- LPL's brokerage supervisory procedures relating to email review and annual branch office examinations, resulting in a civil penalty of $450,000 and an undertaking for third-party review of related processes (Indiana, 2018).

- The sale of unregistered, non-exempt securities in violation of state registration requirements, resulting (upon entry of the individual consent order) in payment to each participating state or jurisdiction of a civil penalty of $499,000, reimbursement of certain investigative expenses, remediation through repurchase of certain securities and payment of losses to certain affected customers, and certain additional undertakings (Settlement with up to 53 members of the North American Securities Administrators Association (NASAA), 2018).

- The sale of non-traded alternative investments in excess of prospectus standards or LPL's internal guidelines and the maintenance of related books and records, resulting in a censure, a fine of $950,000, a $25,000 contribution to an investor education fund and remediation of losses to impacted customers (New Jersey, 2017).

- LPL's supervisory practices for LPL representatives located on the premises of a credit union, resulting in a censure, a fine of $1,000,000, and an undertaking to avoid investor confusion specific to the name under which the credit union does business and review LPL's related policies and procedures (MA, 2017).



Strategic Asset Management Program Brochure

- LPL's oversight of certain VA transactions, resulting in a censure, a fine of $975,000, restitution to clients and former clients of an LPL representative, disgorgement of commissions retained by LPL in connection with such representative's VA sales, and an undertaking to review such representative's brokerage and advisory activities and LPL's related policies and procedures (MA, 2017).

- The sale in brokerage accounts of non-traded REITs in excess of prospectus standards, state concentration limits or LPL's internal guidelines, resulting in an aggregate civil penalty of $1,425,000, reimbursement of certain investigative expenses and remediation of losses to impacted customers (Global settlement with certain members of NASAA, 2015).

- The sale of non-traded REITs in excess of prospectus standards, state concentration limits or LPL's internal guidelines, resulting in an administrative fine of $250,000, reimbursement of investigative costs of $250,000, a $250,000 contribution to an investor education fund and remediation of losses to impacted customers (NH, 2015).

- The sale of leveraged and inverse leveraged ETFs ("Leveraged ETFs"), resulting in an administrative fine of $50,000 (Delaware), a penalty of $200,000 (MA), restitution to Delaware customers in an amount up to $150,000, restitution to MA customers in an amount up to $1,600,000, and an agreement to make certain changes in its supervisory system with respect to Leveraged ETFs (2015).

- Failure to implement procedures related to the use of senior-specific titles by LPL representatives as required under MA law, resulting in a censure and a fine of $250,000 (2015).

For more information about those state events and other disciplinary and legal events involving LPL and its IARs, client should refer to Investment Adviser Public Disclosure at https://adviserinfo.sec.gov/ or FINRA BrokerCheck at https://brokercheck.finra.org/.

## Item 10: Other Financial Industry Activities and Affiliations

LPL is a broker-dealer registered with FINRA and the SEC. As a broker-dealer, LPL transacts business in various types of securities, including mutual funds, stocks, bonds, commodities, options, private and public partnerships, variable annuities, REITs and other investment products. LPL is registered to operate in all 50 states and has primarily an independent-contractor sales force of registered representatives and IARs dispersed throughout the United States. LPL has a dedicated team of employee IARs in its offices who service certain accounts, and also a small subset of IARs who operate their own offices or are located on the premises of certain financial institutions and are employees of LPL Employee Services, LLC, an LPL-affiliated company. IARs may be broker-dealer registered representatives of LPL. LPL is also registered as an introducing broker with the Commodity Futures Trading Commission. In addition, LPL is qualified to sell insurance products in all 50 states.

LPL Enterprise, LLC ("LPLE"), is a registered broker-dealer and related person of LPL. LPLE became a registered investment adviser in August Our affiliate, LPLE, is an investment adviser registered with the SEC and a broker-dealer registered with FINRA and the SEC. As a broker-dealer, LPLE transacts business in various types of securities, including mutual funds, stocks, bonds, commodities, options, private and public partnerships, variable annuities, REITs and other investment products. LPLE is registered to operate in all 50 states and has primarily an independent-contractor sales force of registered representatives and investment advisor representatives dispersed throughout the United States. If required for their positions with a registered broker-dealer, LPLE's principal executive officers are securities licensed as registered representatives of LPL. In addition, LPLE is qualified to sell insurance products in all 50 states.

LPL and The Private Trust Company, N.A. ("PTC"), a federally chartered non-depository bank licensed to provide trust services in all 50 states, are related persons. PTC serves as IRA custodian for SAM program accounts set up as IRAs and receives an annual maintenance fee for this service. PTC also provides personal trustee services to clients for a variety of administrative fiduciary services, which services may relate to a Program account. Because LPL and PTC are affiliated companies and share in revenues, there is a financial benefit to the companies if a client uses PTC as a



## Strategic Asset Management Program Brochure

custodian or for personal trustee services, or if a PTC client uses LPL as an investment advisor. PTC's IRA custodian and trustee services and related fees are established under a separate engagement between the client and PTC.

Fiduciary Trust Company of New Hampshire ("FTC"), a non-depository trust company, is a related person of LPL. FTC provides custodial and various other recordkeeping and services to IRAs and certain employer-sponsored plans maintained through non-SAM Program accounts.   Because LPL and FTC are affiliated companies and share in revenues, there is a financial benefit to the companies if a client is referred to or otherwise elects to engage with FTC for services under another LPL program, and uses LPL as the investment advisor or broker-dealer. FTC's custodial and recordkeeping services and related fees are established under a separate engagement between the client and FTC.

IARs are permitted to engage in certain LPL-approved business activities other than the provision of brokerage and advisory services through LPL, and in certain cases, an IAR could receive greater compensation through the outside business than through LPL.  An IAR could also be an accountant, real estate agent, tax preparer, lawyer or refer customers to other service providers and receive referral fees, for example.  As other examples, an IAR could provide advisory or financial planning services through an independent unaffiliated investment advisory firm, sell insurance, or provide third-party administration to retirement plans through a separate firm.  If an IAR provides investment services to a retirement plan as a representative of LPL and also provides administration services to the plan through a separate firm, this typically means the IAR is compensated from the plan for the two services.   If you engage with an IAR for services separate from LPL, you may wish to discuss with him or her any questions you have about the compensation he or she receives from the engagement.

Additionally, LPL and/or its IARs may refer clients to unaffiliated firms other than investment product sponsors or financial institutions, for either investment or non-investment related products or services, in exchange for a referral fee or other forms of indirect compensation. These may include referrals for investment banking, lending, accounting, tax preparation, financial technology tools, or such other products, services or consultations that may be requested by and/or benefit a client. As applicable, clients will receive additional disclosures identifying these particular arrangements and any related compensation at the time of the referral.

LPL has an affiliated insurance agency, LPL Insurance Associates, Inc. ("LPLIA") through which IARs may sell insurance products. LPL receives compensation from issuers of life insurance (universal, variable universal, whole life, and term) and other insurance contracts that are made available by IARs, such as long-term care insurance and disability insurance. The compensation includes commissions and trails, and may include payments for administrative services that LPL provides and/or payments made in connection with LPL's marketing and sales-force education and training efforts, including LPL's annual national sales and education conference and other conferences. IARs receive a percentage of the commissions or trailing commissions paid to LPL or LPLIA. IARs may also sell insurance through an independent unaffiliated insurance agency. An IAR may earn compensation (including trailing compensation), benefits and non-cash compensation through the third-party insurance agency and may have an incentive to recommend you purchase or sell insurance products with the independent agency.

Some IARs work with UIT sponsors to create customized UITs. For customized UITs, IARs provide the UIT sponsor with input regarding the portfolio composition of the UIT, and in exchange may be paid a consulting fee. The UIT sponsor retains sole responsibility for creating and implementing the investment portfolio of the UIT. An IAR is permitted to invest SAM account assets in customized UITs for which the IAR provided consulting services. LPL has policies and procedures in place for customized UITs that are designed to prevent conflicts of interest and to ensure that IARs act in clients' best interest. Among other things, these policies prevent IARs from receiving consulting fees for assets that any LPL client invests in customized UITs. Depending on the securities held by the UIT and on whether a client separately pays transaction charges (for example in a Program account), a customized UIT's sales charges and sponsor fees could be more expensive than separately purchasing the basket of securities in the UIT's portfolio. Before investing a customized UIT, you may wish to ask your IAR questions about compensation received from the UIT and about the UIT's fees and expenses.



Strategic Asset Management Program Brochure

---

## Item 11: Code of Ethics, Participation or Interest in Client Transactions and Personal Trading

LPL has adopted a code of ethics that includes guidelines regarding personal securities transactions of its employees and IARs. The code of ethics permits LPL employees and IARs to invest for their own personal accounts in the same securities that LPL and IARs purchase for clients in SAM program accounts. This presents a conflict of interest because trading by an employee or IAR in a personal securities account in the same security on or about the same time as trading by a client can disadvantage the client. LPL addresses this conflict of interest by requiring in its code of ethics that LPL employees and IARs report certain personal securities transactions and holdings to LPL. LPL has procedures to review personal trading accounts for front-running. In addition, employees in LPL's Research Department are required to obtain pre-clearance prior to purchasing certain securities for a personal account. Employees and IARs are also required to obtain pre-approval for investments in private placements and initial public offerings. A copy of the code of ethics is available to clients or prospective clients upon request and is available at lpl.com/disclosures.html.

As described under Brokerage Practices below, IARs may aggregate transactions in equities, options, and fixed income securities for client accounts. Clients should be aware that the IAR's personal accounts (including related accounts, such as those of family members) can be included in such a block order. Although the same average price would be applied to client accounts and the IAR's personal accounts, the inclusion of an IAR's personal account in a block order can present a conflict of interest. It is possible that the inclusion of the personal account could negatively impact the price of the security or result in the client being allocated less of an order. If a partially filled order is allocated on a random basis, the inclusion of the personal account could make it less probable that a client account is randomly selected and the IAR's personal account could be randomly selected instead of a client account. LPL addresses this conflict by disclosing it to you. Please ask your IAR if you would like more information on the IAR's practices in this respect.

### Participation or Interest in Client Transactions

Purchases of mutual fund, UIT or alternative investment shares may be processed through the firm's proprietary account resulting in such purchases being characterized as principal transactions for certain reporting purposes. In such case, the shares will be purchased at the fund's net asset value, and no additional charges will be applied to such transactions as a result of the firm's use of a proprietary account. LPL does not otherwise engage in principal transactions with its clients in the Program. LPL's parent company, LPL Financial Holdings Inc., is a publicly traded company. LPL does not permit its IARs to recommend or purchase LPL Financial Holdings Inc. stock in SAM accounts unless expressly directed to do so by the client. In addition, IARs may recommend or purchase an ETF or mutual fund that holds LPL Financial Holdings Inc. stock as an underlying investment, for example, an ETF that seeks to replicate the performance of an investment services index that includes LPL Financial Holdings Inc.

For certain ETFs and stocks, LPL executes trades in fractional shares of those securities as an accommodation to clients. There is not an active open market for fractional shares, and executing trades with LPL is most often the only form of liquidity for a client that holds fractional shares in his or her account. LPL does not receive any compensation in addition to advisory fees for executing trades in fractional shares for a client's advisory account. LPL will only buy and sell fractional shares when a client is also trading whole shares of the security, in connection with a dividend reinvestment plan, or to sell remaining fractional shares to close a position. Trades in fractional shares will happen on the same day and at the same price as a trade in whole shares, or otherwise at market closing price.

### Collateralized Lending Arrangements

LPL has partnered with certain banks to help facilitate clients' access to non-purpose lines of credit collateralized by their investment accounts. Because of LPL's arrangements with the banks participating in the program, clients may be limited in their ability to negotiate the most favorable loan terms. Clients are not required to use the banks in LPL's program, and can work directly with other banks to negotiate loan terms or obtain other, potentially more favorable, financing arrangements. If a Client obtains a loan from a non-partner bank, he should notify his IAR of the amount of the line of credit. Clients should understand that the interest and additional fees paid to the bank in connection with



Strategic Asset Management Program Brochure

the loan are separate from and in addition to the advisory fees the client pays LPL for its advisory services on the account.

LPL receives third party compensation from participant banks based on the amount of outstanding loans. Compensation can be up to 0.75% of the outstanding loan amount. This compensation to LPL varies, and, therefore, LPL can earn more or less depending on the bank selected by the client. The receipt of compensation poses a conflict of interest to LPL because LPL has a financial incentive for the client to select a bank in the program, as well as a participating bank that pays LPL more than other participating banks. However, LPL does not share this compensation with its IARs, and therefore, an IAR does not have a financial incentive if one bank is selected over another. LPL and its IARs have an interest in continuing to receive investment advisory fees, which gives LPL and its IARs an incentive to recommend that clients borrow money rather than liquidate some of their assets managed by LPL and the IAR. This incentive creates a conflict of interest for LPL and its IARs when advising clients seeking to access funds on whether they should liquidate assets or instead hold their securities investments and utilize a line of credit secured by assets in their account. Because LPL and its IARs are compensated primarily through advisory fees paid on clients' accounts, LPL and its IARs also have an interest in managing an account serving as collateral for a loan in a manner that will preserve sufficient collateral value to support the loan and avoid a bank call. This may present a conflict of interest with clients because it could incentivize LPL's IARs to invest in more conservative, lower performing investments to maintain the stability of the account.

For additional disclosures regarding LPL's collateralized lending program, including a list of the banks currently participating in the program, please visit lpl.com/disclosures.html, click on "Account Disclosures, Agreements, Fee Schedules & Conflicts of Interest," and then "Third Party Compensation and Related Conflicts of Interest."

## Cash Sweep Service Options

LPL automatically transfers cash balances (including otherwise uninvested cash amounts received from the customer, securities transactions, dividend and interest payments, and other account-related activities) in a customer's eligible accounts through the account's designated sweep service option, where applicable.  The type of sweep service options available (and how cash is held) depends on the customer's account type. LPL offers Federal Deposit Insurance Corporation ("FDIC")-insured bank sweep services for most customer accounts.  Accounts may be eligible for the LPL Insured Cash Account ("ICA") Program, the LPL Deposit Cash Account ("DCA") Program, the Single Bank Insured Cash Account ("SBICA") sweep program, or the money market mutual fund sweep, each described below.  Not all sweep service options are available to all types of customer accounts. Cash sweep is offered as an account feature and service to facilitate the operation and maintenance of the account and is not intended to be used as an investment option or as part of an account's asset allocation, though for certain advisory accounts, it is typical for an account to have an allocation to cash to support the operational needs and fees charged to the account.  LPL and its financial professionals do not typically recommend specific sweep service options or underlying sweep holdings. For more information , see your customer agreement and the applicable ICA, DCA, or SBICA disclosure booklet, or the sweep money market fund prospectus.

The aggregate fees and expenses received by LPL in connection with the customer account's designated sweep service option can be higher or lower than the customer's yields on the sweep service option depending on the particular sweep option, prevailing interest rates and other market factors. See https://www.lpl.com/disclosures/lpl-financial-fdic-insured-bank-deposit-sweep-programs.html for Information about our customer fees and customer Interest rates for ICA and DCA, or contact your financial professional for information about our customer fees and customer interest rates for SBICA and for money market funds. Historically, customer yields in ICA have always been lower than the aggregate fees and charges received by LPL.  Customer yields in DCA, SBICA and in money market mutual funds have been both lower and higher than the aggregate fees and charges received by LPL.

Cash sweep services are not intended to be used for long-term investments and are more appropriately viewed as an indirect cost of maintaining and operating the account.  LPL makes available a wide range of investment alternatives with differing risk and return characteristics, which are better suited for meeting customer investment needs and objectives. Customers should compare the terms, interest rates, required minimum amounts and other features of



Strategic Asset Management Program Brochure

their account's applicable sweep service option available through other types of accounts and investment options available in their account.

FDIC insurance protects against the loss of FDIC-insured deposits if the depository institution or bank holding the deposit fails.  LPL itself is not an FDIC-insured depository institution. With respect to our sweep service options, only balances received by, and deposited at, the ICA, DCA and SBICA participating banks are eligible for FDIC insurance (subject to applicable limits). Eligibility for pass-through deposit insurance coverage for ICA, DCA, and SBICA deposits is subject to fulfilling specific conditions. Client Cash Accounts and money market mutual funds are not customer bank deposits and are subject to investment risks, including the potential loss of the amount invested.  These investments are not FDIC-Insured, but may be subject to SIPC protection.

- **Insured Cash Account (ICA)**. LPL's ICA sweep service option automatically sweeps otherwise uninvested cash balances held within customer brokerage (and certain advisory accounts) into interest-bearing bank deposits eligible for FDIC insurance (subject to applicable limits). Under its agreement with each ICA participating bank in which customer cash may be swept, LPL receives a fee from the bank equal to a percentage of the average daily deposit balance held at the bank. Such fees differ among the participating banks depending on the current interest rate environment and/or any fee waivers made by LPL.  The fee LPL receives is generally an average aggregate annual rate of up to 6% as applied across the deposits held at all of the ICA participating banks. Because the banks generally pay different amounts to LPL on account balances, fees received by LPL with respect to a specific customer account (and the account's cash holdings) may be higher or lower than this average percentage amount. The fees received by LPL from the ICA participating banks reduce the interest rate customers receive on their cash held through ICA.  These fees are additional compensation to LPL for operating and maintaining the account and for LPL's other services to the account. LPL has chosen to offer ICA as the sole sweep service option for certain account types, in part because of the additional compensation LPL earns from the use of ICA.

  In situations where customer cash balances allocated through ICA exceed the deposit availability at ICA participating banks, uninsured cash balances may be placed into an "overflow" Client Cash Account. Such balances are considered to be "free credit balances" and represent a direct liability of LPL to the customer. See below for information about how LPL is compensated on Client Cash Account balances.

- **Deposit Cash Account (DCA)**. LPL's DCA sweep service option automatically sweeps otherwise uninvested cash balances held within certain advisory accounts into interest bearing bank deposits eligible for FDIC Insurance (subject to applicable limits).  In the DCA program, each Bank pays compensation equal to a percentage of the average daily aggregated omnibus deposit balance held at the bank. This amount includes the fee for the third-party administrator, LPL's per account fee, and interest payable to participating accounts. Such fees differ among the participating banks. Customers have no rights to the amounts paid by the DCA participating banks, except for interest actually credited to the customer account. However, amounts collected from the DCA participating banks during each period, less interest credited, will be allocated on a per-dollar, per-account basis and used to offset each customer's monthly LPL account fee for providing the sweep services.  In addition, part of the payment by the participating banks will be used to compensate the third-party administrator for its services. For its services under the DCA program, including making the platform available, LPL receives a per-account fee each month. The monthly fee is based on a fee schedule indexed to the current Federal Funds Target (FFT) Rate as detailed in the DCA Disclosure Booklet located on lpl.com. The current fee can also be found at lpl.com. It is expected that this fee will be recouped from the DCA participating banks and will not be a fee directly applied to customer accounts. The fee LPL receives under the DCA program does not vary, and is not affected by the actual amounts held in the deposit accounts or in the customer's account.  LPL has chosen to offer DCA as the sole service option for certain account types, in part because of the additional compensation LPL earns from the use of DCA.

  In situations where customer cash balances in DCA exceed the deposit availability at DCA participating banks, uninsured cash balances may be placed into an "overflow" money market mutual fund. See below for further



Strategic Asset Management Program Brochure

information about fees generated by cash balances maintained in the DCA "overflow" money market mutual fund.

- **Single Bank Insured Cash Account (SBICA)**. For certain eligible customers participating in an LPL investment program associated with, or located at, certain banks LPL makes available the SBICA sweep service (and not the sweep service they might otherwise be eligible for, such as ICA). The SBICA sweep service functions like the ICA sweep service, except that otherwise uninvested customer account cash balances will be automatically swept into deposits eligible for FDIC insurance (subject to applicable limits) of the bank through which the investment program is offered, or in some situations, in a series of banks affiliated with the investment program bank. The banks participating in the SBICA have an agreement with LPL for financial professionals to offer brokerage and advisory services on their premises.  This presents an additional conflict of interest because the financial professional is an employee of the bank that is also used for the sweep, and the bank benefits financially from the deposits. Under its agreement with each SBICA bank into which customer cash may be swept, LPL receives a fee from the bank equal to a percentage of the average daily deposit balance in the respective SBICA. The fee paid to LPL equals an average annual rate of up to 0.50% as applied across all deposit accounts taken in the aggregate. Because the SBICA participating banks generally pay different amounts to LPL on account balances, fees received by LPL with respect to a specific customer account (and the account's cash holdings) may be higher or lower than this average percentage amount. In some situations, LPL will receive no fee with respect to these deposits.  The fees received by LPL from the SBICA participating bank(s) reduce the interest rate received by customers on their cash held through SBICA. These fees are additional compensation to LPL for operating and maintaining the account and for LPL's other services to the account.  LPL has chosen to offer SBICA as the sole sweep service option for certain account types (and accounts sourced from the bank, bank premises or the bank employees acting as LPL financial professionals), in part, because of the broader business relationship that LPL has with the bank (and its affiliates) as well as the additional compensation LPL receives (if any).

- **Client Cash Accounts – ICA Overflow Balances**. LPL receives additional compensation and benefits from the customer cash balances maintained in the ICA overflow mechanism, referred to as Client Cash Account, which constitute free credit balances available for LPL use.  LPL can use free credit balances to fund its ongoing operations subject to the limitations under SEC Rule 15c3-3. Pursuant to Rule 15c3-3, LPL can (i) deposit free credit cash balances into a segregated deposit account at its banks, thereby earning interest on the Client Cash Account balances deposited, or (ii) invest the cash balances in securities backed by the full faith and credit of the U.S. government, thereby making money on any yield generated by such securities. The amount LPL will earn from these sources will vary based on market forces and the contracts for deposit arrangements that LPL is able to secure with its banks. LPL may use both or either of these vehicles at its sole discretion. Any amounts LPL receives pursuant to these sources will be reduced by the interest payable, if any, to customers on such balances, and further reduced by the cost of borrowing any funds necessary to meet its reserve requirements under Rule 15c3-3. For example, LPL may earn interest or a return by investing in short-term U.S. Government or Agency instruments or by using these balances to fund margin loans to its customers at a lower funding cost than would otherwise be the case.  Customers do not share in the returns or proceeds associated with LPL's use or investment of such free credit balances, which are expected to exceed the amount of any Interest paid to the customer for Client Cash Account balances.

- **Money Market Mutual Fund Sweep Option**. For customer accounts not eligible for ICA, DCA or SBICA, otherwise uninvested cash balances held in the account are automatically swept and invested daily into shares of a money market mutual fund. Currently, taxable and tax-exempt money market funds offered by J.P. Morgan Asset Management and Federated Services Company, are available. LPL receives compensation in the form of servicing fees of up to 0.25% of customer assets invested in J.P. Morgan Asset Management money market funds and up to 0.35% of customer assets invested in Federated Services Company money market funds. These money market mutual funds generally pay higher 12b-1 fees than other money market funds that are not used for sweep services. The 12b-1 fees and the payer of such fees are set out in the prospectus of the money market mutual fund. LPL receives service and administrative fees relating to the



Strategic Asset Management Program Brochure

support of the sweep program from the sponsors of these funds, ranging between 0.25% and 0.45% of the assets Invested In the money market funds. Such fees may be waived by the fund companies in their sole discretion.  These payments are in addition to other fees (e.g., recordkeeping and 12b-1 fees) received by LPL, where applicable.

LPL also receives fees of up to 0.45% for DCA "overflow" balances that are swept into the Goldman Sachs Asset Management Financial Square Government Fund, if any.  The fees and the payer of such fees are set out in the prospectus of the money market fund.

The compensation that LPL receives related to ICA, DCA (including from any ICA and DCA overflow mechanisms) and the Sweep Funds is in addition to the Account Fee that LPL and IAR receive with respect to the assets in the sweep investment. This compensation related to ICA, DCA and Sweep Funds is an important revenue stream and presents a conflict of interest to LPL because LPL has a financial benefit if cash balances are maintained in the ICA, DCA, or the Sweep Funds. However, this compensation is retained by LPL and is not shared with its IARs.  Therefore, this compensation does not cause an IAR to have a financial incentive to recommend that cash be held in the account instead of holding securities.

### Non-Sweep Money Market Mutual Fund Investments (Outside of LPL's Sweep Service Options)

Clients are able to invest cash balances in a limited number of money market mutual funds outside the sweep options offerings (such funds, "Non-Sweep Money Market Funds"). Like any other mutual fund transactions at LPL, transaction and other fees may apply.  Moreover, unlike under the sweep services, transactions in Non-Sweep Money Market Funds are customer-directed (or directed by customer's representative) and do not provide for automatic daily sweep. Depending on current interest rates and other market factors, investment returns of money market mutual funds could be, lower or higher than the aggregate fees and expenses charged by LPL  in connection with the transaction. Contact your financial professional for information about current fees and investment returns on money market funds.  As described above, under "Fees Charged by Third Parties," clients should understand that the share class offered for a particular Non-Sweep Money Market Fund charges higher fees and expenses than other share classes that are offered by the same Non-Sweep Money Market Fund but are not available on LPL's platform. LPL receives compensation for the LPL customer assets invested in the Non-Sweep Money Market Funds (up to 0.30% on an annual basis) for recordkeeping, shareholder servicing and administrative services it provides for the funds and in connection with marketing support services LPL provides to the fund sponsors as described in this disclosure. This compensation related to Money Market Funds presents a conflict of interest to LPL because LPL has a financial benefit if cash is invested in the Money Market Funds. However, this compensation is retained by LPL and is not shared with its IARs. Therefore, this compensation does not cause an IAR to have a financial incentive to recommend that cash be held in the account instead of holding securities.

Unlike other types of mutual funds available on LPL's platform, LPL makes available Non-Sweep Money Market Funds from only a limited number of mutual fund sponsors.  By making available a limited number of Non-Sweep Money Market Funds, LPL is able to negotiate greater compensation from the fund companies for services it provides to the funds.  Because of the limited number of Non-Sweep Money Market Funds available on LPL's platform and the fees paid by those funds, other money market mutual funds not available through LPL's brokerage platform are likely to have higher returns than the Non-Sweep Money Market Funds.

In addition, LPL has received a waiver from the Money Market Funds to allow a lower investment minimum for the Program Share class of the than that set out in the prospectus; however, LPL imposes its own minimum investment amounts that are higher than minimums that may apply if a client were to invest in the Money Market Funds through another firm outside of the Program.  In light of the investment minimums that LPL imposes with respect to the Money Market Funds, an investment in the Money Market Funds outside of the Program or an investment in one of the many other money market mutual funds offered outside of the Program would likely be more economically advantageous than an investment in the Money Market Funds through the Program. LPL does not charge transaction charges on Money Market Funds.



Strategic Asset Management Program Brochure

---

### Credit Cards

As part of its cash management services, LPL makes available for its customers credit cards through a partner bank. LPL receives a flat fee for each new activated credit card that is used by the cardholder in the first 90 days. LPL also receives a portion of the transaction volume of the cardholder's account. LPL's portion of the transaction volume varies depending on the number of LPL active cardholders.

### Rollovers

If a client is a participant in an employer-sponsored retirement Plan such as a 401(k) plan, and decides to roll assets out of the plan into an account at LPL, LPL and LPL IARs have a financial incentive to encourage client to invest those assets in the client's account, because LPL will be paid on those assets, for example, through advisory fees. Client should be aware that such fees likely will be higher than those a participant pays through an employer-sponsored plan, and there can be maintenance and other miscellaneous fees.  As securities held in employer-sponsored plans are generally not transferrable to the client's account, commissions and sales charges may be charged when liquidating such securities prior to the transfer, in addition to commissions and sales charges previously paid on transactions in the plan. This conflict of interest is mitigated by LPL's policy regarding rollovers from an employer-sponsored plan into an LPL individual retirement account ("IRA").

LPL and LPL IARs may assist clients contemplating a rollover by providing general investment education to assist plan participants in making informed investment decisions about the distribution options available to them. LPL's educational services are intended to be consistent with the Department of Labor's Interpretive Bulletin 96-1. LPL is not acting in a fiduciary capacity under ERISA when providing educational services. The general investment education provided is not intended to be viewed or construed as a suggestion for client to take a particular course of action with respect to employer-sponsored plan assets (including, a distribution therefrom). With respect to employer-sponsored plan rollovers, LPL makes information available that outlines the many factors client should consider (including the types of fees and costs of an IRA and IRA investments) before making a decision.  IARs may also agree to assist clients seeking a recommendation on whether to roll out of their employer-sponsored plan based on an analysis of the client's personal financial needs, savings objectives and other financial and non-financial considerations, that is designed to determine whether such is in the client's best interest under ERISA.

### IRA to IRA Transfers

If LPL or an LPL IAR recommends that client move assets from an LPL brokerage IRA account or an IRA account held at another financial institution into the account, they are required to consider, based on the information client provides, whether client will be giving up certain investment-related benefits, such as the effects of breakpoints or rights of accumulation, and has determined that the recommendation is in client's best interest because (1) greater services and/or other benefits (including discretionary management, trust services, holistic advice and planning, and automatic account rebalancing) can be achieved with the account; (2) access to your chosen financial professional and asset consolidation (in the case of a transfer from another financial institution); and (3) the asset based fees and transaction charges are justified by these services and features.

Notwithstanding whether a recommendation has been made, clients should understand that with respect to any assets clients decide to move into the account, clients should: (1) evaluate the investment and non-investment considerations important to the client in making the decision; (2) review and understand the fees and costs associated with the account; (3) recognize that higher net fees (if applicable) will reduce the client's investment returns and ultimate retirement assets; and (4) understand the conflicts of interest raised by the financial benefits to LPL and its IARs resulting from the client's decision to move assets into the account.

### Other Clients

Clients should understand that LPL and IAR perform advisory and/or brokerage services for various other clients, and that LPL and IAR may give advice or take actions for those other clients that differ from the advice given to the client. The timing or nature of any action taken for the account may also be different.



Strategic Asset Management Program Brochure

## Item 12: Brokerage Practices

LPL does not receive research or other products or services other than execution from a broker-dealer in connection with client securities transactions ("soft dollar benefits"). LPL does not consider, in selecting or recommending broker-dealers, whether LPL or a related person of LPL receives client referrals from a broker-dealer or third party.

In the Program, LPL requires that clients direct LPL as the sole and exclusive broker-dealer to execute transactions in the account. The IAR is not paid a commission in the Program, but LPL is paid transaction charges by the client for processing trades depending on the type of security. Because LPL is both the investment advisor and broker-dealer on the account in the Program, this presents a conflict of interest. Clients should understand that not all advisors require their clients to direct brokerage. By directing brokerage to LPL, clients may be unable to achieve the most favorable execution of client transactions. Therefore, directed brokerage may cost clients more money. In the case of mutual funds, execution is made at the net asset value of the fund. If LPL as broker purchases a new issue security on behalf of client accounts, the execution price may include a concession to the dealers participating in the syndicate. Although LPL is not part of the syndicate and does not receive this concession, the concession is included in the price and is in addition to the Account Fee.

IARs may aggregate transactions in equity, options and fixed income securities for a client with other clients to improve the quality of execution. When transactions are so aggregated, the actual prices applicable to the aggregated transactions will be averaged, and the client account will be deemed to have purchased or sold its proportionate share of the securities involved at the average price obtained. For partially filled orders, the IAR will generally allocate trades pro-rata or on a random basis to treat clients fairly and consistent with our fiduciary duty. IARs may determine not to aggregate transactions, for example, based on the size of the trades, the number of client accounts, the timing of the trades, the liquidity of the securities and the discretionary or non-discretionary nature of the trades. If IARs do not aggregate orders, some clients purchasing securities around the same time may receive a less favorable price than other clients. This means that this practice of not aggregating may cost clients more money.

LPL will reinvest dividends in accordance with LPL's Dividend Reinvestment Program ("DRP"). Some securities held in the Account may be ineligible for DRP, including securities not custodied at LPL Financial. There is no requirement to participate in the DRP, Client can enroll or unenroll at any time by contacting their IAR or LPL. DRP transactions will be confirmed on at least a quarterly basis as part of the regular periodic account statement. Additional important disclosures about DRP, including eligibility, fees, how dividends are reinvested, and more can be found at lpl.com/disclosures.html.

Certain orders may be blocked or subject to review by LPL before they are directed to an exchange or market maker for execution. This review may result in a delay in execution. For securities transactions, this delay may cause a difference between the execution price and the displayed quote at the time the order was entered. This delay may also result in a limit order becoming ineligible for execution. LPL reserves the right to place restrictions on your account in our sole discretion, and to cancel any order that we believe would violate federal credit regulations or other regulatory limitations; however, LPL will have no responsibility or liability for failing to cancel any order.

## Item 13: Review of Accounts

LPL reviews program accounts using a risk based exception reporting system that flags accounts for criteria such as trading activity and concentration on a quarterly or monthly basis, depending upon the nature of the exception. The Advisory Chief Compliance Officer of LPL oversees the process for reviewing flagged accounts IARs review accounts and meet with clients, on a regular basis or as requested by the client, and such meetings may include review of accounts statements, performance information, and other information or data related to the client's account and investment objectives.

LPL provides clients with regular written reports regarding their accounts. LPL provides detailed performance information annually describing account performance and positions, with additional performance information



Strategic Asset Management Program Brochure

available upon request. LPL also provides an additional year-end report for accounts not established on a calendar quarter basis. In addition, LPL sends to clients trade confirmations and account statements showing transactions, positions, and deposits and withdrawals of principal and income. LPL does not send trade confirmations for systematic purchases, systematic redemptions and systematic exchanges. Portfolio values and returns shown in performance reports for the year-end time period may include mutual fund dividends paid out prior to December 31 but that were posted to the account within the first 2 business days of the subsequent year.  The inclusion of such dividends in the year-end performance report may cause discrepancies between the report and the account statement client receives from LPL for the same period.

## Item 14: Client Referrals and Other Compensation

### Other Compensation

LPL, LPL employees and IARs receive additional compensation, business entertainment and gifts from product sponsors. However, such compensation may not be tied to the sales of any products. Compensation includes such items as gifts valued at less than $100 annually, an occasional dinner or ticket to a sporting event, or reimbursement in connection with educational meetings, customer appreciation events or marketing or advertising initiatives, including services for identifying prospective clients. Product sponsors also pay for, or reimburse LPL for the costs associated with, education or training events that may be attended by LPL employees and IARs and for LPL-sponsored conferences and events. LPL, LPL employees and IARs also receive reimbursement from product sponsors for technology-related costs, such as those to build systems, tools and new features to aid in servicing customers.

LPL employees provide sales support resources to IARs that use LPL advisory programs.  The compensation that LPL pays to these employees varies based on the assets in LPL's different advisory programs.  These employees have an incentive to promote certain advisory programs to IARs over other advisory programs. These employees also earn more compensation when IARs transition client assets from brokerage accounts to advisory accounts, and have a financial incentive to encourage IARs to transition brokerage accounts to advisory.

LPL receives compensation in the form of earnings on its short-term investment of cash in program accounts prior to the time the cash is invested for the account.  These earnings are generally known as "float."  Cash in the account would typically result from contributions to the account or sales of securities in the account.  For accounts that opt out of the sweep program, the accounts may remain in free credit balances.  In such case, LPL receives compensation in the form of earnings on cash.  LPL does not share this compensation with IAR.

In the event a trade error occurs in a Program account, and such error is determined to be caused by LPL, LPL typically will cancel the trade and remove the resulting monetary loss to the client from the account.  If a trade correction is required as a result of client (e.g., if client does not make full payment for purchases or fails to deliver negotiable securities for liquidations before trade settlement), LPL typically will cancel the trade and any resulting monetary loss will be borne by the client.  In the case of a trade that requires a correction as described above and that resulted in a monetary gain to the client, such gain will be removed from the account and can result in a financial benefit to LPL.

### Client Referrals

From time to time, LPL and/or its IARs enter into arrangements with clients, third parties or other financial intermediaries for lead generation, client referrals or solicitation for program accounts (collectively, "solicitation arrangements"). These solicitation arrangements range from largely impersonal referrals to specific client introductions to LPL and its IARs. Under solicitation arrangements, the third parties and financial intermediaries are independent contractors. In most cases, third parties are not advisory clients of LPL and do not refer clients based on their experience with LPL as advisory clients. The compensation paid under the solicitation arrangements is structured in various ways, including a one-time fee, a flat fee per lead or referral, and sharing a portion of the ongoing Account Fee. LPL and its IARs have generally entered into the following types of referral arrangements:

- *Referral Networks*. Some third parties operate referral networks. Referral networks may present potential clients with a list of possible investing firms and investment adviser representatives, or may direct potential



Strategic Asset Management Program Brochure

clients specifically only to LPL and its IARs. Some referral networks receive a flat fee per referral and/or an ongoing fee, while others share a portion of the ongoing Account Fee;

- *Professional Cross Referrals.* Some IARs have relationships with other professionals, such as accountants, lawyers or tax advisors, in which the professionals refer clients to IARs and in exchange the IARs refer clients to the professionals for their services. The cross-referral arrangement is a quid pro quo relationship that can give rise to similar conflicts as compensated referrals;

- *Client Referral Awards.* Investment advisory clients of LPL's IARs refer new advisory clients to their IARs. Sometimes, in connection with these referrals, IARs pay their clients one-time, non-cash gifts like gift cards or tickets to events for the clients referring to them new advisory clients;

- *Unaffiliated Financial Institutions.* LPL and its IARs offer advisory services on the premises of unaffiliated financial institutions, like banks or credit unions. These financial institutions refer clients to LPL. See more about LPL's relationship with financial institutions under "Unaffiliated Financial Institutions" below; and

- *Other Arrangements.* LPL and its IARs may enter into other arrangements in the future that provide for compensation similar to one or more of the types of arrangements described above.

Depending on the solicitor's arrangement with LPL, a solicitor may not be compensated for referring a client who opens a brokerage account rather than an advisory account, and as a result may encourage the client to open an advisory account instead of a brokerage account. Solicitation arrangements give rise to material conflicts of interest because the referring party has a financial incentive to introduce new investment advisory clients to LPL and its IARs. Solicitors may also have other conflicts of interest with respect to a particular IAR or may be associated with LPL in another way.  Clients who are introduced to LPL and its IARs through a solicitation arrangement receive specific disclosures at the time of the introduction.  If you receive such disclosures, you should review them carefully to understand the details of LPL's arrangements with the person introducing you to LPL.  LPL's participation in these referral arrangements does not diminish its fiduciary obligations to its clients.

## Conflicts Related to LPL Compensation to IAR

The IAR recommending an advisory service receives compensation from LPL. In most cases, LPL has a compensation arrangement directly with the IAR. (In certain cases, LPL has entered into an agreement with a financial institution offering LPL's advisory services on its bank or credit union premises, as described further below.) LPL typically compensates IARs pursuant to an independent contractor agreement and not as an employee. This compensation includes all or a portion of the advisory fee and, such portion received by IAR may be more than what IAR would receive at another investment advisor firm. All compensation paid to the IAR will be the sole responsibility of LPL and is payable by LPL out of the investment advisory fee clients pay to LPL.

IARs have a financial incentive to negotiate fee arrangements that maximize their compensation. In some programs, LPL charges a negotiable advisory fee for itself plus a fee for third-party managers that is not negotiable. Differences in fees for third-party managers, and the absence of such fees in other programs, creates a conflict of interest for the IARs insofar as IARs can negotiate a higher LPL advisory fee for a program or strategy with lower or no separate manager fee than they could for an account subject to a higher third-party manager. The amount received by an IAR as a result of a client's participation in any particular program offered by LPL often is more than the IAR would have received if the client participated in other programs, paid third-party manager fees, or paid separately for investment advice, brokerage and other services covered by the account fee.

Such compensation includes other types of compensation, such as bonuses, awards or other things of value offered by LPL to the IAR. In particular, LPL pays its IARs in different ways, for example:

- payments based on production

- equity awards from LPL's parent company, LPL Financial Holdings Inc., consisting of awards of either restricted stock units (a promise to deliver stock in the future) or stock options to purchase stock, in each case subject to satisfaction of vesting and other conditions



Strategic Asset Management Program Brochure

- reimbursement or credits of fees that IARs pay to LPL for items such as administrative services, or technology fees

- free or reduced-cost marketing materials

- payments in connection with the transition of association from another broker-dealer or investment advisor firm to LPL

- advances of advisory fees

- payments in the form of repayable or forgivable loans

- attendance at LPL conferences and events.

Some of these forms of compensation, particularly equity awards of LPL Financial Holdings Inc., give IARs a financial interest in the success of LPL.  IARs who have a financial interest in the success of LPL have an incentive to recommend investments that are more profitable for LPL, regardless of whether the IARs share in that compensation directly.

Note that LPL has a dedicated team of employee IARs in its offices who service certain accounts, and also a small subset of IARs who operate their own offices or are located on the premises of certain financial institutions and are employees of LPL Employee Services, LLC, an LPL-affiliated company.  In such cases, the IARs are compensated as employees, and such compensation can include a salary, bonus and other things of value as set out above.

LPL also charges IARs various fees under its independent contractor agreement, for example, for administrative, custody and clearing services to accounts, technology and licensing.  In certain cases, LPL pays IARs this compensation, and charges IARs these fees, based on the IAR's overall business production and/or on the amount of assets serviced in LPL advisory relationships.  When compensation or fees charged is based on the level of production or advisory assets of an IAR, the IAR has a financial incentive to meet those production or asset levels.  The amount of this compensation from LPL could be more, and the amount of these fees charged by LPL could be less, than what the IAR would receive, or pay, if he or she associated with another investment advisor firm.  The level of compensation and costs is an incentive for an IAR to become associated with LPL over another investment advisor firm.  This compensation the IAR receives from LPL could be more than if the client participated in other LPL programs, programs of other investment advisors or paid separately for investment advice, brokerage and other client services, and likewise, the fees that IAR pays to LPL could be less for SAM than other programs or services.  In such cases, the IAR has a financial incentive to recommend advisory services in SAM over other programs and services.  Although the IAR may factor in the fees charged to them by LPL in the overall Account Fee negotiated by the client, IAR can still earn more for offering SAM at a lower overall fee rate than the fee rate for a program offering a third-party manager.  However, an IAR may only recommend a program or service that he or she believes is suitable and in the best interests of a client in accordance with the applicable standards under the Advisers Act or other applicable law.  LPL has systems in place to review IAR-managed accounts in SAM for suitability over the course of the advisory relationship.

LPL also provides various benefits and/or payments to IARs that are newly associated with LPL to assist the IAR with the costs (including foregone revenues during account transition) associated with transitioning his or her business to LPL (collectively referred to as "Transition Assistance").  The proceeds of such Transition Assistance payments are intended to be used for a variety of purposes, including but not necessarily limited to, providing working capital to assist in funding the IAR's business, satisfying any outstanding debt owed to the IAR's prior firm, offsetting account transfer fees (ACATs) as a result of the IAR's clients transitioning to LPL's custodial platform, technology set-up fees, marketing and mailing costs, stationary and licensure transfer fees, moving expenses, office space expenses, staffing support and termination fees associated with moving accounts.

The amount of the Transition Assistance payments is often significant in relation to the overall revenue earned or compensation received by the IAR at his or her prior firm.  Such payments are generally based on the size of the IAR's business established at his or her prior firm, for example, a percentage of the revenue earned or eligible assets serviced by the IAR at the prior firm, and, in certain cases, on the amount of the IAR's client assets that are transferred to LPL above an agreed-upon threshold.  These payments are generally in the form of payments or loans to the new LPL IAR with favorable interest rate terms as permitted under applicable law, which are paid by LPL or forgiven by LPL based



Strategic Asset Management Program Brochure

on years of service with LPL (e.g., if the IAR remains with LPL for 5 years) and/or the scope of business engaged in with LPL.  LPL does not verify that any payments made are actually used for such transition costs.

In addition, existing IARs are eligible to receive financial assistance from LPL in connection with transferring existing client accounts serviced at an approved third-party investment program to an on-platform LPL advisory or brokerage account ("Operational Assistance"). These payments are typically calculated as a percentage of assets transferred to LPL up to 0.15%, but in some cases may involve a flat amount up to $350 per transferred account, and are also generally payable in the form of payments or loans to the IAR that are forgivable based on years of service with LPL. While the loans are intended to offset bona fide time and effort incurred by IARs in identifying and coordinating transfers, the loans can create an incentive for IARs to recommend that clients transfer their assets to on-platform LPL advisory and brokerage accounts.  However, an IAR may only recommend a program or service that he or she believes is suitable and in the best interests of a client in accordance with the standard of care under applicable law.

The receipt of Transition Assistance or Operational Assistance creates a conflict of interest in that an IAR has a financial incentive to recommend that a client open and maintain an account with the IAR and LPL for advisory, brokerage and/or custody services, and to recommend switching investment products or services where a client's current investment options are either not available through LPL or are maintained through a third-party investment program, in order to receive the Transition Assistance or Operational Assistance benefit or payment.  LPL and its IARs attempt to mitigate these conflicts of interest by evaluating and recommending that clients use LPL's services based on the benefits that such services provide to clients, rather than the Transition Assistance or Operational Assistance earned by any particular IAR.  However, clients should be aware of this conflict and take it into consideration in making a decision whether to establish or maintain a relationship with LPL, or to transfer an existing third-party investment program account to LPL. If LPL makes a payment or loan to a new or existing IAR, there is also a conflict of interest because LPL's interest in collecting on the payment or loan affects its ability to objectively supervise the IAR.

### Ownership Interest in Doing-Business-As ("DBA") Entities

Some IARs operate through independent practices with a separate Doing-Business-As (or "DBA") designation. In some cases, LPL may partially or wholly own such practices, and have a financial interest in the business success of the DBA as a whole, or in a particular element of the DBA via specific ownership interests in its brokerage, advisory, insurance, or other financial services business (or any combination thereof). Clients should ask their IAR about the extent to which LPL has a financial interest in their practice.

### Unaffiliated Financial Institutions

LPL and its IARs offer advisory services on the premises of unaffiliated financial institutions, like banks or credit unions. When services are offered in a bank or credit union, the advisory services are offered by LPL and not the financial institution. Any securities recommended as part of the investment advice are not guaranteed by the financial institution, or insured by the Federal Deposit Insurance Corporation or any other federal or state deposit guarantee fund relating to financial institutions.

LPL has entered into agreements with the financial institutions pursuant to which LPL typically shares compensation, including a portion of the Account Fee, with the financial institution for the use of the financial institution's facilities and for client referrals. Instead of paying the IAR the portion of the Account Fee as described above, LPL shares the Account Fee with the financial institution, and the financial institution pays part of that amount to the IAR.  The financial institution establishes the compensation plan for the IAR, which is subject to approval by LPL. The compensation plan determines how the IAR's compensation is structured. IAR will have a financial incentive to recommend a particular service or product if under the compensation plan the recommended product will result in more compensation to the IAR than another product or service, including advisory versus brokerage services.  If an IAR is recommending an advisory program or service, he or she must believe that the program or service is suitable and in the best interests of the client in accordance with the applicable standards under the Advisers Act. In a few situations, LPL has agreements to provide similar services at financial institutions in which compensation is not shared with the financial institution.



Strategic Asset Management Program Brochure

If IAR is an employee of the financial institution where it provides services to program accounts, LPL typically shares with the financial institution between 75% to 100% of the Account Fee, after LPL retains its portion of the Account Fee for its administrative services. IAR (an employee of the financial institution) will be compensated (e.g. in the form of salary, bonus, commissions, etc.) by the financial institution based on the specific agreement and/or compensation between the financial institution and the IAR. If IAR is not an employee of the financial institution where it provides services to program accounts, LPL typically shares directly with IAR, after deduction of LPL's portion, between 25% to 100% of the Account Fee, and with the financial institution between 0% to 75%. All compensation paid to IAR or the financial institution will be the sole responsibility of LPL, and will not result in any increase in the Account Fees you pay to LPL.

Some of these financial institutions are affiliated with investment product sponsors (such as mutual fund sponsors) or offer certificates of deposit. An IAR located on the premises of a financial institution has a potential conflict of interest when IAR encourages clients to invest in that financial institution's certificates of deposit or proprietary investment products, such as mutual funds and structured products. If your IAR is an employee of and/or provides services on the premises of one of these financial institutions, the financial institution has a financial incentive for its IAR to select the financial institution's affiliated investment products or certificates of deposit over non-affiliated products. When an affiliated investment product is selected for an account, the financial institution receives a portion of the Account Fee pursuant to the agreement between LPL and the financial institution and its affiliate receives fees or other benefits from the affiliated investment product. Because affiliates of the financial institution earn fees and other benefits from the affiliated products, the financial institution has an incentive to select its affiliated product based on the compensation and benefits its affiliates receive rather than on a client's needs. In addition, because mutual funds benefit from scale, the financial institution and its affiliated companies have an interest in the mutual funds gaining greater assets.

Certain financial institutions provide a credit in an amount equal to the mutual fund advisory and administrative services fees for affiliated investment products. We update this information from time to time on lpl.com/disclosures.html. For more information, click on "Account Disclosures, Agreements, Fee Schedules & Conflicts of Interest," and then "Third Party Compensation and Related Conflicts of Interest."

Note that the IAR does not receive additional compensation from the financial institution for selecting affiliated products and the IAR may only recommend an investment product that he or she believes is appropriate for clients. LPL reviews and selects investment products for the Program and LPL may elect to remove or replace an investment product. There is a conflict of interest because the business relationship between LPL and the financial institution could affect LPL's ability to objectively select and determine whether to continue to maintain these investment products in the Program. However, LPL only approves investment products that it determines are suitable and in the best interests of clients using the Program depending on clients' investment objective and risk tolerance.

LPL also provides other forms of compensation to financial institutions, such as bonuses, awards or other things of value offered by LPL to the institution. For example, LPL pays financial institutions based on production, in the form of repayable or forgivable loans, reimbursement of fees that LPL charges for items such as administrative services, and other things of value such as free or reduced-cost marketing materials, transition assistance for changing association from another broker-dealer or investment advisor firm to LPL, advances of advisory fees, and/or attendance at LPL's national conference or top producer forums and events. LPL can pay this compensation based on overall business production and/or on the amount of assets serviced in LPL advisory programs. Financial institutions are also eligible to receive Operational Assistance (as defined above) from LPL in order to assist with offsetting time and expense in coordinating transfers of client accounts from third party investment platforms to LPL's platform.  The compensation is typically calculated and payable to the institution as a percentage of assets transferred to LPL up to 0.15%, but in some cases may be a flat-dollar amount per transferred account with a maximum of up to $350 per account. The amount of this compensation may be more than what the financial institution would receive if the client participated in other LPL programs, programs of other investment advisors or paid separately for investment advice, brokerage and other client services. As a result, the financial institution and IAR have a financial incentive for the IAR to recommend the program account and services that will result in the greatest compensation to the financial institution and IAR. If LPL makes a loan to a new or existing financial institution, there is also a conflict of interest



Strategic Asset Management Program Brochure

because LPL's interest in collecting on the loan affects its ability to objectively supervise an IAR at that financial institution.

In addition, financial institution employees who are not associated with LPL often refer prospective customers to IARs working in the financial institutions. Those employees frequently receive a nominal referral fee from the financial institution (typically up to $25) as compensation for each referral.

Employees of trust departments at certain financial institutions are authorized under the terms of applicable trust arrangements to delegate investment management responsibility to LPL and to receive a portion of the compensation earned in connection with investment advisory services provided to these accounts through LPL. These amounts are negotiated and vary but often amount to a significant portion of the total fees paid for investment advisory services.

## Item 15: Custody

LPL is a qualified custodian as defined in Rule 206(4)-2 under the Advisers Act and maintains custody of Program client funds and securities in a separate account for each client under the client's name. LPL as a qualified custodian sends account statements showing all transactions, positions, and all deposits and withdrawals of principal and income. LPL sends account statements periodically when the account has had activity or quarterly if there has been no activity. Clients should carefully review those account statements.

Although most securities available in Program accounts are custodied at LPL, there are certain securities managed as part of the account that are held at third parties, and not at LPL. For example, variable annuities, hedge funds and managed futures are often held directly with the investment sponsor. For those outside positions, client will receive confirmations and statements directly from the investment sponsor.

For outside positions not custodied at LPL, LPL may receive information (e.g., number of shares held and market value) from the investment sponsor and display that information on statements and reports prepared by LPL. Such information also may be used to calculate performance in performance reports prepared by LPL. Although LPL believes that the information it receives from the investment sponsors is reliable, LPL recommends that you refer to the statements and reports you receive directly from the investment sponsor and compare them with the information provided in any statements or reports from LPL. The statements and reports you receive from LPL with respect to outside positions should not replace the statements and reports you receive directly from the investment sponsor.

## Item 16: Investment Discretion

In the Program, the IAR provides advisory services on a discretionary basis for the purchase and sale of mutual funds, UITs, closed-end funds, ETFs, and variable annuity subaccounts. The IAR provides advisory services on a non-discretionary basis for all other types of securities approved by LPL for investment in the account. In some cases, the client may provide discretionary authorization to the IAR to trade various other securities, including equities and fixed income securities. Alternatively, the client may elect that the IAR manage the account on a non-discretionary basis, so that the client directs the purchase and sale of securities in the account. The client authorizes the IAR to have discretion by executing the Account Agreement and Application.

## Item 17: Voting Client Securities

In the Program, LPL and IARs do not accept authority to vote client securities. Clients retain the right to vote all proxies that are solicited for securities held in the account. Clients will receive proxies or other solicitations from LPL. When LPL delivers mutual fund shareholder reports and proxies to clients, LPL is reimbursed by the mutual fund for the delivery costs. The maximum fee that can be charged for delivery is set by New York Stock Exchange (NYSE) rules. If LPL uses a vendor to perform the delivery, the vendor seeks reimbursement from the mutual fund on LPL's behalf and in certain cases remits a portion of the reimbursement to LPL. If clients have questions regarding the solicitation, they should contact the contact person that the issuer identifies in the proxy materials or their IAR.



Strategic Asset Management Program Brochure

In addition, LPL and IARs do not accept authority to take action with respect to legal proceedings relating to securities held in the account.

## Item 18: Financial Information

LPL is a qualified custodian as defined in Rule 206(4)-2 under the Advisers Act and is therefore not required to include a balance sheet for its most recent financial fiscal year. LPL is not aware of any financial condition that is reasonably likely to impair its ability to meet its contractual commitments to clients, nor has it been the subject of a bankruptcy petition at any time during the past ten years.

### Brochure Supplements

Accompanying this Brochure are Brochure Supplements for individual employees or officers of LPL. Note that although these individuals are responsible for investment advice provided by LPL and may meet with clients from time to time, they are not the IARs responsible for the ongoing individualized investment advice provided to a particular client. For more information about the IAR managing the account, client should refer to the Brochure Supplement for the IAR, which should have been provided by the IAR along with this Brochure at the time client opened the account. If client did not receive a Brochure Supplement for the IAR, the client should contact the IAR or LPL at lplfinancial.adv@lplfinancial.com.



 LPL Financial

# Brochure Supplements

**March 31, 2025**

| | | |
|---|---|---|
| **Marc Andrew Zabicki** | **Adam Turnquist** | 1055 LPL Way |
| **Garrett Fish** | **Lawrence Dean Gillum** | Fort Mill, SC 29715 |
| **Jason Hoody** | **Jina Yoon** | (704) 733-3300 |
| **Kristian Kerr** | **Thomas Shipp** | www.lpl.com |
| **Jeffrey Roach** | **Craig Brown** | |
| | **Scott Froidl** | |

| | |
|---|---|
| **Jeffrey Alan Buchbinder** | 201 Washington Street |
| | Suite 300 |
| | Boston, MA 02108 |
| | (617) 423-3644 |

| | |
|---|---|
| **George Smith** | 4707 Executive Drive |
| | San Diego, CA 92121 |
| | (858) 450-9606 |

These Brochure Supplements provide information about certain LPL employees or officers that supplements the LPL Financial Brochure that is attached to these Brochure Supplements. Please contact LPL Financial at the number above if you did not receive the LPL Financial Brochure or if you have any questions about the contents of these Brochure Supplements. You may also contact your LPL investment advisor representative with questions. Additional information about these LPL employees or officers is available on the SEC's website at https://adviserinfo.sec.gov/.

Note that although these LPL employees or officers included in these Brochure Supplements are responsible for investment advice provided by LPL they are not the IARs responsible for the ongoing individualized investment advice provided to a particular client. For more information about the IAR managing the account, client should refer to the Brochure Supplement for the IAR, which should have been provided by the IAR along with the LPL Financial Brochure and these Brochure Supplements at the time client opened the account. If client did not receive a Brochure Supplement for the IAR, the client should contact the IAR or LPL at lplfinancial.adv@lplfinancial.com.



Brochure Supplements

---

## Marc Andrew Zabicki

**Educational Background and Business Experience**

Marc Zabicki was born in 1966. He has a BS in Economics from Florida State University and he is a Chartered Financial Analyst (CFA). He is Chief Investment Officer and the Director of Research for LPL Research and has been with the firm since 2020. Prior to joining LPL, he was Chief Investment Officer at Bower Hill Capital Management.

**Disciplinary Information**

None.

**Other Business Activities**

Mr. Zabicki is a registered representative of LPL. However, he does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Mr. Zabicki receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Zabicki is responsible for the advice provided by the LPL Research Department through LPL's advisory programs, and he reports to Rob Pettman, Executive Vice President. The advice provided by Mr. Zabicki is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The Chief Compliance Officer ("CCO"), Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.

## Garrett Fish

**Educational Background and Business Experience**

Garrett Fish was born in 1969. He has a BA in Japanese History from Bates College and is a CFA Charterholder. He is a Senior Vice President and Head of Model Portfolio Management at LPL and joined LPL in 2022. Prior to joining LPL, Mr. Fish was a Portfolio Manager at JPMorgan Asset Management.

**Disciplinary Information**

None.

**Other Business Activities**

Mr. Fish is a registered representative of LPL. However, he does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Mr. Fish receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Fish reports to Mr. Zabicki, Chief Investment Officer and the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Mr. Fish is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.



Brochure Supplements

---

## Jason Hoody

**Educational Background and Business Experience**

Jason Hoody was born in 1975. He has a BS in Political Science from Clarkson University, an MA in International Affairs from American University, an MS in Finance from Johns Hopkins University, and is a CFA Charterholder. He is a Senior Vice President in Research at LPL and joined LPL in 2015. Prior to joining LPL, he was a Vice President at BB&T and an analyst at KPMG.

**Disciplinary Information**

None.

**Other Business Activities**

None.

**Additional Compensation**

Mr. Hoody receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Hoody reports to Mr. Zabicki, Chief Investment Officer and the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Mr. Hoody is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.

## Kristian Kerr

**Educational Background and Business Experience**

Kristian Kerr was born in 1977. He has a BBA in International Business from Schiller International University in Madrid, Spain. He is a Senior Vice President and the Head of Macro Strategy at LPL and joined LPL in 2023. Prior to joining LPL, Mr. Kerr worked at Citi Private Bank as the Western Region Head of Foreign Exchange & Macro.

**Disciplinary Information**

None.

**Other Business Activities**

Mr. Kerr does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Mr. Kerr receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Kerr reports to Mr. Zabicki, the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Mr. Kerr is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.



Brochure Supplements

---

## Jeffrey Roach

**Educational Background and Business Experience**

Jeffrey Roach was born in 1973. He has a BS in Mathematics from Bob Jones University and a MA and PhD in Economics from Clemson University. He is Chief Economist at LPL and joined LPL in 2022. Prior to joining LPL, Dr. Roach was Senior US Economist for Visa Inc, Managing Director, Economist at MacroView Partners and Chief Economist at Horizon Investments.

**Disciplinary Information**

None.

**Other Business Activities**

Dr. Roach is a registered representative of LPL. However, he does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Dr. Roach receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Dr. Roach reports to Mr. Zabicki, Chief Investment Officer and the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Dr. Roach is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.

## Adam Turnquist

**Educational Background and Business Experience**

Adam Turnquist was born in 1984. He has a BS from the University of Minnesota-Duluth and an MBA from the University of St. Thomas. He is Chief Technical Strategist and joined LPL in 2022. Prior to joining LPL, Mr. Turnquist worked as a Vice President, Technical Research Analyst at Piper Sandler.

**Disciplinary Information**

None.

**Other Business Activities**

Mr. Turnquist is a registered representative of LPL. However, he does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Mr. Turnquist receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Turnquist reports up to Mr. Zabicki, Chief Investment Officer and the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Mr. Turnquist is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.



Brochure Supplements

---

## Lawrence Dean Gillum

**Educational Background and Business Experience**

Lawrence Gillum was born in 1974. He has a BS from University of Florida and a Master in Business Administration from the University of North Carolina, Keenan Flagler Business School. He is a Vice President of Research at LPL and joined LPL in 2021. Prior to joining LPL, Mr. Gillum served as a Director at Raymond James where he oversaw fixed income research within the firm's discretionary model platform.

**Disciplinary Information**

None.

**Other Business Activities**

Mr. Gillum is a registered representative of LPL. However, he does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Mr. Gillum receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Gillum reports up to Mr. Zabicki, Chief Investment Officer and the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Mr. Gillum is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.

## Jina Yoon

**Educational Background and Business Experience**

Jina Yoon was born in 1983. She has a BS and MEng from Cornell University. She is Chief Alternate Investment Strategist at LPL and joined LPL in 2023. Prior to joining LPL, Ms. Yoon was the Head of Portfolio Management & Senior Portfolio Manager at Nomura Private Capital. Prior to Nomura, she served both Institutional and Private Wealth Clients as the Head of Tactical Strategies at Credit Suisse.

**Disciplinary Information**

None.

**Other Business Activities**

Ms. Yoon does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Ms. Yoon receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Ms. Yoon reports up to Mr. Zabicki, the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Ms. Yoon is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.



Brochure Supplements

---

## Thomas Shipp

**Educational Background and Business Experience**

Thomas Shipp was born in 1984. He has a BS in Business Administration from Fordham University and is a CFA Charterholder. He is a Vice President and Head of Equity Research at LPL and joined LPL in 2017. Prior to joining LPL, Mr. Shipp was an Associate in the Equity Research Department at BMO Capital Markets.

**Disciplinary Information**

None.

**Other Business Activities**

Mr. Shipp is a registered representative of LPL. However, he does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Mr. Shipp receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Shipp reports to Mr. Zabicki, the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Mr. Shipp is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.

## Craig Brown

**Educational Background and Business Experience**

Craig Brown was born in 1988 He has a dual BS in Economics and Information Analysis from James Madison University and a MAIS in Computational Social Science from George Mason University. He is a Vice President and Head of Quant Strategy at LPL and joined LPL in 2021. Prior to joining LPL, Mr. Brown was a Senior Associate in Investment Analytics and Data at Dimensional Fund Advisors.

**Disciplinary Information**

None.

**Other Business Activities**

Mr. Brown does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Mr. Brown receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Brown reports to Mr. Zabicki, the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Mr. Brown is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.



Brochure Supplements

---

## Scott Froidl

**Educational Background and Business Experience**

Scott Froidl was born in 1971. He has a BS from Lindenwood University. He is an Assistant Vice President Senior Investment Analyst at LPL and joined LPL in 2021. Prior to joining LPL, Mr. Froidl was a Senior Investment Analyst at Wells Fargo from 2018 until 2021 and Senior Investment Analyst at Stifel in 2018 while starting with the firm in 2001.

**Disciplinary Information**

None.

**Other Business Activities**

Mr. Froidl is a registered representative of LPL. However, he does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Mr. Froidl receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Froidl reports to Mr. Zabicki, the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Mr. Froidl is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.

## Jeffrey Alan Buchbinder

**Educational Background and Business Experience**

Jeffrey Alan Buchbinder was born in 1971. He has a BA in Economics from Northwestern University and an MBA from Duke University. He is Chief Equity Strategist and Portfolio Manager for LPL Financial Research and has been with the firm since 2003. Prior to joining LPL, he served as an Equity Research Associate at Sanford C. Bernstein. Prior to Bernstein, he was an Equity Research Associate at Deutsche Bank.

**Disciplinary Information**

None.

**Other Business Activities**

Mr. Buchbinder is a registered representative of LPL. However, he does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Mr. Buchbinder receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Buchbinder reports up to Mr. Zabicki, Chief Investment Officer and the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Mr. Buchbinder is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.



Brochure Supplements
___

# George Smith

**Educational Background and Business Experience**

George Smith was born in 1983. He has a BS in Mathematics from the University of Bristol in the United Kingdom (UK). He is Portfolio Strategist at LPL and joined LPL in 2013. Prior to joining LPL, Mr. Smith worked in London, UK for Legal and General Investment Management (LGIM) and Goldman Sachs Asset Management (GSAM).

**Disciplinary Information**

None.

**Other Business Activities**

Mr. Smith is a registered representative of LPL. However, he does not engage in the sale of securities or receive commissions or other compensation based on the sale of securities or other investment products.

**Additional Compensation**

Mr. Smith receives a regular salary and a discretionary bonus. Since the bonus for LPL Research personnel is based on the performance of certain portfolios managed by LPL Research, it presents a conflict of interest because it could incentivize the LPL Research team to focus on short-term performance, take undue risk, or favor certain portfolios over others. LPL mitigates this conflict by basing the bonus calculation on short and long-term performance, capping the amount of compensation paid regardless of the return, and tying a portion of the compensation to the outperformance of all LPL managed portfolios.

**Supervision**

Mr. Smith reports up to Mr. Zabicki, the Director of Research of LPL, who is responsible for the advice provided by the LPL Research Department through LPL's advisory programs. The advice provided by Mr. Smith is subject to LPL's policies and procedures and to any guidelines established for the applicable advisory program. The CCO, Advisory Compliance is responsible for administering LPL's policies and procedures for investment advisory activities. The Advisory Compliance Department can be reached at (800) 877-7210.

